# pwc

31 August 2015

*Strictly private
and confidential*

# Omagine LLC
## Accounting for a usufruct right

## Important notice

This report has been prepared solely for the purpose of considering the appropriate accounting treatment of a usufruct and other rights (the "Project Rights") obtained by Omagine LLC ("Omagine", or the "Company") in connection with the development and the operation of an integrated residential and tourism complex (the "Project") by the Company in the Sultanate of Oman ("Oman"), under the International Financial Reporting Standards framework ("IFRS").

Our work has been performed and the paper prepared in accordance with the terms of our engagement letter dated 24 June 2015. It is intended solely for your use and should not be relied upon by any other person.

A copy of this report may be made available in its entirety to Omagine's legal and other professional advisors provided it is made clear to such recipients that we accept no responsibility to them in respect thereof (whether in contract, tort (including negligence), or otherwise). This report must not be made available or copied in whole or in part to any other person without PwC's express written permission.

We draw your attention to additional matters in relation to the scope of our engagement which are set out in Appendix 1.

This report has been prepared based on the facts and circumstances discussed with Omagine's management. We highlight that our accounting comments herein could be impacted by changes in these facts and circumstances.

If you require any clarification or further information, please do not hesitate to contact Blaise Jenner on +971 4 3043 067 or Habib Souffane Hamdani on +971 4 3043 512.

Strictly private and confidential

# Contents

| | | |
|---|---|---|
| 1 | Executive summary | 4 |
| 2 | Background and scope | 6 |
| 3 | Key assumptions and scope exclusions | 9 |
| 4 | **Accounting analysis** | 10 |
| 4.1 | Considering the nature of the contribution to the Company | 11 |
| 4.2 | Accounting treatment for the shares issued to RCA (the Credit Entry) | 13 |
| 4.3 | Accounting treatment for the Project Rights (the Debit Entry) | 14 |
| | **Appendices** | 21 |
| 1 | Scope & process: supplementary information | 22 |
| | **Glossary** | 23 |

> **To navigate this report on-screen (in pdf format)**
>
> From any page – click on the section title in the header navigation bar
>
> From this Contents page – click on the title of the section or sub-section
>
> From the contents listing on any section divider – click on the title of the sub-section

# Executive summary (1 of 2)

## Key areas of analysis

- This paper considers the following key questions:

*What is the nature of the contribution that has been provided to the Company?*

- The rights granted to the Company under both the UA and the DA should be considered collectively – being the "Project Rights".
- The Project Rights have been contributed by His Majesty (through RCA) to the Company. As outlined in Section 3 "Key assumptions and scope exclusions", it is assumed that in doing so, His Majesty is acting in his personal capacity – i.e. the Project Rights have not been provided through a grant from the Government of Oman.

*What is the accounting treatment by the Company for the shares issued to RCA (the accounting "Credit Entry") in exchange for the Project Rights?*

- The Arrangement appears to meet the definition of an IFRS 2 equity-settled share-based payment transaction, on the basis that the Company will issue shares to RCA in exchange for the provision by RCA of the Project Rights to the Company.
- Accordingly, the Company shall measure the Project Rights at fair value and recognise a direct corresponding increase in equity – i.e. with no income statement impact. IFRS does not prescribe to which lines in equity any such increase should be recorded, but subject to legal confirmation, we would expect the increase in equity to be composed of (i) an increase of share capital for the nominal value of the shares issued and (ii) an increase in share premium/ other reserve for the difference between the fair value of the Project Rights and the nominal value of the shares issued, recorded under (i) above.

## Background

- Omagine has been provided with the Project Rights in relation to the Project. These rights have been provided through a usufruct agreement (the "UA") and a development agreement (the "DA").
- These Project Rights has been provided to Omagine in exchange for the issuance of shares in the Company to the Office of Royal Court Affairs ("RCA"), who manages the personal assets of His Majesty Sultan Qaboos bin Said, the ruler of Oman ("His Majesty") (the "Arrangement").

## Key management assumptions

- Given the current early stage of the Project, there will invariably be an element of risk attached to the ultimate viability of the Project. This accounting analysis has been based on a number of key assumptions provided by management, as outlined in Section 3, that we have not verified. Two such key assumptions include management's view that the Project is commercially and financially viable and that fair value of the Project Right is OMR 277m.
- **To the extent these assumptions are not valid, then the accounting treatment outlined in this paper shall no longer apply and will be require to be revisited. We note any such change in assumptions could restrict the ability of the Company to recognise an asset, or impact the amount at which any asset is recorded.**

# Executive summary (2 of 2)

## Key areas of analysis

*What is the accounting treatment by the Company for the Project Rights (the accounting "Debit Entry")?*

- This paper considers the Project Rights held by the Company over the following two areas:

  i. **Right to Sell Area** (as referred to in this paper) – relating to rights over areas that can be developed as residential and commercial property and then either sold on a piecemeal basis as free hold title or leased to third parties; and

  ii. Rights over remaining areas, referred to in this paper as the **Infrastructure Area**. These rights include the building of general infrastructure, landscaping, roads, marina, etc. The Project Rights do not enable the individual components of this infrastructure to be sold on a piecemeal basis.

*Treatment of the Right to Sell Area*

- The Right to Sell Area meets the definition of an asset to be recorded at its fair value (assumed to be OMR 277m) in the Company's balance sheet.
- Management should consider which asset categorisation most appropriately represents the current status and intention of relevant portions of the Right to Sell Area. Accordingly, different asset categorisation may be appropriate for different segments of the Right to Sell Area.
- In Section 4.3, we outline the key criteria for the potential alternative day one asset categorisations of the Right to Sell Area.

*Treatment of the Infrastructure Area*

- The Project Rights appear to provide the Company with a right of use over the Infrastructure Area – this would suggest the existence of a lease in respect of the Infrastructure Area.
- Given land has an indefinite useful life, it is in practice uncommon that a lease over a plot of land would result in being classified as a finance lease. Accordingly this would suggest that the Project Rights over the Infrastructure Area represent an operating lease.
- Under operating lease principles of IAS 17, the Company shall recognise an annual lease payment as an income statement expense. This lease payment shall effectively relate to a portion of the annual usufruct fee that relates to the Infrastructure Area.

# Background and scope (1 of 3)

## Background

- Omagine was initially incorporated by Omagine Inc. and its wholly owned subsidiary Journey of Light Inc. (together "OMAG") for the purposes of developing, owning and operating the Project in Oman.

- The Project is an integrated residential and touristic project and will entail the construction of residential units (villas and apartments), retail space and a retail mall, hotels, services chalets and apartments, office space, and additional ancillary items.

- On 20 April 2011, the Company entered into a shareholders agreement (the "Shareholders Agreement") with OMAG and new investors in order to achieve its desired capitalisation level, whereby it was agreed that the following steps shall be undertaken:

  i.   A first and second cash capital increases through the issuance of new shares to OMAG, RCA, Consolidated Contractors Co. Oman LLC and Consolidated Contractors Company S.A (which shall act as the construction company for the Project, together "CCC"). These two capital increases shall be undertaken at the nominal value of OMR 0.1 per share. We understand this Step is already completed.

  ii.  A third cash capital increase through the issuance of new shares solely to RCA and CCC, at a value of OMR 36.17 per share; and

  iii. A fourth capital increase, through the issuance of shares solely to RCA, against the contribution in kind by RCA, via the Government of the Sultanate of Oman (the "Government"), of the Project Rights over a 1 million square meters plot of land ("the "Land").

- The table on the next page summarises the number of shares and value for each share capital increase.

- In relation to the fourth capital increase under (iii), we understand that:

  - RCA has first transferred the Land to the Government, represented by the Ministry of Tourism, in order to facilitate the contribution of the Usufruct Right to the Company;

  - The Company shall, in accordance with the requirements of the Shareholders Agreement, sign with the Government (i) a development agreement (the "DA"), which shall set the framework for the Company to develop the Project and (ii) a usufruct agreement (the "UA"), which shall form part of the DA and grant to the Company the usufruct right over the Land. The DA was signed on 2 October 2014 and the UA was signed on 1 July 2015 and registered on 2 July 2015; and

  - The fourth capital increase is completed, whereas the third capital increase shall be undertaken afterwards.

- The intended target group structure after all four of the share capital increases is outlined below.



# Background and scope (2 of 3)

## Summary of the number of Omagine shares and their value under each capital increase

| | Number of OMAG shares | Number of RCA shares | Number of CCC shares | Total Number of shares | Cash subscription OMR | Observations |
|---|---|---|---|---|---|---|
| Opening position | 200,000 | - | - | 200,000 | 20,000 | In accordance with the Shareholders Agreement, these cash subscriptions have been undertaken at the nominal value of OMR 0.1 per share. |
| 1st capital increase – cash | 700,000 | 375,000 | 225,000 | 1,300,000 | 130,000 | |
| 2nd capital increase – cash | 2,100,000 | - | - | 2,100,000 | 210,000 | |
| **Sub-total I** | **3,000,000** **83.3%** | **375,000** **10.4%** | **225,000** **6.3%** | **3,600,000** **100.0%** | **360,000** | |
| 3rd capital increase – cash | - | 211,250 | 525,000 | 736,250 | 26,628,125 | In accordance with the Shareholders Agreement, this cash subscription shall be undertaken at a value of OMR 36.2 per share. |
| **Sub-total II** | **3,000,000** **69.2%** | **586,250** **13.5%** | **750,000** **17.3%** | **4,336,250** **100.0%** | **26,988,125** | |
| 4th capital increase – In kind contribution of the Usufruct Right | - | 663,750 | - | 663,750 | - | The Shareholders Agreement does not provide any value for this subscription, but states that it shall be based on an independent valuation. Management has assumed a value of the Usufruct Right of OMR 27m based on external valuation exercises undertaken. |
| **Closing position** | **3,000,000** **60.0%** | **1,250,000** **25.0%** | **750,000** **15.0%** | **5,000,000** **100.0%** | **26,988,125** | |

Note: the number of shares attributed to each shareholder under the various share capital increases has been determined and agreed by the shareholders to achieve a target shareholding structure based on the implied value of each shareholder's contribution.

PwC
Omagine LLC
Strictly private and confidential
31 August 2016
7

2 Background and scope
Contents | Appendices | Glossary

# Background and scope (3 of 3)

## Your objectives

- You are seeking to understand the basis of accounting for the contribution of the Usufruct Right in the financial statements of the Company under the IFRS framework.

- The paper consider the following key accounting questions:

  - Section 4.1: Considering the nature of the contribution to the Company;

  - Section 4.2: Accounting treatment for the shares issued to RCA (the accounting Credit Entry); and

  - Section 4.3: Accounting treatment for the Project Rights (the accounting Debit Entry).

## Key terms of the DA

- The DA provides the Company, subject to certain terms and conditions, with a wide range of rights in relation to the Project (the "Project Rights"), including:

  - A usufruct right over the Land for a period of 50 years renewable subject to written agreement between the parties, in exchange, the Company shall pay an annual usufruct fee (the "Usufruct Fee") to the Government. It is provided that the DA shall be separately entered into (which shall be subordinated to the DA in case of discrepancy between the two);

  - The right to develop the Land for the purposes of the Project;

  - The right to grant licences to third parties to undertake commercial activities within the Project;

  - The right to lease or utilise any part of the Land and the right to sell as a freehold title any developed part of the Land, provided that the coverage of the development shall not exceed 30% of the Land, of which a maximum 50% of the development shall be for non-tourism purposes and the balance of the development shall be for tourism purposes (this being the "Right to Sell Area"); and

  - The right to levy fees to third parties who have been granted certain rights in relation to the Project.

- The Company shall make a one off payment to the Ministry of Housing an amount of OMR 25 per square meter (increased by 6% annually) for each freehold title sold to a third party.

# Key assumptions and scope exclusions

## Key assumptions

Given the current early stage of the Project there will invariably be an element of risk attached to the ultimate viability of the Project. This accounting analysis has been based on the below assumptions that have been provided by management. To the extent the below assumptions/management judgments are not valid then the accounting treatment outlined in this paper shall no longer apply and will require to be revisited. We note any such change in assumptions could restrict the ability of the Company to recognise an asset, or the amount at which any asset is recorded.

Based on the various feasibility studies undertaken for the Project, management is of the view that the Project:

i. is technical, commercially and financially viable; and

ii. will generate economic benefits for the Company.

Management have determined that the fair value of the Project Rights is OMR 277m, based on three external independent valuations performed by DTZ, JLL and Savills. We understand these valuations have applied a residual value to the Project Rights. This approach considers the market value of the Project Rights from a market participant's perspective, and relies on assumptions made regarding the different variables of costs, revenues, finance, timeframe and risk. As noted opposite we have not reviewed the appropriateness of these valuation approaches, methodologies or calculations.

- RCA manages the personal assets of His Majesty and does not act on behalf of the Government. The Land was previously owned by His Majesty, who transferred it to the Ministry of Tourism of Oman to facilitate the contribution of the Project Rights by RCA to the Company, and on condition that the Land be used for the development of the Project. On this basis, the contribution of the Project Rights to the Company does not have the substance of a government grant.

## Scope exclusions

- This paper does not consider the tax, legal, and regulatory implications of the Project. We would recommend you separately confirm any such tax, legal, and regulatory requirements or implications of the Project.

- Any review or commentary on the external valuations undertaken in relation to the Project Rights is outside the scope of this engagement. As noted opposite, this paper assumes the Usufruct fair value of OMR 277m provided by management.

- Our accounting analysis was based on the following key documents and subsequent discussions with management to confirm our understanding in a number of areas:

  i. The Development Agreement entitled "Omagine DA_Final_v.61_add date" and dated 2 October 2014;

  ii. The Usufruct Agreement entitled "Usufruct Agreement Registration with MOH" dated 2 July 2015; and

  iii. The executed version of the Shareholders Agreement entitled "SHA_April 20_2011_Executed" and dated 20 April 2011.

3 Key assumptions and scope exclusions

Contents | Appendices | Glossary

Omagine LLC
PwC

Strictly private and confidential

31 August 2015
9

# Accounting analysis

# Considering the nature of the contribution to the Company (1 of 2)

**Purpose of this section**

- Given the key rights and obligations for the Project are effectively spread across various agreements, it is necessary to consider the following questions:

  1) Should the rights granted by the UA and the other rights granted by the DA be considered together?

  2) Have the relevant rights considered under (1) above been contributed by His Majesty in his personal capacity or by the Government?

**1) Should the rights granted by the UA and the other rights granted by the DA be considered together?**

- As outlined in Section 2, a number of rights have been granted to the Company through two separate agreements, the UA and the DA.

- With this regard, we note the following:

  - The UA is an integral part of the DA. In case of conflict between the UA and the DA, the DA shall prevail;

  - The UA and the DA are both entered into by the same parties;

  - The UA and the DA both relate to the same project and were entered into in contemplation of each other; and

  - The UA does not appear to include extensive details about the rights provided under the UA (the usufruct rights are not defined in the UA) whereas the DA provides a comprehensive (and non limitative) list of rights granted to the Company under the DA.

- We also understand from management:

  - At no point during the discussions and negotiations between the Company and KOA or the Government was there two separate sets of rights being discussed. All the rights associated with the Land were always discussed and considered together;

  - The only reason why the Company entered into two separate agreements with the Government in relation to the rights associated with the Land (being the UA and the DA) is to comply with procedural and administrative requirements associated with the registration of these contracts within the relevant authorities, as opposed to being driven by commercial reasons.

**Based on the above, it appears that the rights granted to the Company under both the UA and the DA should be considered together for the purposes of assessing their accounting treatment. These rights are referred to as the Project Rights in this paper.**

Omagine LLC
PwC

Strictly private and confidential

31 August 2015

11

4.1 Considering the nature of the contribution to the Company

Contents | Appendices | Glossary

# Considering the nature of the contribution to the Company (2 of 2)

**2) Have the Project Rights been contributed by His Majesty in his personal capacity or by the Government of Oman?**

- As previously noted, the Project Rights are granted to the Company through an agreement signed between the Company and the Government, whereas we understand the substance is that these Project rights have been contributed by His Majesty in his personal capacity through RCA. As noted under the key assumptions, RCA manages the personal assets of His Majesty and does not act on behalf of the Government.

- As outlined in Section 2, we understand that:
  - The Land was originally owned by RCA;
  - RCA has first transferred the Land to the Government, represented by the Ministry of Tourism, in order to facilitate the contribution of the Project Rights to the Company.

- The above appears to be aligned with the following clause included in the Shareholders Agreement (as part of Exhibit D: RCA Subscription Agreement)."; *"9. The Company hereby acknowledges and agrees that the Existing Land is being provided by RCA to the Company via an agreement with the Government (the "Usufruct Agreement") which grants the Company extensive rights over the Existing Land.*

- *The Company further acknowledges and agrees that the grant of the Usufruct Rights to the Company is a payment-in-kind by RCA to the Company."*

- On the above basis, it appears that the Projects Rights, albeit granted to the Company through the execution of agreements with the Government, constitute in substance a contribution by RCA against the issuance of shares by the Company to RCA.

**Based on the above it appears that the Project Rights (being a combination of the rights granted to the Company through both the UA and the DA) have been contributed by His Majesty (through RCA) in his personal capacity to the Company.**

- The accounting analysis undertaken in the following sections is based on this assumption.

# Accounting treatment for the shares issued to RCA (the accounting Credit Entry)

## Purpose of sections 4.2 and 4.3

- In order to determine the appropriate accounting treatment for the contribution by RCA of the Project Rights to the Company, it will be necessary to consider the following two questions:

  1) What is the accounting treatment for the shares issued to RCA (the accounting "Credit Entry")?

  2) What is the accounting treatment for the Project Rights (the accounting "Debit Entry")?

- This Section 4.2 considers question (1) above, whereas Section 4.3 considers question (2).

- In order to determine the accounting treatment for the Credit Entry, it would be key to determine whether or not the Arrangement falls within the scope of IFRS 2: "Share-based Payment".

## Does the Arrangement fall into the scope of IFRS 2?

- The Arrangement appears to meet the definition of an equity-settled share-based payment transaction as defined under IFRS 2 para 2, on the basis that the Company will issue shares to RCA in exchange for the provision by RCA of the Project Rights to the Company.

- We note there are specific scope exclusions for the application of IFRS, outlined in IFRS 2 para 5, which do not appear to be relevant for the Arrangement.

## Key accounting implications of the Arrangement being within the scope of IFRS 2

- **In accordance with IFRS 2 para 10, the Company shall measure the Project Rights at fair value and recognise a direct corresponding increase in equity – i.e. with no income statement impact.**

- As previously noted this paper assumes:

  i. the fair value of the Project Rights provided by the Company can be reliably measured – as evidenced by third party valuation reports undertaken; and

  ii. the fair value of the Project Rights can be reliably measured at OMR 277m.

*Interaction between IFRS and Company Law*

- As outlined above, IFRS requires the Credit Entry of the Arrangement to be recorded as a direct increase in equity.

- IFRS does not provide any guidance about which elements of equity should be impacted by this accounting entry. The actual allocation is a matter of Omani law. Subject to legal confirmation, we would expect the increase in equity to be composed of the following:

  i. An increase of share capital for the nominal value of the shares issued, i.e. OMR 66,375, being 663,750 shares x OMR 0.1; and

  ii. An increase in share premium /other reserve account for the difference between the fair value of the Project Rights and the nominal value of the shares recorded under (i) above.

# Accounting treatment for the Project Rights (the accounting Debit Entry)

## (1 of 7)

**Purpose of this section**

- In order to determine the accounting treatment for the Debit Entry of the Project Rights, the following questions should be considered:
  1) Do the Project Rights meet the definition and IFRS recognition criteria of an asset?
  2) If the Project Rights do not meet the definition of an asset, how should such rights be treated?
  3) If the Project Rights meet the definition of an asset, what type of asset should be recognised in the Company's balance sheet?

**1) Do the Project Rights meet the definition of an asset?**

- The IFRS Conceptual Framework ("IFRS CF") para 4.4 defines an asset as "a resource controlled by the entity as a result of past events and from which future economic benefits are expected to flow to the entity."
- IFRS CF 4.44 requires "An asset is recognised in the balance sheet when it is probable that the future economic benefits will flow to the entity and the asset has a cost or value that can be measured reliably."
- For the Project Rights to meet the above criteria the following questions should be considered:
  a) Are the Project Rights a resource controlled by the Company as a result of past events?
  b) Is it probable that future economic benefits will flow to the Company?
  c) Can the cost/value of the Project Rights be reliably measured?

*a) Are the Project Rights a resource controlled by the Company as a result of past events?*

- The DA and the UA have been executed between the Company and the Government, which implies that the Company can legally exercise its rights under both these agreements (i.e. the Project Rights).
- Whether these Project Rights provide the Company with "control" over the Land is dependent to the nature of these Project Rights. A review of clauses 4 and 5 of the DA suggests the classification of these Project Rights into two main categories:

  i. Rights over areas that can be developed as residential and commercial property and then sold on a piecemeal basis as free hold title or leased to third parties. Such areas will include not just the building foot print, but also any grounds specifically associated with that property – i.e. a front or back yard in the case of a residential property. These areas shall be referred to as the "**Right to Sell Area**". The building footprints contained within this Right to Sell Area cannot exceed 30% of the Land; and

  ii. Rights over the rest of the area, referred to as the "**Infrastructure Area**". These rights include the building of general infrastructure, landscaping, roads, marina, etc. Unlike the Right to Sell Area, the Project Rights do not enable the freehold of individual components of this infrastructure to be sold on a piecemeal basis under the DA.

# Accounting treatment for the Project Rights (the accounting Debit Entry)

## (2 of 7)

*Do the Project Rights provide control over the Right to Sell Area?*

- The range of rights over this area, including the right to design, develop and sell freehold title to third parties appear to provide the widest possible rights to the Company.
- Whilst the Project Rights do not grant legal title to the land within the Right to Sell Area, the rights provided to the Company appear to be akin to the rights, risks and rewards that would be associated with the legal ownership of the land.
- On this basis, the Company appears to control the Right to Sell Area.

*Do the Project Rights provide control over the Infrastructure Area?*

- As described above, through the DA and UA the Company has acquired the right to design and build general infrastructure, landscaping, roads, marina, etc, on the Infrastructure Area.
- As noted above the Company does not, however, have the right to dispose of this land on a piecemeal basis at their discretion. **This would suggest that the Project Rights do not provide the Company with control over the Infrastructure Area, but with a 'right to use'. See part (2) of this section as to how such Project Rights should be treated in these circumstances.**

*b) Is it probable that future economic benefits will flow to the Company?*

- This criteria is only considered for the Right to Sell Area given the Infrastructure Area does not meet the control requirements under (1) above.

---

- This is a judgemental area given the early stage of the Project. As noted under the assumptions section (Section 3), **management believe the Project is technically feasible, financially and commercially viable and that it is probable that future economic benefits will flow to the Company for the Right to Sell Area. This is a fundamental management assumption applied in our analysis that we have not reviewed or verified.**

*c) Can the cost/value of the Project Rights be reliably measured?*

- This criteria is only considered for the Right to Sell Area given the Infrastructure Area does not meet the control requirements under (1) above.
- The Company hired external valuers to assess the value of the Project Rights contributed by RCA to the Company.

**After consideration of these external valuations, management has concluded that the fair value of the Project Rights can be reliably measured and amounts to OMR 277m. This is a fundamental management assumption that we have not reviewed or verified as part of our analysis.**

*IFRS considerations in relation to the fair value of the Project Rights.*

- As outlined above, we have not reviewed the external valuations performed for the Project Rights. We note however, that IFRS 13 does prescribe the following consideration for determining the fair value of a non cash asset:

# Accounting treatment for the Project Rights (the accounting Debit Entry) (3 of 7)

**Conclusions – whether the Project Rights meet the definition of an asset**

- Noting the above key management assumptions, it appears that:
  - **The Right to Sell Area meets the definition of an asset and shall be recorded at its fair value in the Company's balance sheet; and**
  - **The Infrastructure Area does not meet an asset recognition criteria.** The required accounting treatment for this Infrastructure Area is considered on the following page.

- As previously noted, this paper assumes that the Company generates economic benefits through a variety of sources including the piecemeal disposal of freehold interests and leases to third parties in the Right to Sell Area. On this basis it would appear appropriate to assign the entire fair value of the Project Rights of OMR 277m to the Right to Sell Area.

*IFRS considerations in relation to the fair value of the Project Rights (continued)*

- IFRS 13.27 states that "a fair value measurement of a non-financial asset takes into account a market participant's ability to generate economic benefits by using the asset in its highest and best use or by selling it to another market participant that would use the asset in its highest and best use".

- IFRS 13.28 clarifies "the highest and best use of a non-financial asset takes into account the use of the asset that is physically possible, legally permissible and financially feasible, as follows:

  (a) A use that is physically possible takes into account the physical characteristics of the asset that market participants would take into account when pricing the asset (eg the location or size of a property).

  (b) A use that is legally permissible takes into account any legal restrictions on the use of the asset that market participants would take into account when pricing the asset (eg the zoning regulations applicable to a property).

  - A use that is financially feasible takes into account whether a use of the asset that is physically possible and legally permissible generates adequate income or cash flows (taking into account the costs of converting the asset to that use) to produce an investment return that market participants would require from an investment in that asset put to that use.

- **Management shall therefore consider whether any valuation undertaken meets the above criteria.**

# Accounting treatment for the Project Rights (the accounting Debit Entry) (4 of 7)

## 2) If the Project Rights in relation to the Infrastructure Area do not meet the definition of an asset, how should such rights be treated?

- IFRIC 4 "Determining whether an Arrangement contains a Lease"" is the relevant IFRS guidance to determine whether the Project Rights in relation to the Infrastructure Area meet the definition of a lease.
- In accordance with IFRIC 4 para 6, the following conditions need to be present for the Infrastructure Area to contain a lease:
  (a) fulfilment of the arrangement is dependent on the use of a specific asset or assets; and
  (b) the arrangement conveys a right to use the asset.
- Condition (a) appears to be met given the Arrangement relates to the specific asset, being the Land.
- IFRIC 4 provides additional guidance in relation to condition (b) and states that any of the following conditions needs to be met for condition (b) to be met:
  i. The purchaser has the ability or right to operate the asset or direct others to operate the asset in a manner it determines while obtaining or controlling more than an insignificant amount of the output or other utility of the asset.
  ii. The purchaser has the ability or right to control physical access to the underlying asset while obtaining or controlling more than an insignificant amount of the output or other utility of the asset.

- The Company will need to classify this lease arrangement as either a finance lease or an operating lease in accordance with IAS 17.
- On the above basis, the Infrastructure Area appears to meet both conditions (a) and (b) and have the substance of a lease.
- The principal benefit of the Infrastructure Area will bring to the Company is to support the value of the Right to Sell Area by improving and providing the infrastructure surrounding the Right to Sell Area. The output or other utility of the Infrastructure Area would therefore be the fact that the Company can achieve the proposed proceeds for the sale/ lease of the Right to Sell Area.
- It appears conditions (i) and (ii) would be met by the Company if it can demonstrate that it have the ability to direct the use of the Infrastructure Area and will obtain or control more than an insignificant amount of the output or other utility of the asset.
  iii. Facts and circumstances indicate that it is remote that one or more parties other than the purchaser will take more than an insignificant amount of the output or other utility that will be produced or generated by the asset during the term of the arrangement, and the price that the purchaser will pay for the output is neither contractually fixed per unit of output nor equal to the current market price per unit of output as of the time of delivery of the output.
- Given land has an indefinite useful life, it is in practice uncommon that a lease over a plot of land would result in being classified as a finance lease. Accordingly this would suggest that the Infrastructure Area is an operating lease.

# Accounting treatment for the Project Rights (the accounting Debit Entry)

## (5 of 7)

**2) If the Project Rights in relation to the Infrastructure Area do not meet the definition of an asset, how should rights be treated?**

- Under operating lease principles of IAS 17 the Company shall recognise an annual lease payment as an income statement expense. This lease payment shall effectively relate to a portion of the annual usufruct fee that relates to the Infrastructure Area.

**3) What type of asset should be recognised in the Company's balance sheet in relation to the Right to Sell Area?**

- Management should consider which asset categorisation most appropriately represents the current status and intention of relevant portions of the Right to Sell Area. Accordingly, different asset categorisation may be appropriate for different segments of the Right to Sell Area.

- We note that:

  i.   Whilst the Project Rights do not grant legal title to the land within the Right to Sell Area, the rights provided to the Company appear to be akin to the rights, risks and rewards that would be associated with the legal ownership of the land.

  ii.  We understand that the Project master plan is subject to finalisation and as such, there is currently no definitive and final confirmation as to how the Right to Sell Area will be used.

- Further to point (ii) above, we note that land under IAS 40 investment property accounting would ordinarily be applied when land is currently held for an 'undetermined future use'.

- The table on the following page summarises the key criteria for the potential day one asset categorisation of the Right to Sell Area, along with comments on the day one and prospective accounting impact on the Company's balance sheet.

## Accounting treatment for the Project Rights (the accounting Debit Entry)
### (6 of 7)

| Asset category | When this might be appropriate? | Day one accounting treatment | Prospective accounting treatment |
|---|---|---|---|
| **Land under IAS 40** Investment property – undetermined future use | • Where the Company does not have a definitive and final master plan in relation to the project and specifically the Right to Sell Area. | • Day one recognition of the asset at cost, which is deemed to be fair value for initial recognition purposes. | • The following two methods of accounting are allowed under IAS 40:<br>  - **Cost model** – depreciation of the initial cost (less any expected residual value) over the useful life of the asset;<br>  - **Fair value** – The asset is revalued at each reporting date, with changes in fair value being recognised in the income statement. It would be expected that the fair value of the asset would represent the impact of any freehold disposals to third parties. Reclassification to another category of asset may be achieved where certain criteria are met – see comments below under note 1. |
| **Land under IAS 40** Investment property accounting – other categories | • Where the asset is held:<br>  - To earn rentals; or<br>  - For capital appreciation. | • Day one recognition of the asset at cost, which is deemed to be fair value for initial recognition purposes. | • Same as 'Investment Property under IAS 40 – undetermined future use'. |
| **Land under IAS 16** Property - owner-occupied | • Where the relevant portion of the Right to Sell Area is intended to be used by the Company for the production of goods or services, or for administrative purposes (i.e. Hotel managed by the Company, Head-office of the Company). | • Day one recognition of the asset at cost, which is deemed to be fair value for initial recognition purposes. | • The following two methods of accounting are allowed under IAS 16:<br>  - **Cost model** – depreciation of the initial cost (less any expected residual value) over the useful life of the asset; or<br>  - **Revaluation model** – The asset is revalued at its fair value on a regular basis with fair value changes being recorded directly in equity. |

4.3 Accounting treatment for the Project Rights (the Debit Entry)

# Accounting treatment for the Project Rights (the accounting Debit Entry) (7 of 7)

| Asset category | When this might be appropriate? | Day one accounting treatment | Prospective accounting treatment |
|---|---|---|---|
| Inventory under IAS 2 | • Where the relevant freehold interest in the Right to Sell Area is or is intended to be sold (whether as-is or further to developments). | • Day one recognition of the asset at cost, which is deemed to be fair value for initial recognition purposes. | • Inventories shall be measured at the lower of cost and net realisable value in accordance with IAS 2.<br>• Where relevant freehold interests are sold, the associated inventory asset would effectively be derecognised and treated as a cost of sale. |

**Note 1 –** In order to subsequently reclassify the asset from land under IAS 40 (undetermined use) to another class of asset the guidance provided in IAS 40 para 57 will need to be considered. This guidance clarifies that transfers to, or from, investment property shall be made only when there is a change in use, evidenced by:

a.  commencement of owner-occupation, for a transfer from investment property to owner-occupied property; or
b.  commencement of development with a view to sale, for a transfer from investment property to inventories; or
c.  end of owner-occupation, for a transfer from owner-occupied property to investment property; or
d.  commencement of an operating lease to another party, for a transfer from inventories to investment property.

# Appendices

**Appendices** .......... **21**

1 Scope & process: supplementary information 22

## *Scope and process: supplementary information*

| Scope | Process |
|---|---|
| **Responsibility for accounting entries** | The numbers used throughout are for illustrative purposes only. Our work does not include preparation of accounting entries but includes illustrative accounting analysis. Any such illustrative accounting analysis is based on historical or illustrative financial information. The directors are responsible for determining the actual accounting entries required and any subsequent recording of these within their own accounting records. |
| **Changes to guidance** | The comments in this paper are based on IFRS in force as at the date of this report. The development of accounting standards is ongoing and the subject of continual review and revision by the various accounting standard setters and interpretation committees, and could be retrospective in nature. Accordingly, we accept no responsibility for any change that might become necessary to our advice through events or circumstances occurring after the date of the advice, and we accept no responsibility for updating our advice in the event of such a situation occurring. |
| **Scope** | You have not asked us to consider in this paper the tax, regulatory or legal implications of the Arrangement set out herein. On this basis, we accept no responsibility or liability in the event that the tax, regulatory or legal treatment that you anticipate is not achieved whether as a result of dispute with the accounting advice contained in this letter or otherwise. |
| **Provision of information** | We have summarised in Section 2 our understanding of the proposed transaction. Should the actual details of the proposed transaction not accord with our understanding, then any advice or conclusions in this paper may not be correct and should not be relied upon. Our analysis and advice is based on information provided by you and you are responsible for the accuracy and the completeness of the information supplied to us. You have agreed that we may rely, without verification, upon such information. |
| **Discussions with your auditor** | As required by the Code of Ethics, we may need to hold discussions with your auditors. There may be other factors that affect the application of our advice, and we therefore advise you to consider how the advice applies to your own circumstances, and to discuss the matter with your auditors and rely on their advice. We may send a copy of this advice to your auditors but we make it clear that we owe them no duty of care. |

# Glossary (1 of 2)

| Term | Definition |
| --- | --- |
| Arrangement | The arrangement to contribute the Project Rights to the Company, as described in Section 1 |
| CCC | Consolidated Contractors Co, Oman LLC and Consolidated Contractors Company S.A |
| Company Law | The company law of Oman |
| Credit Entry | The accounting credit entry relating to the contribution of the Project Rights to the Company |
| DA | The Development Agreement signed between the Government and the Company |
| Debit Entry | The accounting debit entry relating to the contribution of the Project Rights to the Company |
| His Majesty | His Majesty Sultan Qaboos bin Said, the ruler of Oman |
| IAS 16 | International Accounting Standard 16: Property, Plant and Equipment |
| IAS 2 | International Accounting Standard 2: Inventories |
| IAS 40 | International Accounting Standard 40: Investment Property |
| IFRS | International Financial Reporting Standards |
| IFRS 13 | International Financial Reporting Standard 13: Fair Value Measurement |
| IFRS 2 | International Financial Reporting Standard 2: Share-based Payment |

# Glossary (2 of 2)

| Term | Definition |
|------|------------|
| IFRS CF | The IFRS Conceptual Framework |
| Infrastructure Area | Rights over the area other than the Right to Sell Area |
| OMAG | Omagine Inc. and Journey of light Inc. |
| Omagine, or the Company | Omagine LLC |
| Oman | The Sultanate of Oman |
| Project Rights | The various rights granted to the Company through the Development Agreement and the Usufruct Agreement |
| RCA | Royal Court Affairs |
| Right to Sell Area | Rights over areas that can be developed as residential and commercial property and then either sold on a piecemeal basis as free hold title or leased to third parties |
| Shareholders Agreement | The shareholders agreement dated 20 April 2011, entered into by the Company with OMAG and new investors, as described in Section 2. |
| The Government | The Government of the Sultanate of Oman |
| The Land | The 1 million square meters plot of land subject of the Project |
| The Project | The integrated residential and tourism complex referred to in this paper |
| UA | The Usufruct Agreement signed between the Government and the Company |
| Usufruct Fee | The usufruct fee payable to the Government |

Mon 11/16/2015 12:46 PM

Zaidi, Mohammad Hasan (OM - Muscat) <mozaidi@deloitte.com>

RE: RE:

To    Frank J. Dreham; Agron Telaku

Cc   Cilliers, Niel (OM - Muscat); Dunn, Mark David (OM - Muscat)

You forwarded this message on 11/16/2015 1:24 PM.

Final TechiView.docx
19 KB

Dear Frank

Please find attached our work paper detailing our view on the treatment of Project Rights. The upshot is that you get to record the project rights as an asset against issue of share capital to RCA.

However, the recording of the value of rights under different asset categories depends upon the nature of right associated to that particular asset category. In short, the management will have to do an internal split between the rights to be recorded into 3 different categories, i.e.:

1.  Inventory (work in progress);
2.  Property, plant and equipment; and
3.  Investment property.

The criteria for each category is detailed in the work paper. I believe this effectively ends our deliberation on the issue of the shares to RCA and the consequent recording of Project rights on Omagine LLC's balance sheet. Our internal team as well as our excellence center have spent a considerable amount of time to come up with the accounting treatment proposed.

Kindly do not hesitate to contact us if you have any further queries in this regard.

Kind regards
Mohammad Hasan Zaidi
Senior Manager | Audit, Assurance & Advisory
Deloitte & Touche (M.E.) & Co. LLC
Muscat International Centre, P.O Box 258, Postal Code 112, Ruwi, Sultanate of Oman
Tel: +968 24817775 | Fax: +968 24815561 | Mobile: +968 95985116
mozaidi@deloitte.com | www.deloitte.com/middleeast

 

Please consider the environment before printing.

**Deloitte makes an impact that matters.**

**Issuance of shares to RCA in "Company"**

| Official View | Other View |
|---|---|
| In accordance with IFRS 2 the Company shall measure the Project Rights at fair value and recognise a direct corresponding increase in equity – i.e. with no income statement impact. | Irrespective of subsequent accounting for the Development Agreement and Project Rights, this transaction appears to be a share-based payment ("SBP") in the scope of IFRS 2 Share-based payments ("IFRS 2") on the basis that the Project Rights (goods) have been received in exchange for the issuance of shares to RCA. |

The fair value of the Project Rights can be reliably measured at RO 277 million. The increase to be recorded as follows:

Share Capital    Cr 66,375
Share premium Cr 276,933,625

(being Issue of 663,750 shares of RO 0.1 each to RCA against Project Rights acquired)

The scope of IFRS 2 includes:

"2. An entity shall apply this IFRS in accounting for all share-based payment transactions, whether or not the entity can identify specifically some or all of the goods or services received, including:
(a) equity-settled share-based payment transactions…"

5 Goods includes inventories, consumables, property, plant and equipment, intangible assets and other non-financial assets."

- The measurement of SBP which is equity-settled is based on the fair value of the goods or services received, which according to the report have been valued at RO 277 million.
- Where the fair value of the goods cannot be determined reliably the SBP is measured at the fair value of the equity instruments issued (to RCA) in exchange for the Project Rights.

Below we have included the accounting entry relating to the various accounting aspects as at day one:

Accounting for the issuing of the shares to RCA (credit related entry)

Share Capital    Cr.    66,375
Share premium    Cr    276,933,625

(being Issue of 663,750 shares of RO 0.1 each to RCA against Project Rights acquired)

| IFRS | Funding View | Financial View |
|---|---|---|
| The right to sell title a as a freehold in any freehold price being paid by the buyer to the Government) of the Land | – Where the relevant freehold interest in the Right to Sell Area is intended to be sold (whether as-is or further to developments), they are to be recognized as Inventory. | We recommend an approach similar to one adopted for Investment Property and Property Plant and Equipment detailed in the approach below provided this relates to a right to sell only developed land. |

We believe this to be appropriate on the basis that the right which was purchased, as part of a bundle of rights acquired by the Company as part of the share-based payment, is directly attributable to real estate assets to be developed and sold to third parties.

Our reading of the document suggests that the land portion of the sale price will be paid to government whilst the completed real estate (developed item) is attributable to the Company. In this sense the land in this scenario is never an asset of the Company but remains fully vested in government. The value created by development vests in the Company.

Where the rights apply to undeveloped land (as-is) that would not result in asset and the entire attributed cost would be accounted for as a cost towards developed inventory.

Our view is that the cost of rights acquired apportioned to the Sell Area should be treated as Inventory (Work-in-Progress) where it is intended to relate to land to be developed for sale. This is on the basis that it is a direct cost of the developed property which is being developed for sale and not as a separate asset in itself.

"Inventories are assets:
(a) held for sale in the ordinary course of business;
(b) in the process of production for such sale; or"

"Cost of Inventories
10 The cost of inventories shall comprise all costs of purchase, costs of conversion and other costs incurred in bringing the inventories to their present location and condition."

The accounting for the property develop for resale (debit related entry):

Inventory (WIP)          Dr XXXX

*(based on the initial cost split between the assets develop for sale and assets identified for own use / leasing)*

| The right to lease or utilise any part of the Land in terms of the Usufruct and or Development Agreement | Where the asset is held to earn rentals or for capital appreciation (Investment Property). Where the asset is held for use (Property, Plant and Equipment) Measurement basis under each of the above may be at historical cost less depreciation or fair value subject to accounting policy choice | In our experience it is not uncommon for a developer to purchase development rights from a landowner in an arrangement to develop the landowners' property, in such an instance it would be appropriate to consider that payment as part of the cost of the development and not as a separate asset from the developed (tangible) assets. |
|---|---|---|

We are of the view that where rights relate to property this is to be developed for rental (as provided for under the Development Agreement) or capital appreciation (not likely in the circumstances described) that such rights acquired be considered as part of the cost of acquiring Investment property.

The conclusion above is irrespective of whether the lease is determined to be a finance or operating lease as IAS 40 Investment Property specifically makes provision for both scenarios. Where the lease is determined to be an operating lease such Investment properties must be measured at fair value and the cost option is prohibited.

*"6 A property interest that is held by a lessee under an operating lease may be classified and accounted for as Investment property if, and only if, the property would otherwise meet the definition of an Investment property and the lessee uses the fair value model set out in paragraphs 33–55 for the asset recognised.*
*...all property classified as Investment property shall be accounted for using the fair value model."*

We conclude on a similar basis as above for Investment property that the development rights related to portions of the land that will be developed for own use may be treated as part of the costs of developing that Property Plant and Equipment and can therefore be treated as such. The fact that the right itself is intangible is not relevant, what is relevant is that it is a cost incurred which is directly attributable to the development of Property Plant and Equipment.

*"16 The cost of an item of property, plant and equipment comprises:*
*(b) any costs directly attributable to bringing the asset to the location and condition necessary for it to be capable of operating in the manner intended by management."*

The accounting for the property develop for own use (debit related entries):

| | |
|---|---|
| Investment property | Dr XXX |
| Property, plant and equipment | Dr XXX |

*(based on the initial cost split between the assets develop for sale and assets identified for own use / leasing)*