10-Q 1 f10q0917_omagineinc.htm QUARTERLY REPORT

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

**FORM 10-Q**

☒ QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the Quarterly Period Ended: September 30, 2017

Commission File Number: 0-17264

**Omagine, Inc.**
(Exact name of registrant as specified in its charter)

| Delaware | 20-2876380 |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification Number) |

136 Madison Avenue, 5th Floor, New York, NY 10016
(Address of principal executive offices)

(212) 563-4141
(Registrant's telephone number, including area code)

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15 (d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. ☒ Yes ☐ No

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate website every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). ☒ Yes ☐ No

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ (Do not check if a smaller reporting company) | Smaller reporting company | ☒ |
| | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by a check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). ☐ Yes ☒ No

As of November 13, 2017, the Registrant had outstanding 23,093,084 shares of common stock, par value $.001 per share ("Common Stock").

| | Page |
|---|---|
| FORWARD LOOKING STATEMENTS | 1 |
| **PART I – FINANCIAL INFORMATION** | 1 |
| ITEM 1: FINANCIAL STATEMENTS | 1 |
| CONSOLIDATED BALANCE SHEETS: SEPTEMBER 30, 2017 AND DECEMBER 31, 2016 | 1 |
| CONSOLIDATED STATEMENTS OF OPERATIONS: THREE AND NINE MONTHS ENDED SEPTEMBER 30, 2017 AND SEPTEMBER 30, 2016 | 2 |
| CONSOLIDATED STATEMENT OF CHANGES IN STOCKHOLDERS' EQUITY | 3 |
| CONSOLIDATED STATEMENTS OF CASH FLOWS: NINE MONTHS ENDED SEPTEMBER 30, 2017 AND SEPTEMBER 30, 2016 | 4 |
| NOTES TO FINANCIAL STATEMENTS | 5 |
| ITEM 2: MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS | 24 |
| ITEM 3: QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK | 62 |
| ITEM 4: CONTROLS AND PROCEDURES | 62 |
| **PART II – OTHER INFORMATION** | 63 |
| ITEM 1: LEGAL PROCEEDINGS | 63 |
| ITEM 1A: RISK FACTORS | 63 |
| ITEM 2: UNREGISTERED SALES OF EQUITY SECURITIES AND USE OF PROCEEDS | 63 |
| ITEM 3: DEFAULTS UPON SENIOR SECURITIES | 64 |
| ITEM 4: MINE SAFETY DISCLOSURES | 64 |
| ITEM 5: OTHER INFORMATION | 64 |
| ITEM 6: EXHIBITS | 64 |
| SIGNATURES | 68 |

# FORWARD-LOOKING STATEMENTS

Some of the statements contained in this report that are not statements of historical facts constitute "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995, notwithstanding that such statements are not specifically identified as such. These forward-looking statements are based on current expectations and projections about future events. The words "estimates," "projects," "plans," "believes," "expects," "anticipates," "intends," "targeted," "continue," "remain," "will," "should," "may" and other similar expressions, or the negative or other variations thereof, as well as discussions of strategy that involve risks and uncertainties (such as the potential new investor or investors in LLC or the potential financing with MENA region banks), are intended to identify forward-looking statements but are not the exclusive means of identifying such statements. Examples of forward-looking statements include but are not limited to statements about or relating to: (i) future revenues, expenses, income or loss, cash flow, earnings or loss per share, the payment or nonpayment of dividends, capital structure and other financial items, (ii) plans, objectives and expectations of Omagine, Inc. ("OMAGI") or its subsidiary Omagine LLC ("LLC") or the managements or Boards of Directors thereof, (iii) the Company's business plans, products or services, (iv) future economic or financial performance, and (v) assumptions underlying such statements. We urge you to be cautious of the forward-looking statements and other similar forecasts and statements of expectations since such statements (i) reflect our current beliefs with respect to future events, (ii) involve, and are subject to, known and unknown risks, uncertainties and other factors affecting our operations and growth strategy, and (iii) could cause the Company's actual results, financial or operating performance or achievements to differ from future results, financial or operating performance, or achievements expressed or implied by such forward-looking statements. Forecasts, projections and assumptions contained and expressed herein were reasonably based on information available to the Company at the time so furnished and as of the date of this report. All such forecasts, projections and assumptions are subject to significant uncertainties and contingencies, many of which are beyond the Company's control, and no assurance can be given that such forecasts, projections or assumptions will be realized. No assurances can be given regarding the achievement of future results, as our actual results may differ materially from our projected future results as a result of the risks we face, and actual future events may differ from anticipated future events because of the assumptions underlying the forward-looking statements that have been made regarding such anticipated events.

Factors that may cause actual results, our performance or achievements, or industry results, to differ materially from those contemplated by such forward-looking statements include without limitation:

- the uncertainty associated with political events in the Middle East and North Africa (the "MENA Region") in general, including the ongoing civil disorder and military activities in the MENA Region;

- the success or failure of OMAGI's and LLC's efforts to secure additional financing, including project financing for the Omagine Project;

- oversupply of residential and/or commercial property inventory in the Oman real estate market or other adverse conditions in such market;

- the impact of MENA Region or international economics and/or future events (including natural disasters) on the Oman economy, on LLC's business or operations, on tourism within or into Oman, on the oil and natural gas businesses in Oman and on other major industries operating within the Omani market;

- deterioration or malaise in economic conditions, including the continuing destabilizing factors associated with the recent rapid decline in the price of crude oil on international markets;

- inflation, interest rates, movements in interest rates, securities market and monetary fluctuations;

- threatened and ongoing acts of war, civil or political unrest, terrorism or political instability in the MENA Region; or

- the ability to attract and retain skilled employees.

Potential investors are cautioned not to place undue reliance on any such forward-looking statements, which speak only as of the date hereof. The Company undertakes no obligation to publicly release any revisions to these forward-looking statements to reflect events or circumstances after the date hereof or to reflect the occurrence of unanticipated events.

i

ITEM 1: FINANCIAL STATEMENTS

OMAGINE, INC. AND SUBSIDIARIES
CONSOLIDATED BALANCE SHEETS

|  | September 30, 2017 (Unaudited) | December 31, 2016 |
|---|---|---|
| **ASSETS** | | |
| **CURRENT ASSETS:** | | |
| Cash | $ 516 | $ 229,228 |
| Inventory (Note 2) | | |
| Land under development | 490,813,363 | 490,813,363 |
| Total inventory held for sale | 490,813,363 | 490,813,363 |
| Prepaid expenses and other current assets | 7,500 | 1,859 |
| 15% equity interest in Omagine LLC to be acquired pursuant to April 3, 2017 exercise of OMAG Options (Notes 1 and 11) | 58,500 | - |
| Total Current Assets | 490,879,879 | 491,044,450 |
| **PROPERTY AND EQUIPMENT:** | | |
| Real estate held for investment (Note 2) | | |
| Total investment in real estate | 227,800,637 | 227,800,637 |
| Office and computer equipment | 160,002 | 160,002 |
| Less accumulated depreciation and amortization | (156,126) | (153,738) |
| Total Property and Equipment | 227,804,513 | 227,806,901 |
| **OTHER ASSETS** | 4,057 | 4,057 |
| **TOTAL ASSETS** | $718,688,449 | $718,855,408 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| **CURRENT LIABILITIES:** | | |
| Convertible notes payable and accrued interest (less unamortized discount of $5,003 and $13,904, respectively) | 642,357 | $ 526,372 |
| Note payable and accrued interest - YA II PN, Ltd. (less unamortized discount of $12,500 and $68,750, respectively) | 471,290 | 686,387 |
| Note payable - St. George Investments LLC (less unamortized Original Issue Discount of $0 and $22,500, respectively) | 183,000 | 162,500 |
| Note payable and accrued interest - JSJ Investments Inc. | 104,701 | - |
| Accounts payable | 779,010 | 663,913 |
| Accrued officers' payroll | 535,526 | 419,626 |
| Accrued expenses and other current liabilities | 187,261 | 209,192 |
| Amount due to CCC-Panama and CCC-Oman pursuant to the April 3, 2017 exercise of OMAG Options (Notes 1 and 11) | 58,500 | - |
| Total Current Liabilities | 2,963,445 | 2,667,990 |
| Long Term Liabilities | - | - |
| **TOTAL LIABILITIES** | 2,963,445 | 2,667,990 |
| **STOCKHOLDERS' EQUITY** | | |
| Preferred stock: $0.001 par value Authorized: 850,000 shares Issued and outstanding: - none | - | - |
| Common stock: $0.001 par value Authorized: 50,000,000 shares Issued and outstanding: 22,152,350 shares in 2017 and 20,432,648 in 2016 | 22,152 | 20,432 |
| Capital in excess of par value | 471,358,707 | 470,350,815 |
| Deficit | (42,731,907) | (41,273,266) |
| Total Omagine, Inc. stockholders' equity | 428,648,952 | 429,097,981 |
| Noncontrolling interests in Omagine LLC | 287,076,052 | 287,089,437 |

| | | |
|---|---|---|
| Total Stockholders' Equity | 715,725,004 | 716,187,418 |
| TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY | $ 718,688,449 | $718,855,408 |

See accompanying notes to consolidated financial statements.

1

OMAGINE, INC. AND SUBSIDIARIES
CONSOLIDATED STATEMENTS OF OPERATIONS
(Unaudited)

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2017 | 2016 | 2017 | 2016 |
| REVENUE: | | | | |
| Total revenue | $ — | $ — | $ — | $ — |
| OPERATING EXPENSES: | | | | |
| Officers and directors compensation (including stock-based compensation of $72,525, $135, $374,045 and $301,655 respectively) | 186,275 | 113,885 | 640,295 | 578,238 |
| Professional fees | 7,780 | 266,276 | 52,400 | 342,757 |
| Consulting fees (including stock-based compensation of $76,200, $25,000, $76,200 and $25,000 respectively) | 112,091 | 28,458 | 179,462 | 466,251 |
| Commitment fees (All stock-based compensation) | — | 150,000 | — | 150,000 |
| Travel | 9,875 | 114,604 | 145,548 | 389,203 |
| Occupancy | 15,070 | 14,690 | 44,459 | 45,657 |
| Other selling general and administrative (including stock-based compensation of $7,500, $0, $22,500 and $0, respectively) | 39,071 | 50,677 | 149,169 | 203,898 |
| Total Costs and Expenses | 370,162 | 738,590 | 1,211,333 | 2,176,004 |
| OPERATING LOSS | (370,162) | (738,590) | (1,211,333) | (2,176,004) |
| OTHER EXPENSE | | | | |
| Amortization of debt discounts | (79,035) | (25,000) | (152,939) | (63,333) |
| Interest expense | (30,886) | (26,678) | (73,754) | (60,048) |
| Fees relating to extension of maturity of note payable to St. George Investments LLC | (24,000) | — | (34,000) | — |
| Total Other Expense | (133,921) | (51,678) | (260,693) | (123,381) |
| NET LOSS | (504,083) | (790,268) | (1,472,026) | (2,299,385) |
| Add net loss attributable to noncontrolling interests in Omagine LLC | 4,022 | 113,223 | 13,385 | 139,508 |
| NET LOSS ATTRIBUTABLE TO OMAGINE, INC. | $ (500,061) | $ (677,045) | $ (1,458,641) | $ (2,159,877) |
| LOSS PER SHARE - BASIC AND DILUTED | $ (0.02) | $ (0.03) | $ (0.07) | $ (0.11) |
| WEIGHTED AVERAGE NUMBER OF SHARES OUTSTANDING - BASIC AND DILUTED | 22,152,350 | 19,850,406 | 21,724,841 | 19,561,559 |

See accompanying notes to consolidated financial statements.

2

OMAGINE, INC. AND SUBSIDIARIES
CONSOLIDATED STATEMENTS OF CHANGES IN STOCKHOLDERS' EQUITY  (DEFICIT)

| | Common Stock Issued and Outstanding | | Capital in Excess of Par Value | Deficit | Noncontrolling Interests in Omagine LLC | Total |
| --- | --- | --- | --- | --- | --- | --- |
| | Shares | $0.001 Par Value | | | | |
| Balances at December 31, 2014 | 16,878,119 | $ 16,878 | $ 32,252,954 | $(32,669,399) | $ (79,621) | $ (479,188) |
| Issuance of Common Stock for 401(K) Plan contribution | 36,483 | 37 | 76,213 | – | – | 76,250 |
| Stock grant to consultant for services rendered | 5,000 | 5 | 9,445 | – | – | 9,450 |
| Issuance of Common Stock for cash | 206,281 | 206 | 219,794 | – | – | 220,000 |
| Issuance of Common Stock to an Executive Officer in payment of salaries payable | 100,000 | 100 | 119,900 | – | – | 120,000 |
| Stock Options exercised by former Director | 2,000 | 2 | 1,018 | – | – | 1,020 |
| Exercise of Tempest Warrants | 160,603 | 161 | 252,879 | – | – | 253,040 |
| Issuance of Common Stock for finders' fees on restricted Common Stock sales | 41,245 | 41 | 72,459 | – | – | 72,500 |
| Issuance of Common Stock for Directors' Compensation for services September 1, 2015 to December 31, 2015 | 50,000 | 50 | 99,950 | – | – | 100,000 |
| Issuance of Common Stock under SEDA | 17,696 | 18 | 24,982 | – | – | 25,000 |
| Issuance of restricted Common Stock for cash | 1,230,886 | 1,230 | 1,238,470 | – | – | 1,239,700 |
| Stock Option expense | | | 4,001 | | | 4,001 |
| Stock Option expense – Extension of 1,965,000 Strategic Options to December 31, 2016 | | | 915,493 | – | – | 915,493 |
| Stock Option expense – Extension of 950,000 Strategic Options to December 31, 2016 | | | 541,215 | – | – | 541,215 |
| Stock Option expense – Stock Appreciation Rights (1,455,000 expiring December 31, 2017) | | | 1,654,481 | – | – | 1,654,481 |
| Payment-in-Kind capital contribution of land by noncontrolling interest in Omagine LLC | – | – | 431,168,400 | – | 287,445,600 | 718,614,000 |
| Adjustments to noncontrolling interests in Omagine LLC | | | | | (195,879) | (195,879) |
| Net loss | | | | (5,673,293) | – | (5,673,293) |

| | | | | | | |
|---|---|---|---|---|---|---|
| Balances at December 31, 2015 | 18,728,313 | 18,728 | 468,651,654 | (38,342,692) | 287,170,100 | 717,497,390 |
| Issuance of Common Stock for 401(K) Plan contribution | 61,001 | 61 | 76,189 | | | 76,250 |
| Issuance of Common Stock for Directors' Stock Compensation for services January 1, 2016 to December 31, 2016 | 115,386 | 116 | 149,884 | | | 150,000 |
| Stock Option expense | | | 540 | | | 540 |
| Issuance of Common Stock to an Executive Officer in payment of salaries payable | 56,000 | 56 | 50,344 | | | 50,400 |
| Issuance of Common Stock for Directors' Cash Compensation for services January 1 2016 to June 30, 2016 | 83,334 | 83 | 74,917 | | | 75,000 |
| Issuance of restricted Common Stock for cash | 1,139,488 | 1,140 | 742,860 | | | 744,000 |
| Conversion of Convertible Note payable liability into Common Stock | 24,207 | 24 | 30,960 | | | 30,984 |
| Issuance of Common Stock to a Director for the exercise of Stock Options | 2,000 | 2 | 1,698 | | | 1,700 |
| Issuance of Common Stock under SEDA | 31,289 | 31 | 24,969 | | | 25,000 |
| Issuance of Common Stock to consultant for services | 30,340 | 30 | 24,970 | | | 25,000 |
| Issuance of Common Stock for SEDA commitment fees | 161,290 | 161 | 149,839 | | | 150,000 |
| Stock Option expense - Extension of 1,965,000 Strategic Options to December 31, 2017 | | | 232,263 | | | 232,263 |
| Stock Option expense - Extension of 950,000 Strategic Options to December 31, 2017 | | | 59,660 | | | 59,660 |
| Fair value of 150,000 warrants issued to lender in connection with $75,000 loan | | | 61,530 | | | 61,530 |
| Beneficial conversion feature of convertible note issued to lender in connection with $50,000 loan | | | 18,538 | | | 18,538 |
| Adjustments to noncontrolling interests in Omagine LLC | | | | | (80,663) | (80,663) |
| Net loss | | | | (2,930,574) | | (2,930,574) |

| | Shares | Amount | | | | Total |
|---|---|---|---|---|---|---|
| Balances at December 31, 2016 | 20,432,648 | 20,432 | 470,350,815 | (41,273,266) | 287,089,437 | 716,187,418 |
| Issuance of Common Stock for 401(k) Plan contribution | 123,782 | 124 | 76,126 | | | 76,250 |
| Issuance of Common Stock for Directors' Stock Compensation for services January 1, 2017 to December 31, 2017 | 243,507 | 244 | 149,756 | | | 150,000 |
| Issuance of restricted Common Stock for cash | 639,948 | 640 | 232,438 | | | 233,078 |
| Issuance of Common Stock to two Executive Officers in payment of salaries payable | 147,170 | 147 | 75,853 | | | 76,000 |
| Issuance of Common Stock for 3 Directors' Cash Compensation for services July 1, 2016 to June 30, 2017 | 283,020 | 283 | 149,717 | | | 150,000 |
| Issuance of Restricted Common Stock to Stockholder Relations Agent for Services rendered January 1, 2016 to March 31, 2017 | 93,750 | 94 | 37,406 | | | 37,500 |
| Issuance of Restricted Common Stock to Stockholder Relations Agent in advance for services to be rendered April 1, 2017 to December 31, 2017 | 56,250 | 56 | 22,444 | | | 22,500 |
| Issuance of Common Stock under SEDA | 132,275 | 132 | 49,868 | | | 50,000 |
| Beneficial conversion features and warrants issued in connection with issuance of convertible notes payable | | | 65,289 | | | 65,289 |
| Stock Option expense | | | 148,995 | | | 148,995 |
| Adjustments to noncontrolling interests in Omagine LLC | | | | | (13,385) | (13,385) |
| Net loss | | | | (1,458,641) | | (1,458,641) |
| Balances at September 30, 2017 (Unaudited) | 22,152,350 | $ 22,152 | 471,358,707 | $(42,731,907) | $ 287,076,052 | $ 715,725,004 |

See accompanying notes to consolidated financial statements.

3

# OMAGINE, INC. AND SUBSIDIARIES
## CONSOLIDATED STATEMENTS OF CASH FLOWS
### (Unaudited)

| | Nine Months Ended September 30, | |
|---|---|---|
| | 2017 | 2016 |
| **CASH FLOWS FROM OPERATING ACTIVITIES:** | | |
| Net loss attributable to Omagine, Inc. | $ (1,458,641) | $ (2,159,877) |
| Adjustments to reconcile net loss to net cash flows used by operating activities: | | |
| Net loss attributable to noncontrolling interests in Omagine LLC. | (13,385) | (139,508) |
| Depreciation and amortization of property and equipment | 2,388 | 3,633 |
| Stock-based compensation related to stock options | 148,995 | 405 |
| Issuance of Common Stock for consulting fees | - | 25,000 |
| Issuance of Common Stock for Stockholder Relations Agent | 22,500 | - |
| Issuance of Common Stock for 401(k) Plan contributions | 76,250 | 76,250 |
| Issuance of Common Stock for Directors' fees | 225,000 | 225,000 |
| Issuance of Common Stock for commitment fees | - | 150,000 |
| Amortization of debt discounts | 152,939 | 63,333 |
| Changes in operating assets and liabilities: | | |
| Prepaid expenses and other current assets and other assets | 1,859 | 20,382 |
| Accrued interest on notes payable | 45,439 | 17,507 |
| Accounts payable | 220,097 | 436,236 |
| Accrued officers' payroll | 191,700 | 28,443 |
| Accrued expenses and other current liabilities | (21,931) | 10,216 |
| Net cash flows used by operating activities | (406,790) | (1,242,980) |
| | | |
| **CASH FLOWS FROM INVESTING ACTIVITIES:** | | |
| Purchase of equipment | - | - |
| Net cash flows used by investing activities | - | - |
| | | |
| **CASH FLOWS FROM FINANCING ACTIVITIES:** | | |
| Proceeds from the sale of Common Stock | 283,078 | 584,000 |
| Principal payments on 2015 note payable to YA II PN, Ltd. | - | (225,000) |
| Proceeds from exercise of stock options | - | 1,700 |
| Proceeds of issuance of March 2016 note payable to YA II PN, Ltd. net of $60,000 commitment fee | - | 540,000 |
| Principal payments on March 2016 $600,000 note payable to YA II PN, Ltd. | - | (315,000) |
| Proceeds of issuance of June 2016 note payable to YA II PN, Ltd. net of $40,000 commitment fee | - | 360,000 |
| Principal payments on 2016 $400,000 note payable to YA II PN, Ltd. | - | (115,000) |
| Principal payments on December 2016 $750,000 note payable to YA II PN, Ltd. | (290,000) | - |
| Proceeds from the issuance of convertible Notes Payable | 185,000 | 100,000 |
| Net cash flows provided by (used by) financing activities | 178,078 | 930,700 |
| | | |
| **NET DECREASE IN CASH** | (228,712) | (312,280) |
| **CASH BEGINNING OF PERIOD** | 229,228 | 324,703 |
| **CASH END OF PERIOD** | $ 516 | $ 12,423 |
| | | |
| **SUPPLEMENTAL CASH FLOW INFORMATION:** | | |
| Income taxes paid | $ 1,260 | $ 600 |
| Interest paid | $ 22,653 | $ 56,451 |
| | | |
| **NON-CASH FINANCING ACTIVITIES:** | | |
| Issuance of Common Stock to Executive Officers in payment of salaries payable | $ 76,000 | $ 50,400 |
| Issuance of Common Stock to Directors in payment of accounts payable ($75,000) and prepaid fees for services for the quarter ended June 30, 2017 ($37,500) | $ 112,500 | $ - |

Issuance of Common Stock to Stockholders Relations Agent in payment of accounts payable ($30,000) and prepaid fees for the period April 1, 2017 to December 31, 2017 ($22,500)      $ 52,500   $ -

Issuance of Common Stock in satisfaction of convertible note payable ($15,000) and accrued interest ($15,984)      $   $ 30,984   -

Amount due to CCC-Panama and CCC-Oman pursuant to April 3, 2017 exercise of OMAG Options for 15% equity interest in Omagine LLC to be acquired      $ 58,500   $ -

See accompanying notes to consolidated financial statements.

4

OMAGINE, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

NOTE 1 – NATURE OF THE BUSINESS AND SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

Nature of the Business

Omagine, Inc. ("OMAG" or the "Registrant") is a holding company incorporated in Delaware in October 2004 which operates through its wholly owned subsidiary, Journey of Light, Inc., a New York corporation ("JOL") and its majority owned subsidiary Omagine LLC, a limited liability company incorporated under the laws of the Sultanate of Oman ("LLC"). The Registrant and JOL are sometimes collectively referred to herein as "OMAG" and the Registrant, JOL and LLC are collectively referred to herein as the "Company". JOL was acquired by OMAG in October 2005. LLC is the Omani real estate development company organized by OMAG to do business in Oman.

The Company is focused on entertainment, hospitality and real-estate development opportunities in the Middle East and North Africa (the "MENA Region"). On October 2, 2014, LLC signed a Development Agreement with the Government of Oman (the "Government") for the development of the Omagine Project. On July 2, 2015, a usufruct over one million square meters of beachfront land (the "Land Rights") was registered in LLC's name with the Government. On November 29, 2015, LLC executed a Murabaha Facility Agreement with Masraf Al Rayan Bank (Qatar) for a $25 million loan (the "Al Rayan Bank Loan") to finance the first phase of the Omagine Project consisting of design, development and initial construction activities. The Al Rayan Bank Loan, which was subject to the satisfaction of certain conditions precedent to closing, would bear interest at an annual rate equal to the 12 month LIBOR rate plus 1% and would be payable one year from the closing date. A condition precedent to closing the Al Rayan Bank Loan was that it be secured by a $25 million cash deposit in an LLC account at Masraf Al Rayan Bank. This $25 million cash deposit was to be provided pursuant to the terms of the Shareholder Agreement but upon CCC's default thereunder, it did not occur and the Masraf Al Rayan Bank loan will not now be utilized by LLC. Contingent upon the closing of an investment into LLC to replace CCC, commencement of the Omagine Project's first phase activities are expected to begin promptly thereafter. (See Note 11 – "Omagine Project").

Interim Financial Statements

The consolidated balance sheet for the Company at the end of the preceding fiscal year has been derived from the audited balance sheet and notes thereto contained in the Company's annual report on Form 10-K for the fiscal year ended December 31, 2016 and is presented herein for comparative purposes. All other financial statements are unaudited. In the opinion of management, all adjustments, which include only normal recurring adjustments necessary to present fairly the financial position, results of operations and cash flows for all periods presented, have been made. The results of operations for the interim periods presented are not necessarily indicative of the operating results for the respective full years.

Certain footnote disclosures normally included in the financial statements prepared in accordance with accounting principles generally accepted in the United States ("US GAAP") have been omitted in accordance with the published rules and regulations of the Securities and Exchange Commission ("SEC"). These financial statements should be read in conjunction with the financial statements and notes thereto included in the Company's annual report on Form 10-K for the fiscal year ended December 31, 2016 filed with the SEC on April 14, 2017.

Summary of Significant Accounting Policies

Principles of Consolidation - The consolidated financial statements include the accounts of OMAG, JOL and LLC. LLC is an Omani limited liability company organized under the laws of the Sultanate of Oman. All inter-company transactions have been eliminated in consolidation.

Financial Instruments - Financial instruments include cash, convertible notes payable and accrued interest, notes payable and accrued interest, accounts payable, accrued officers' payroll and accrued expenses and other current liabilities. The amounts reported for financial instruments are considered to be reasonable approximations of their fair values, based on market information available to management.

Cash and Cash Equivalents – The Company considers all highly liquid instruments with a maturity of three months or less at the time of issuance to be cash equivalents. At September 30, 2017 and December 31, 2016, cash included approximately $400 and $2,100 respectively in an Oman bank account not covered by FDIC insurance.

<u>Inventory</u> – Inventory is stated at cost. At September 30, 2017 and December 31, 2016, inventory consists only of the land under development acquired on July 2, 2015 (which was costed at the fair value of the property at the date of acquisition). (See: Note 2 – "Inventory and Property").

<u>Property, Plant and Equipment</u> - Property, plant and equipment ("PP&E") are stated at cost. PP&E consists of land under development which is held for investment; furniture and fixtures; and office machinery and equipment. PP&E (including buildings and structures after they are completed and put into service) are depreciated on a straight-line basis over their respective useful service lives. (See: Note 2 – "Inventory and Property").

5

Impairment of Long-Lived Assets

Long-lived assets are reviewed for impairment whenever events or changes in circumstances indicate that the carrying amount of the assets might not be recoverable. Conditions that would necessitate an impairment assessment include a significant decline in the observable market value of an asset, a significant change in the extent or manner in which an asset is used, or a significant adverse change that would indicate that the carrying amount of an asset or group of assets is not recoverable. For long-lived assets to be held and used, the Company recognizes an impairment loss only if its carrying amount is not recoverable through its undiscounted cash flows and measures the impairment loss based on the difference between the carrying amount and the estimated fair value.

Stockholders' Equity - Stockholders' equity consists of common stock, capital in excess of par value, deficit, and non-controlling interests in LLC. The Company's consolidated financial statements for the year ended December 31, 2015 reflect an increase of $718,614,000 in stockholders' equity resulting from LLC's July 2, 2015 acquisition of the Land Rights (a $431,168,400 increase in OMAG stockholders' equity and a $287,445,600 increase in non-controlling interests in LLC). (See: Note 2 – "Inventory and Property").

Estimates and Uncertainties - The preparation of financial statements in conformity with accounting principles generally accepted in the United States ("US GAAP") requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results as determined at a later date could differ from those estimates. In recording $718,614,000 in the accompanying consolidated financial statements for the year ended December 31, 2015 as the value of the non-cash consideration received by LLC as Land Rights, management relied to a great extent upon the written opinions of three expert valuation firms engaged by LLC to value such Land Rights. Furthermore, in allocating such Land Value to inventory and land under development, management relied to a great extent upon the written opinion of an expert independent accounting firm engaged by LLC to advise it on the proper accounting to record the Land Value in LLC's financial statements. Both LLC's independent auditor and OMAG's independent auditor are in agreement with and have consented to the accounting indicated in the consolidated financial statements for the year ended December 31, 2015. (See: Note 2 – "Inventory and Property").

Revenue Recognition - The Registrant follows the guidelines of SEC Staff Accounting Bulletin No. 101, "Revenue Recognition in Financial Statements" (SAB101). LLC signed a development agreement for the Omagine Project with the Government of Oman in October 2014, and will recognize revenue ratably over the development period of the Omagine Project measured by methods appropriate to the services or products provided.

Income Taxes - OMAG and JOL are subject to United States ("U.S.") income taxes at both the federal and state level and LLC is subject to income taxes in Oman. Separate state income tax returns are filed with each state in the U.S. in which OMAG or any subsidiary of OMAG is incorporated or qualified as a foreign corporation. LLC files an income tax return in Oman. Other than with respect to LLC, the Company is not presently subject to income taxes in any foreign country. The Registrant reports interest and penalties as income tax expense. Deferred tax assets and liabilities are recognized based on differences between the book and tax bases of assets and liabilities using presently enacted income tax rates. The Company establishes a provision for U.S. income taxes by applying the provisions of the applicable enacted tax laws to taxable income, if any, for the relevant period. Valuation allowances are established when necessary to reduce deferred tax assets to the amount expected to be realized.

Stock-based Compensation - Stock-based compensation is accounted for at fair value in accordance with Accounting Standards Codification 718, "Compensation – Stock Compensation" ("ASC 718"). For stock options granted, OMAG has recognized compensation expense based on the estimated grant date fair value method using the Black-Scholes valuation model. For such stock option awards, OMAG has recognized compensation expense using a straight-line amortization method over the requisite service period. ASC 718 requires that stock-based compensation expense be based on awards that are ultimately expected to vest. Stock option expense for the nine months ended September 30, 2017 and 2016 were $148,995 and $405, respectively (See Note 9).

Earnings (Loss) Per Share - Basic earnings (loss) per share of common stock ("Common Stock") is based upon the weighted-average number of shares of Common Stock ("Common Shares") outstanding during the relevant period. Diluted earnings (loss) per share is based upon the weighted-average number of Common Shares and dilutive securities (stock options, warrants, stock appreciation rights and convertible notes) outstanding during the relevant period. Dilutive securities having an anti-dilutive effect on diluted earnings (loss) per share are excluded from the calculation.

6

For the nine month periods ended September 30, 2017 and 2016, the Common Shares underlying the following dilutive securities were excluded from the calculation of diluted shares outstanding as the effect of their inclusion would be anti-dilutive:

| | 2017 | 2016 |
|---|---|---|
| Convertible Notes | 1,036,763 | 286,663 |
| Stock Options | 5,057,000 | 3,269,000 |
| Stock Appreciation Rights | 1,455,000 | 1,455,000 |
| Warrants | 6,672,124 | 6,422,124 |
| Total Common Shares Issuable | 14,220,887 | 11,432,787 |

Non-controlling Interests in Omagine LLC - As of the date of this report (and subject to the closing of the exercise of the OMAG Options) LLC is owned 75% by OMAG. In May 2011, OMAG's 100% ownership of LLC was reduced to 60% pursuant to a shareholders' agreement (the "Shareholder Agreement") signed by OMAG, JOL, the Office of Royal Court Affairs, an Omani organization representing the personal interests of His Majesty Sultan Qaboos bin Said, the ruler of Oman ("RCA"), and two subsidiaries of Consolidated Contractors International Company, SAL: "CCC-Panama" and "CCC-Oman" (collectively, "CCC").

CCC has defaulted on its investment obligation under the Shareholder Agreement and OMAG exercised its options under the Shareholder Agreement (the "OMAG Options") on April 3, 2017 to purchase all of LLC shares owned by CCC. Subsequent to the closing of this transaction CCC will no longer be a shareholder of LLC and the registered LLC shareholders with the Government of Oman will be so amended. As of the date thereof, the ownership percentages of LLC as registered with the Government of Oman are as follows:

| LLC Shareholder | Percent Ownership |
|---|---|
| OMAG | 60% |
| RCA | 25% |
| CCC-Panama | 10% |
| CCC-Oman | 5% |
| Total | 100% |

Recent Accounting Pronouncements

On August 27, 2014, the Financial Accounting Standards Board ("FASB") issued Accounting Standards Update ("ASU") 2014-15, "Presentation of Financial Statements—Going Concern (Subtopic 205-40): Disclosure of Uncertainties about an Entity's Ability to Continue as a Going Concern" ("ASU 2014-15"). ASU 2014-15 provides guidance on determining when and how reporting entities must disclose going concern uncertainties in their financial statements. The new standard requires management to perform interim and annual assessments of an entity's ability to continue as a going concern within one year of the date of issuance of the entity's financial statements (or within one year after the date on which the financial statements are available to be issued, when applicable). Further, an entity must provide certain disclosures if there is "substantial doubt about the entity's ability to continue as a going concern." The FASB believes that requiring management to perform the assessment will enhance the timeliness, clarity and consistency of related disclosures and improve convergence with IFRS (which emphasize management's responsibility for performing the going concern assessment). However, the time horizon for the assessment (look-forward period) and the disclosure thresholds under U.S. GAAP and IFRS will continue to differ. This ASU 2014-15 is effective for annual periods ending after December 16, 2016, and interim periods thereafter. The Registrant does not believe that this pronouncement has had or will have a material impact on our financial statement disclosures.

Certain other accounting pronouncements have been issued by the FASB and other standard setting organizations which are not yet effective and therefore have not yet been adopted by the Company. The impact on the Company's financial position and results of operations from adoption of these standards is not expected to be material.

## NOTE 2 – INVENTORY AND PROPERTY

The Company's consolidated financial statements for the nine months ended September 30, 2017 reflect $718,614,000 of land under development which the Company has allocated to inventory ($490,813,363) and property ($227,800,637). This $718,614,000 of land under development was purchased by LLC on July 2, 2015 pursuant to the terms of the Shareholder Agreement whereby an LLC shareholder agreed to transfer the Land Rights over one million square meters of beachfront land to LLC in exchange for the issuance to such shareholder of 663,750 Omagine LLC shares (the "LLC Shares"). Since the Land Rights represented a non-cash payment for the LLC Shares, it was necessary to value the Land Rights.

Three expert real estate valuation companies were engaged by LLC to independently value the Land Rights in accordance with the professional standards specified by the Royal Institution of Chartered Surveyors ("RICS") and International Financial Reporting Standards ("IFRS"). The average of the three Land Rights valuations was 276,666,667 Omani Rials ($718,614,000).

LLC engaged the services of PricewaterhouseCoopers LLP ("PwC") as its IFRS accounting consultant to definitively determine the correct method of recording the $718,614,000 average value of its Land Rights in its IFRS compliant financial statements. After receiving PwC's written opinion, LLC then consulted with its independent auditor, Deloitte & Touche (M.E.) & Co. LLC ("Deloitte") with respect to the matter and received Deloitte's written opinion agreeing with the PwC opinion. Both PwC and Deloitte independently concluded that the Land Rights should be recorded as capital, work-in-process (inventory) and land on LLC's financial statements. With respect to the Company's consolidated financial statements, OMAG's independent auditor in the U.S. has likewise concurred that, pursuant to US GAAP, the Land Rights should also be recorded as capital, inventory and land.

In determining the allocations to inventory and to land, LLC followed the advice of Deloitte by computing the percentage (x) calculated by dividing (y) the area of the land LLC definitively knew it intended to sell, by (z) the total area of land constituting the Omagine Site, and then multiplying that percentage (x) by $718,614,000 to get the correct number (N) for inventory. The correct number for land was then calculated by subtracting N from $718,614,000. Using its detailed internal financial model, management calculated (x) to be equal to 68.3%, thereby making the inventory number $490,813,363 and the land number $227,800,637. In its consolidated financial statements therefore, the Company has divided the Land Rights between land under development which is held for sale (inventory) and land under development which is held for investment (PP&E). These percentage allocations may be modified over time as the more precise land uses become apparent during and after the master planning and construction processes.

As more fully described in Note 1 and in Note 11 (See: the "Omagine LLC Shareholder Agreement" section of Note 11), financing for the Omagine Project has not yet been secured. If such financing is not obtained, LLC may not be able to complete the Omagine Project and may not be able to recover the $718,614,000 value of the land under development described above.

## NOTE 3 – PREPAID EXPENSES AND OTHER CURRENT ASSETS

Prepaid expenses and other current assets consist of:

|  | September 30, 2017 | December 31, 2016 |
|---|---|---|
| Prepaid rent (New York office) | $ — | $ 1,859 |
| Common Stock issued to investor relations vendor for services to be rendered from October 1, 2017 to December 31, 2017 | 7,500 | — |
| Total | $ 7,500 | $ 1,859 |

8

## NOTE 4 – CONVERTIBLE NOTES PAYABLE AND ACCRUED INTEREST

Convertible notes payable and accrued interest thereon consist of:

| | September 30, 2017 | December 31, 2016 |
|---|---|---|
| Due to a director of Omagine, interest at 10% per annum, due on demand, convertible into Common Stock at a conversion price of $2.50 per Common Share: | | |
| Principal | $ 150,000 | $ 150,000 |
| Accrued Interest | 104,987 | 93,768 |
| Due to investors, interest at 15% per annum, due on demand, convertible into Common Stock at a conversion price of $2.50 per Common Share: | | |
| Principal | 35,000 | 35,000 |
| Accrued Interest | 45,092 | 41,165 |
| Due to investors, interest at 10% per annum, due on demand, convertible into Common Stock at a conversion price of $2.50 per Common Share: | | |
| Principal | 50,000 | 50,000 |
| Accrued Interest | 21,760 | 18,021 |
| Due to entity owned by two Directors of Omagine, interest at 5% per annum, due on December 24, 2016, convertible into Common Stock at a conversion price of $0.75 per Common Share: | | |
| Principal | 100,000 | 100,000 |
| Accrued Interest | 5,521 | 1,781 |
| Due to an investor, interest at 0% per annum, due on March 12, 2018, convertible into common stock at a conversion price of $0.20 per Common Share (as modified April 13, 2017 and September 12, 2017) | | |
| Principal | 100,000 | 50,000 |
| Unamortized Debt Discount | - | (13,904) |
| Accrued Interest | - | 541 |
| Due to an investor, interest at 0% per annum, due on January 2, 2018, convertible into common stock at a conversion price of $0.15 per Common Share | | |
| Principal | 35,000 | - |
| Unamortized Debt Discount | (5,003) | - |
| Total | $ 642,357 | $ 526,372 |

## NOTE 5 – NOTES PAYABLE AND ACCRUED INTEREST – YA II PN. LTD. (n/k/a YA GLOBAL MASTER SPV. LTD.)

In July 2013, OMAG borrowed $200,000 from YA II PN, Ltd. ("YA") (p/k/a YA Global Master SPV, Ltd.) via an unsecured loan (the "2013 YA Loan") and on April 23, 2014 OMAG paid the 2013 YA Loan balance and accrued interest thereon due at April 23, 2014 in full and borrowed an additional $500,000 from YA via a second unsecured loan (the "2014 YA Loan") and on April 22, 2015 OMAG paid the 2014 YA Loan balance and the accrued interest thereon in full. On May 20, 2015, OMAG borrowed an additional $500,000 from YA via a third unsecured loan (the "2015 YA Loan"). On March 15, 2016 OMAG paid the 2015 Loan balance and the accrued interest thereon in full and borrowed an additional $600,000 from YA via a fourth unsecured loan (the "March 2016 YA Loan") and on June 22, 2016, OMAG borrowed an additional $400,000 from YA via a fifth unsecured loan (the "June 2016 YA Loan"). OMAG paid both the March 2016 Loan and the June 2016 Loan balances and accrued interest thereon in full. On December 7, 2016 OMAG borrowed an additional $750,000 from YA via a sixth unsecured loan (the "December 2016 YA Loan").

Notes payable and accrued interest thereon due to YA consist of:

| | September 30, 2017 | December 31, 2016 |
|---|---|---|
| December 2016 YA Loan – interest at 10% per annum, due in 12 monthly installments of principal ($75,000 monthly January 2017 to March 2017, $65,000 monthly April to June 2017, $55,000 monthly July 2017 to October 2017, $50,000 and $60,000 in November 2017 and $60,000 in December 2017.) | 460,000 | 750,000 |
| Less: Unamortized debt discount at September 30, 2017 and December 31, 2016 | (12,500) | (68,750) |
| Principal, net | 447,500 | 681,250 |
| Accrued interest | 23,790 | 5,137 |
| Total | $ 471,290 | $ 686,387 |

OMAG has not made monthly installments due YA for the months May 2017 to September 2017.

10

## NOTE 6 – NOTE PAYABLE – ST. GEORGE INVESTMENTS LLC

On November 14, 2016, the Registrant entered into an interest free six month Convertible Promissory Note with an accredited investor for the principal amount of $185,000 due on May 13, 2017, convertible into the Registrant's Common Stock only in the case of an Event of Default at a Conversion Price equal to 60% of the three lowest daily Volume Weighted Average Prices for OMAG's Common Stock during the twenty trading days immediately preceding the Conversion. OMAG may prepay the Note in whole or in part at any time without penalty. After deduction of a $30,000 original issue discount (OID) and legal fees of $5,000, the Registrant received net proceeds of $150,000 on November 16, 2016. On May 10, 2017 OMAG and St. George executed an Amendment to Convertible Promissory Note extending the maturity date to July 17, 2017 in consideration of a $10,000 extension fee paid to St. George. On July 12, 2017, August 14, 2017 and September 15, 2017, OMAG and St. George executed additional amendments extending the maturity date of the Convertible Promissory Note to August 17, 2017, September 17, 2017 and October 17, 2017, respectively, in consideration of extension fees paid to St. George of $8,000, $8,000 and $8,000, respectively,

## NOTE 7 – NOTE PAYABLE - JSJ INVESTMENTS INC.

On May 8, 2017, the Registrant entered into a Convertible Promissory Note with JSJ Investments Inc., an accredited investor, for the principal amount of $100,000 with interest at 12% per annum, due February 7, 2018 and convertible into OMAG's Common Stock after 180 days from the Issuance Date at a conversion price equal to 60% of the lowest trading price of the Common Stock during the twenty day period prior to the conversion. The Note provided that the Registrant may prepay the Note in full together with any accrued interest before the Prepayment Date which occurs 180 days after the Issuance Date with a cash redemption premium of 125% (in the case of prepayments within 90 days of the Issuance Date), 135% (in the case of prepayments 91 to 120 days after the Issuance Date) and 140% (in case of prepayments 121 to 180 days after the Issuance Date). (See: Exhibit 10.49, the Convertible Promissory Note).

## NOTE 8 – COMMON STOCK

With respect to the issuances of the Common Shares listed below:

1.  see Note 11 under "Equity Finance Agreements" with respect to sales of Common Shares made to YA II PN, Ltd. (p/n/a YA Global Master SPV, Ltd.) ("YA") pursuant to the Standby Equity Distribution Agreement ("2014 SEDA").

2.  where issuances of restricted Common Shares occurred at non-discounted valuations, it is so noted and all such non-discounted valuations were based on the closing price of a Common Share on the relevant date.

3.  where issuances of restricted Common Shares occurred at discounted valuations, it is so noted and all such discounted valuations were calculated using the Finnery Method based on the closing price of a Common Share on the relevant date less a restricted stock discount.

4.  where issuances of restricted Common Shares occurred at agreed upon negotiated prices, the sale proceeds or value of services rendered are so noted.

11

On January 4, 2017, OMAG contributed 123,782 restricted Common Shares at a non-discounted valuation of $76,250 to all eligible employees of Omagine Inc. 401(k) Plan.

On January 4, 2017, OMAG issued 81,169 restricted Common Shares at a non-discounted valuation of $50,000 to each of the Registrant's three independent directors based on the $0.616 closing price of the Registrant's Common Stock on December 30, 2016 for the 50% non-cash payment of the $100,000 annual retainer due them.

On January 13, 2017, OMAG sold 18,051 restricted Common Shares to an accredited investor for proceeds of $10,000.

On January 20, 2017, OMAG sold 25,000 restricted Common Shares to an accredited investor for proceeds of $12,500.

On January 25, 2017, OMAG sold 20,000 restricted Common Shares to an accredited investor for proceeds of $10,000.

On February 1, 2017, the President of the Registrant purchased 100,000 restricted Common Shares based on the $0.62 closing price of OMAG's Common Stock on January 31, 2017 minus the Finnerty discount of 18% for proceeds of $51,000.

On February 2, 2017, the three independent OMAG directors each purchased 94,340 restricted Common Shares and OMAG's Vice President purchased 47,170 restricted Common Shares based on the $0.6414 closing price of OMAG's Common Shares on February 1, 2017 minus the Finnerty discount of 18% for aggregate proceeds of $175,000.

On February 21, 2017, OMAG sold 200,000 restricted Common Shares to a non-U.S. person who is an accredited investor for proceeds of $100,000.

On March 31, 2017, OMAG issued 93,750 restricted shares of Common Stock to its investor relations vendor as payment in full for $37,500 of services rendered for the period January 1, 2016 through March 31, 2017, and issued an additional 56,250 restricted shares of Common Stock to the same vendor as payment in full for $22,500 of services to be rendered for the period April 1, 2017 through December 31, 2017.

On April 4, 2017, OMAG sold 266,667 restricted Common Shares to a non-U.S. person who is an accredited investor for proceeds of $80,000.

On April 17, 2017, pursuant to the SEDA, OMAG sold 132,275 Common Shares to YA for proceeds of $50,000.

On May 30, 2017, OMAG sold 25,253 restricted Common Shares to an accredited investor for proceeds of $7,500.

On June 6, 2017, OMAG sold 64,977 restricted Common Shares to an accredited investor for proceeds of $10,000.

On June 7, 2017, OMAG sold 20,000 restricted Common Shares to an accredited investor for proceeds of $3,078.

On January 16, 2016, OMAG contributed an aggregate of 61,001 restricted Common Shares at the non-discounted valuation of $76,250 to all eligible employees of the Omagine, Inc. 401(k) Plan.

On January 16, 2016, OMAG issued 38,462 restricted Common Shares to each of three independent directors for services to be rendered from January 1, 2016 to December 31, 2016 for an aggregate value of $150,000.

On April 5, 2016, the president of the Registrant purchased 56,000 restricted Common Shares based on the $0.90 closing price of OMAG's Common Stock on such date of purchase. The total purchase price of $50,400 was paid to the Registrant by the $50,400 reduction in the accrued salary and expenses owed by the Registrant to its president.

On April 6, 2016, the three independent directors of the Registrant each purchased 27,778 restricted Common Shares based on the $0.90 closing price of OMAG's Common Stock on April 5, 2016 for an aggregate of 83,334 Common Shares purchased. The aggregate purchase price of $75,000 was paid to OMAG by the $25,000 reduction in accrued director's fees owed by the Registrant to each of the independent directors.

On April 12, 2016, OMAG sold 700,000 restricted Common Shares to a non-U.S. person who is an accredited investor for proceeds of $504,000.

On April 22, 2016, the holders of a Convertible Note converted $30,984 of principal and accrued interest into 24,207 shares of Common Stock.

On May 17, 2016, an Independent Director exercised Stock Options at $0.85 to purchase 2,000 shares of Common Stock.

12

On June 15, 2016, pursuant to the SEDA, OMAG sold 31,289 Common Shares to YA for proceeds of $25,000.

On July 29, 2016, OMAG sold 10,684 restricted Common shares to an accredited investor for proceeds of $10,000.

On August 19, 2016, OMAG sold 13,245 restricted Common Shares to an accredited investor for proceeds of $10,000.

On August 30, 2016, OMAG sold 11,312 restricted Common Shares to an accredited investor for proceeds of $10,000.

On September 16, 2016, OMAG sold 34,247 restricted Common Shares to an accredited investor for proceeds of $25,000.

On September 19, 2016 OMAG paid a consultant 30,340 restricted Common Shares at a value of $25,000.

On September 21, 2016, OMAG issued 161,290 restricted Common Shares to YA in satisfaction of a $150,000 commitment fee due in connection with the extension of the 2014 SEDA to February 1, 2019.

On October 14, 2016, the Registrant entered into a Convertible Promissory Note with an accredited investor for the principal amount of $50,000 with interest at 5% per annum, due on April 14, 2017 and convertible into the Registrant's Common Stock at a conversion price of $0.65 per Common Share.

On October 17, 2016, the Registrant entered into an Interest Free Promissory Note with an accredited investor for the principal amount of $75,000, due on December 13, 2016, and in lieu of any interest due and payable on the principal amount of the Note, the Registrant issued to the Note Holder 150,000 Common Stock Purchase Warrants exercisable at the greater of (a) $0.50, or (b) 80% of the Market Price on the Trading Day immediately preceding the relevant Exercise Date. On December 5, 2016, the $75,000 note was satisfied (see sixth succeeding paragraph below).

On November 1, 2016, OMAG sold 20,000 restricted Common Shares to an accredited investor for proceeds of $10,000 and also sold 10,000 restricted Common Shares to an independent director who is also an accredited investor for proceeds of $5,000.

On November 4, 2016, OMAG sold 10,000 restricted Common Shares to an accredited investor for proceeds of $5,000.

On November 8, 2016, OMAG sold an aggregate of 20,000 restricted Common Shares to two accredited investors for aggregate proceeds of 10,000.

On November 14, 2016, OMAG sold 10,000 restricted Common Shares to an accredited investor for proceeds of $5,000.

On November 14, 2016, the Registrant entered into an interest free Convertible Promissory Note with St. George Investments LLC, an accredited investor, for the principal amount of $185,000 due on May 15, 2017, six months from the funding date of November 16, 2016, convertible into the Registrant's Common Stock only in the case of non-payment or in the Event of Default at a Conversion Price equal to 60% of the three lowest daily Volume Weighted Average Prices for the Registrant's Common Stock during the twenty trading days immediately preceding the Conversion. OMAG may prepay the Note in whole or in part at any time without penalty. After deduction of a $30,000 original issue discount (OID) and legal fees of $5,000, OMAG received net proceeds of $150,000 on November 16, 2016.

On December 5, 2016, OMAG sold 300,000 restricted Common Shares to an accredited investor for proceeds of $150,000 which was paid to OMAG by the cancellation and payment in full of the Registrant's $75,000 Promissory Note dated October 17, 2016 (see sixth preceding paragraph above) and the remaining $75,000 of the purchase price was paid to OMAG in cash.

On January 5, 2015, OMAG contributed an aggregate of 36,483 restricted Common Shares at the discounted valuation of $76,250 to all eligible employees of the Omagine, Inc. 401(k) Plan.

On February 23, 2015, OMAG paid a consultant 5,000 restricted Common Shares at the discounted valuation of $9,450.

On March 26, 2015, OMAG sold 6,281 restricted Common Shares to an accredited investor for proceeds of $10,000.

On March 26, 2015, OMAG sold 200,000 restricted Common Shares to a non-U.S. person who is an accredited investor for proceeds of $210,000.

On May 16, 2015, OMAG sold 100,000 restricted Common Shares to an officer and director for proceeds of $120,000.

13

On June 29, 2015, the Non-US investor (described below in connection with a June 24, 2014 transaction) exercised 158,228 Tempest Warrants at an exercise price of $1.58 for proceeds of $250,000.

On June 29, 2015, OMAG paid a finder's fee to a non-U.S. Finder in connection with the aforementioned sale of 158,228 restricted Common Shares. Such finder's fee was satisfied by issuing such non-U.S. Finder 7,911 restricted Common Shares valued at $12,500.

On June 30, 2015, a former director exercised 2,000 stock options for proceeds of $1,020.

On September 1, 2015, two new Directors were each issued 25,000 restricted Common Shares at a value of $50,000 each for services to be rendered from September 1, 2015 to December 31, 2015.

On September 3, 2015, pursuant to the SEDA, OMAG sold 17,696 Common Shares to YA for proceeds of $25,000.

On September 14, 2015, OMAG sold 10,000 restricted Common Shares to an accredited investor for proceeds of $14,700.

On October 8, 2015, 2,375 Tempest Warrants were transferred to an affiliate of the Non-U.S. Investor, a "Non-U.S. Affiliate".

On October 8, 2015, such Non-U.S. Affiliate exercised such 2,375 Tempest Warrants at an exercise price of $1.28 per Common Share for proceeds to OMAG of $3,040.

On October 26, 2015, OMAG sold an aggregate of 1,200,000 restricted Common Shares to three non-U.S. persons who are accredited investors (500,000 restricted Common Shares each to two investors and 200,000 restricted Common Shares to one investor) for aggregate proceeds to OMAG of $1,200,000.

On November 16, 2015, OMAG paid a finder's fee to a non-U.S. Finder in connection with the October 26, 2015 aforementioned sale of 1,200,000 restricted Common Shares. Such finder's fee was satisfied by issuing such non-U.S. Finder 33,334 restricted Common Shares valued at the discounted valuation of $60,000.

On November 16, 2015, OMAG sold 20,886 restricted Common Shares to an accredited investor for proceeds to OMAG of $25,000.

## NOTE 9 – STOCK OPTIONS, STOCK APPRECIATION RIGHTS AND WARRANTS

### Stock Options/Stock Appreciation Rights

OMAG's shareholders approved the reservation by OMAG of 2,500,000 Common Shares for issuance under the 2003 Omagine, Inc. Stock Option Plan (the "2003 Plan"). The 2003 Plan expired on August 31, 2013. On March 6, 2014, the Board of Directors approved the adoption of the 2014 Omagine, Inc. Stock Option Plan (the "2014 Plan").

Both the 2003 Plan and the 2014 Plan are designed to attract, retain and motivate employees, directors, consultants and other professional advisors of OMAG and its subsidiaries (collectively, the "Recipients") by giving such Recipients the opportunity to acquire stock ownership in OMAG through the issuance of stock options ("Stock Options") to purchase Common Shares.

OMAG has registered for resale the 2.5 million Common Shares reserved for issuance under the 2003 Plan by filing a registration statement with the SEC on Form S-8. At September 30, 2017, there were 2,117,000 unexpired Stock Options issued but unexercised under the 2003 Plan and all such Stock Options remain valid until the earlier of their exercise date or expiration date.

Pursuant to the 2014 Plan, 3,000,000 Common Shares were reserved for issuance. The 2014 Plan was amended to increase the reservation of 3,000,000 Common Shares for issuance to 5,000,000 Common Shares and to permit issuance of stock appreciation rights ("The Amended 2014 Plan"). OMAG intends to seek its shareholders' ratification of the adoption of the Amended 2014 Plan. At September 30, 2017, there were 2,940,000 unexpired Stock Options and 1,455,000 Stock Appreciation Rights ("SARs") issued but unexercised under the Amended 2014 Plan.

14

A summary of Stock Option and SARs activity for the periods ended September 30, 2017 and 2016 pursuant to both the 2003 Plan and the Amended 2014 Plan is as follows:

| | Number of Shares | Weighted Average Exercise Price | Weighted Average Remaining Contractual Term (in years) | Aggregate Intrinsic Value |
|---|---|---|---|---|
| Outstanding at January 1, 2016 | 4,728,000 | $ 1.98 | 1.41 | $ 26,240 |
| Exercised Q2 2016 | (2,000) | $ 0.85 | | |
| Expired Q2 2016 | (2,000) | $ 0.85 | | |
| Outstanding September 30, 2016 | 4,724,000 | $ 1.98 | 0.65 | |
| Exercisable at September 30, 2016 | 4,724,000 | $ 1.98 | 0.65 | |
| Outstanding at January 1, 2017 | 4,724,000 | $ 1.98 | 1.02 | - |
| Expired Q1 2017 | (160,000) | $ 1.25 | | - |
| Expired Q2 2017 | (2,000) | $ 1.70 | | |
| Granted Q3 2017 | 1,950,000 | $ 0.15 | | |
| Outstanding September 30, 2017 | 6,512,000 | $ 1.45 | 0.43 | - |
| Exercisable at September 30, 2017 | 6,512,000 | $ 1.45 | 0.43 | - |

Of the 6,512,000 Stock Options and SARs outstanding at September 30, 2017, 4,865,000 of such Stock Options were issued by OMAG in January 2012, December 2014, and July 2017 as "Strategic Options" to officers, directors and consultants of OMAG whose continued service was deemed by the Board of Directors to be particularly crucial to attaining LLC's then strategic goal of signing the Development Agreement ("DA") with the Government of Oman and in recognition of those efforts during 2014 and beyond. The Strategic Options are fully vested and provide for a cashless exercise feature. 1,965,000 of the Strategic Options are exercisable at $1.70 and expire December 31, 2017; 950,000 are exercisable at $2.55 and expire December 31, 2017; and 1,950,000 Strategic Options are exercisable at $0.15 and expire June 30, 2018. To continue to incentivize the retention and sustained service to the Company of its mission-critical employees and consultants, the expiration date of the 1,965,000 Strategic Options issued in January 2012 was extended by OMAG in December 2012 to December 31, 2013 (the "First Extension") and in December 2013 to December 31, 2014 (the "Second Extension") and in December 2014 to December 31, 2015 (the "Third Extension") and on August 12, 2015 to December 31, 2016 (the "Fourth Extension") and on December 9, 2016 to December 31, 2017 (the "Fifth Extension"). The December 31, 2015 expiration date of the 950,000 Strategic Options issued December 29, 2014 was extended on August 12, 2015 to December 31, 2016 ("First Extension") and on December 9, 2016 to December 31, 2017 ("Second Extension").

Of the 4,865,000 Strategic Options, an aggregate of 2,485,000 were granted to OMAG's three officers, an aggregate of 275,000 were granted to OMAG's independent directors and 1,500,000 were granted to the Deputy Managing Director of LLC who, pursuant to a March 2007 consulting agreement expiring on December 31, 2017, is also a consultant to the Registrant.

15

Of the 1,455,000 Stock Appreciation Rights, an aggregate of 750,000 were granted to three officers of OMAG, 15,000 were granted to one independent director and 675,000 were granted to the Deputy Managing Director of LLC.

On August 12, 2015, the expiration date of the 1,965,000 Strategic Options issued in January 2012 was extended from December 31, 2015 to December 31, 2016 (the "Fourth Extension"). The $915,493 estimated fair value of the Fourth Extension was calculated using the Black Scholes option pricing model and the following assumptions: (i) $1.91 share price, (ii) 507 day term, (iii) 147% expected volatility, (iv) 0.32% (507 day term) risk free interest rate and was expensed in full in the quarterly period ended September 30, 2015.

On August 12, 2015, the expiration date of the 950,000 Strategic Options issued in December of 2014 was extended from December 31, 2015 to December 31, 2016 (the "First Extension"). The $541,215 estimated fair value of the First Extension was calculated using the Black Scholes option pricing model and the following assumptions: (i) $1.91 share price, (ii) 507 day term, (iii) 147% expected volatility, (iv) 0.32% (507 day term) risk free interest rate and was expensed in full in the quarterly period ended September 30, 2015.

On June 30, 2015, a former OMAG director exercised 2,000 stock options at $0.51 per share.

On August 31, 2015, OMAG granted an aggregate of 1,455,000 Stock Appreciation Rights ("SARs") to six persons exercisable at $2.00 per share and expiring on December 31, 2017. Of the 1,455,000 SARs, an aggregate of 750,000 were granted to three officers of OMAG, 15,000 were granted to one OMAG independent director and 675,000 were granted to the Deputy Managing Director of LLC. The $1,654,481 estimated fair value of the SARs was calculated using the Black Scholes option pricing model and the following assumptions: (i) $1.60 share price, (ii) 854 day term, (iii) 147% expected volatility, (iv) 0.28% (854 day term) risk free interest rate and was expensed in full in the quarterly period ended September 30, 2015.

On December 9, 2016, the expiration date of the 1,965,000 Strategic Options issued in January of 2012 was extended from December 31, 2016 to December 31, 2017 (the "Fifth Extension"). The $232,263 estimated value of the Fifth Extension was calculated using the Black Scholes option pricing model and the following assumptions: (i) $0.78 share price, (ii) 387 day term, (iii) 91.45% expected volatility, (iv) 0.85% (387 day term) risk free interest rate and was expensed in full in the quarterly period ended December 31, 2016.

On December 9, 2016, the expiration date of the 950,000 Strategic Options issued in December of 2014 was extended from December 31, 2016 to December 31, 2017 (the "Second Extension"). The $59,660 estimated value of the Second Extension was calculated using the Black Scholes option pricing model and the following assumptions: (i) $0.78 share price, (ii) 387 day term, (iii) 91.45% expected volatility, (iv) 0.85% (387 day term) risk free interest rate and was expensed in full in the quarterly period ended December 31, 2016.

On July 7, 2017 (the "Grant Date"), the Registrant granted the aggregate of 1,950,000 stock options (the "July Strategic Options") to three officers, three independent directors and two consultants pursuant to a Board of Directors resolution. All such July Strategic Options are exercisable for the purchase of one share of the Registrant's Common Stock at an exercise price of fifteen cents ($0.15) per share in cash or via a "cashless exercise feature" which exercise price is in excess of 115% of the closing sale price for a share of OMAG's Common Stock on the trading day immediately prior to the Grant Date. All July Strategic Options are fully vested and are exercisable as of the Grant Date and all shall expire at 5pm Eastern Time on June 30, 2018. The eight individuals receiving grants of the July Strategic Options are: Frank J. Drohan, President, 500,000; Charles P. Kuczynski, VP and Secretary, 200,000; William Hanley, Controller, 100,000; 50,000 to each of three independent directors, Louis I.J Lombardo, Jack A. Smith, and Alan M. Manus; Sam Hamdan, Consultant and Deputy Managing Director of Omagine LLC, 500,000 and Agron Telaku, consultant, 500,000. The value of the Stock Options ($149,590) were calculated using the Black Scholes option pricing model and the following assumptions: (i) $0.1449 share price, (ii) 359 day term, (iii) 147.00% expected volatility, (iv) 1.22% (359 day term) risk free interest rate and was expensed in full in full in the quarterly period ended September 30, 2017

16

Issued and outstanding Stock Options and SAR's (all non-qualified) as of September 30, 2017 are as follows:

| Year Granted | Number Outstanding | Number Exercisable | Exercise Price | Expiration Date |
|---|---|---|---|---|
| 2008 | 150,000 | 150,000 | $ 2.60 | September 23, 2018 |
| 2012 | 1,965,000 | 1,965,000 | 1.70 | December 31, 2017 |
| 2013 | 2,000 | 2,000 | 1.38 | January 14, 2018 |
| 2014 | 40,000 | 40,000 | 1.80 | March 27, 2019 |
| 2014 | 950,000 | 950,000 | 2.55 | December 31, 2017 |
| 2015 | 1,455,000 | 1,455,000 | 2.00 | December 31, 2017 |
| 2017 | 1,950,000 | 1,950,000 | 0.15 | June 30, 2018 |
| Totals | 6,512,000 | 6,512,000 | | |

A summary of information about Stock Options and SARs outstanding at September 30, 2017 is as follows:

| | Stock Options Outstanding | | | Exercisable | |
|---|---|---|---|---|---|
| Range of Exercise Prices | Number of Shares | Weighted Average Exercise Price | Weighted Average Remaining Contractual Term (in years) | Number of Shares | Weighted Average Exercise Price |
| $ 0.00 - $1.00 | 1,950,000 | $ 0.15 | 0.76 | 1,950,000 | $ 0.15 |
| $ 1.01 - $2.00 | 3,462,000 | 1.83 | 0.27 | 3,462,000 | 1.83 |
| $ 2.01 - $3.00 | 1,100,000 | 2.56 | 0.36 | 1,100,000 | 2.56 |
| Totals | 6,512,000 | $ 1.45 | 0.43 | 6,512,000 | $ 1.45 |

As of September 30, 2017, there was $135 of unrecognized compensation costs relating to unexpired Stock Options, that is expected to be recognized in 2017.

*Warrants*

As of September 30, 2017, OMAG had 6,672,124 Common Stock purchase warrants ("Warrants") issued and outstanding. The Warrants do not contain any price protection provisions that would require them to be classified as liabilities (subject to re-measurement at fair value each time a balance sheet is presented) rather than presented as a component of stockholders' equity.

17

*The Tempest Warrants*

On June 24, 2014, in connection with the sale of 362,308 restricted Common Shares to an investor, OMAG issued 1,000,000 Warrants to such investor, each of which were exercisable for the purchase of one restricted Common Share at a per Common Share exercise price equal to the greater of: (a) $1.00 per Common Share, or (b) 80% of the closing sale price for a Common Share on the trading day immediately preceding the relevant exercise date (the "Tempest Warrants"). Prior to their expiration, a total of 650,603 Tempest Warrants were exercised for aggregate proceeds to OMAG of $916,540. The remaining 349,397 Tempest Warrants expired unexercised on June 23, 2016. As of the date of this report there were no Tempest Warrants issued or outstanding.

*Adjustable Warrants*

On October 14, 2016, in connection with a non-interest bearing convertible promissory note in favor of Rural Concepts LLC, a British corporation ("Rural Concepts"), OMAG issued 150,000 Warrants to Rural Concepts, each of which is exercisable for the purchase of one restricted Common Share at a per Common Share purchase price equal to the greater of (a) $0.50 per Common Share, or (b) 80% of the Market Price on the Trading Day immediately preceding the relevant Exercise Date (the "Adjustable Warrants"). On April 13, 2017, the Registrant issued a non-interest bearing $100,000 convertible promissory note to an accredited investor due October 12, 2017. In connection with the six month Note the Registrant issued 100,000 Adjustable Warrants to the accredited investor. The Adjustable Warrants expire on December 31, 2017.

*The Strategic Warrants*

OMAG has 6,422,124 Warrants outstanding, 3,211,062 of which are exercisable for the purchase of one Common Share at a per Common Share exercise price of $5.00 and 3,211,062 of which are exercisable for the purchase of one Common Share at a per Common Share exercise price of $10.00 (collectively, the "Strategic Warrants").

OMAG filed a post-effective amendment to its registration statement on Form S-1 (Commission File No. 333-183852) whereby the Strategic Warrants and the 6,422,124 Common Shares underlying the Strategic Warrants were registered by OMAG (the "Warrant Registration"). The Warrant Registration was declared effective by the SEC and its effective status expired. OMAG filed another post-effective amendment to the Warrant Registration on February 11, 2015 which was declared effective by the SEC on February 13, 2015 and its effective status expired. OMAG filed another post-effective amendment to the Warrant Registration on January 14, 2016 which was declared effective by the SEC on January 25, 2016 (the "Updated Warrant Registration"). As of the date hereof, the effective status of the Updated Warrant Registration expired and the Registrant intends to file a post-effective amendment to such Registration Statement with the SEC in order to again register the Common Shares issuable upon the exercise of the Strategic Warrants. Neither the exercise prices of the Strategic Warrants nor the number of Common Shares issuable upon exercise of the Strategic Warrants are subject to adjustment in the event of a stock split, combination or subdivision of the Common Stock, or a dividend, reclassification, reorganization, or spinoff.

On August 18, 2014, pursuant to a resolution of the Board of Directors, the expiration date for all Strategic Warrants was extended for a third time to June 30, 2015 and again on January 5, 2015, pursuant to a resolution of the Board of Directors, the expiration date for all Strategic Warrants was extended to December 31, 2015. On August 12, 2015, pursuant to a resolution of the Board of Directors, the expiration date for all Strategic Warrants was again extended to December 31, 2016 and on December 9, 2016, pursuant to a resolution of the Board of Directors, the expiration date for all Strategic Warrants was again extended to December 31, 2017. All other terms and conditions of the Strategic Warrants remained the same. All Strategic Warrants expire on December 31, 2017 unless redeemed earlier by OMAG upon 30 days prior written notice to the Strategic Warrant holders.

18

## NOTE 10 – U.S. INCOME TAXES

Deferred U.S. tax assets are comprised of the following:

| | September 30, 2017 | December 31, 2016 |
|---|---|---|
| U.S. federal net operating loss carry forwards | $ 6,613,000 | $ 6,333,000 |
| U.S. state and city net operating loss carry forwards, net of U.S. federal tax benefit | 2,100,000 | 2,011,000 |
| | 8,713,000 | 8,344,000 |
| Less: Valuation allowance | (8,713,000) | (8,344,000) |
| Total | $ — | $ — |

Management has determined, based on the Registrant's current condition, that a full valuation allowance is appropriate at September 30, 2017. At September 30, 2017, the Registrant had U.S. federal net operating loss carry forwards of approximately $20,995,000 expiring in various amounts from fiscal year 2017 to fiscal year 2037.

Current U.S. income tax law limits the amount of loss available to offset against future taxable income when a substantial change in ownership occurs.

The Registrant believes that it has no uncertain tax positions and no unrecognized tax benefits at September 30, 2017 and December 31, 2016.

## NOTE 11 – COMMITMENTS

### Leases

OMAG maintains its corporate offices at 136 Madison Avenue, 5th Floor, New York, NY 10016. The premises are leased by OMAG under a month to month lease from an unaffiliated third party, LLC leases premises in Muscat, Oman from an unaffiliated third party under a one year lease which commenced in January 2017 which provides for an annual rental of $35,880. The Registrant's rent expense for the nine month periods ended September 30, 2017 and 2016 was $44,459 and $45,657, respectively.

### Employment Agreements

The Registrant presently has no employment agreements with any person.

Pursuant to a prior employment agreement, OMAG was obligated to employ its President and Chief Executive Officer at an annual base salary of $125,000 plus an additional amount based on a combination of net sales and earnings before taxes. OMAG plans to enter into a new employment agreement with its President although the terms of such employment agreement have not yet been determined. OMAG has from time to time fully or partially suspended and accrued salary payments due to its President. For the years ended December 31, 2015 and 2016 the Registrant continued to accrue salary payable to Mr. Drohan on the basis of an annual salary of $125,000. On May 1, 2015 the Registrant paid its President $87,781 of accrued officer's payroll and on May 16, 2015 the Registrant applied $120,000 of accrued officer's payroll in exchange for the purchase of 100,000 restricted Common Shares of Omagine, Inc. stock at a purchase price of $1.20 per share. On April 5, 2016 the Registrant applied $50,400 of accrued officer's payroll in exchange for the purchase of 56,000 restricted Common Shares of Omagine Inc. stock at a purchase price of $0.90 per share. On June 14, 2016 the Registrant paid its President $55,601 of accrued officer's payroll. On February 1, 2017 the Registrant applied $51,000 of accrued officer's payroll in exchange for the purchase of 100,000 restricted Common Shares of Omagine, Inc. stock at a purchase price of $0.51 per share and on July 8, 2017 was paid $2,000 of accrued officer's payroll. At September 30, 2017 and December 31, 2016, OMAG had unpaid accrued officer's compensation due to its President of $129,155 and $88,405, respectively.

19

Pursuant to a prior employment agreement, OMAG was obligated to employ its Vice-President and Secretary at an annual base salary of $100,000. OMAG plans to enter into a new employment agreement with its Vice-President although the terms of such employment agreement have not yet been determined. OMAG has from time to time fully or partially suspended and accrued salary payments due to its Vice-President on the basis of an annual salary of $100,000. During 2015 the Registrant paid Mr. Kuczynski accrued officer's payroll of $33,000 on March 26, $2,000 on September 9, $3,200 on October 2, and $2,500 on December 7, 2015. During 2016 the November paid its Vice President accrued officer's payroll of $33,000 on June 23, $2,700 on July 28, $1,000 on October 20, $6,000 on November 4, and $10,000 on December 9, 2016. On February 2, 2017 the Registrant applied $25,000 of accrued officer's payroll in exchange for the purchase of 47,170 restricted Common Shares of Omagine, Inc. stock at a purchase price of $0.53 per share. In addition during 2017 the Registrant accrued officer's payroll of $3,000 on January 11, $7,350 on February 21, $2,000 on April 6, $5,700 on February 26, $10,000 on June 6, $5,000 on June 30, $2,000 on July 6. At September 30, 2017 and December 31, 2016, OMAG had unpaid and accrued officer's compensation due to its Vice-President of $164,072 and $149,121, respectively.

OMAG has from time to time fully or partially suspended and accrued salary payments due to its Controller on the basis of an annual salary of $80,000. On January 14, 2015 the Registrant paid its Controller $25,000 of accrued officer's payroll. On December 9, 2016 the Registrant paid the Controller $7,500 of accrued officer's payroll. At September 30, 2017 and December 31, 2016, OMAG had unpaid accrued officer's compensation due to its Controller of $242,100 and $182,100, respectively.

<u>Equity Financing Agreements</u>

Omagine, Inc. and YA were parties to a Stand-By Equity Distribution Agreement (the "2011 SEDA") which was due to expire on September 1, 2014. On July 21, 2014, the 2011 SEDA was terminated by the mutual consent of OMAG and YA.

On April 22, 2014, OMAG and YA entered into a new Standby Equity Distribution Agreement on generally the same terms and conditions as the 2011 SEDA (the "2014 SEDA"). Unless earlier terminated in accordance with its terms, the 2014 SEDA was to terminate automatically on the earlier of (i) the first day of the month next following the 24-month anniversary of the "Effective Date" (as hereinafter defined) (i.e. February 1, 2017), or (ii) the date on which YA shall have made payment to OMAG of Advances pursuant to the 2014 SEDA in the aggregate amount of $5,000,000. On September 20, 2016, the Registrant and YA entered into an agreement amending the SEDA extending the term of the 2014 SEDA to February 1, 2019 or to such date on which YA shall have made payment to OMAG of Advances pursuant to the 2014 SEDA in the aggregate amount of $5,000,000 (the "Second SEDA Amendment"). On April 22, 2014, in satisfaction of a $150,000 commitment fee due pursuant to the 2014 SEDA, OMAG issued 85,822 restricted Common Shares to YA Global II SPV, LLC, which is an affiliate of YA (the "Affiliate"). On September 21, 2016 in satisfaction of a $150,000 commitment fee due pursuant to the Second SEDA Amendment, OMAG issued 161,290 restricted Common Shares to the YA Affiliate. (See Note 8).

Pursuant to the terms of the 2014 SEDA, OMAG may in its sole discretion, and upon giving written notice to YA (an "Advance Notice"), periodically sell Common Shares to YA ("Shares") at a per Share price ("Purchase Price") equal to 95% of the lowest daily volume weighted average price (the "VWAP") for a Common Share as quoted by Bloomberg, L.P. during the five (5) consecutive Trading Days (as such term is defined in the 2014 SEDA) immediately subsequent to the date of the relevant Advance Notice (the "Pricing Period").

OMAG is not obligated to sell any Shares to YA but may, over the term of the 2014 SEDA and in its sole discretion, sell to YA that number of Shares valued at the Purchase Price from time to time in effect that equals up to five million dollars ($5,000,000) in the aggregate. YA is obligated under the 2014 SEDA to purchase such Shares from OMAG subject to certain conditions including (i) OMAG filing a registration statement with the SEC to register the resale by YA of the Shares sold to YA under the 2014 SEDA ("Registration Statement"), (ii) the SEC declaring such Registration Statement effective (the date of such declaration by the SEC being the "Effective Date"), (iii) OMAG certifying to YA at the time of each Advance Notice that OMAG has performed all covenants and agreements to be performed and has complied with all obligations and conditions contained in the 2014 SEDA, (iv) periodic sales of Shares to YA must be separated by a time period of at least five Trading Days, and (v) the dollar value of any individual periodic sale of Shares designated by OMAG in any Advance Notice may not exceed the greater of (a) two hundred thousand dollars ($200,000), or (b) the average of the "Daily Value Traded" for each of the five (5) Trading Days immediately preceding the date of the relevant Advance Notice, where Daily Value Traded is the product obtained by multiplying the number representing the daily trading volume of Common Shares for such Trading Day by the VWAP for a Common Share on such Trading Day.

20

Omagine Project

The Omagine Project is planned to be developed on one million square meters (equal to approximately 245 acres) of beachfront land facing the Gulf of Oman just west of the capital city of Muscat and nearby Muscat International Airport (the "Omagine Site"). LLC has signed a Development Agreement ("DA") and a Usufruct Agreement ("UA") for the Omagine Project with the Government of Oman. (See "Development Agreement and Usufruct Agreement" below). The Omagine Project is planned to be an integration of cultural, heritage, entertainment and residential components including a high-culture theme park and associated buildings, shopping and retail establishments, restaurants and approximately 2,100 residences.

Development Agreement and Usufruct Agreement

OMAG's majority owned subsidiary, LLC, signed a DA with the Government of Oman in October 2014 for the development in Oman by LLC of the Omagine Project. The legal effectiveness of the DA was conditional upon its ratification by Oman's Ministry of Finance, which Ratification occurred in March 2015. On July 1, 2015 (the "Operative Date"), the Government and LLC entered into the UA with respect to the land constituting the Omagine Site.

The Land Rights give LLC extensive rights over the land constituting the Omagine Site including the right to sell such land on a freehold basis. On July 2, 2015, the UA was registered by the Government and a Land Rights registration fee of 20,250 Omani Rials ($52,650) was paid by LLC to the Government (and expensed in the consolidated statements of operations for the three months ended September 30, 2015), which registration legally perfected LLC's ownership of the Land Rights.

The five year period commencing on the Operative Date is a rent free period and thereafter LLC will pay annual rent to the Government based on only the built but unsold commercial area of the Omagine Project (approximately 150,000 square meters) or approximately 45,000 Omani Rials ($117,000) per year based on the current annual per square meter rent of 0.300 Omani Rials ($0.78). The term of the DA is 20 years and the term of the UA is 50 years (renewable) commencing from the Operative Date. The UA and the DA provisions relevant to the UA survive the expiration of the term of the DA.

The Operative Date of July 1, 2015 is the date from which all time periods for the execution by LLC of various tasks enumerated in the DA are to be measured. The continued legal effectiveness of the DA subsequent to the Operative Date is dependent upon the following milestone dates being achieved (any or all of which may be extended or waived by the Government): (1) LLC's delivery to the Government within twelve months from the Operative Date of a term sheet with lenders for the financing of the first phase, any other phase or all of the Project, (2) LLC's submission to the Ministry of Tourism of a social impact assessment within 8 months of the Operative Date and the Government's approval thereof within 12 months of the Operative Date, (3) the Government's approval within 12 months of the Operative Date of the development control plan for the Omagine Project, and (4) the transformation of LLC into a joint stock company within 12 months of the Operative Date. The Ministry of Tourism has not further extended the Operative Date. Company management has had informal discussions with the concerned government officials and assuming LLC succeeds in closing an equity transaction with RCA per the Shareholder Agreement or to replace CCC as an LLC investor, management expects LLC will be granted an extension of time on many of such due dates similar to the extension of the Operative Date to July 1, 2015 already previously granted by the Government.

Pursuant to the DA, LLC must substantially complete the construction of the seven Pearl buildings and one hotel (the "Minimum Build Obligation" or "MBO") within 5 years of the Operative Date. Any material breach by LLC of its obligation to perform the MBO would constitute an event of default under the DA. The DA specifies that the principal construction contracts should be executed within one year of the Operative Date. LLC is required to provide written notice to the Government in certain circumstances, such as LLC's change in an anticipated milestone date that would result in a substantial achievement of work to occur later than 60 days after such milestone date. The DA provides that the Government is required to grant reasonable requests for the extension of the terms of the DA in such circumstances.

The foregoing discussion of the terms of the DA and UA is not meant to be definitive or complete and is qualified in its entirety by reference to the complete texts of the DA and UA as filed by the Registrant with the SEC.

Omagine LLC Shareholder Agreement

OMAG and JOL organized LLC in Oman and capitalized it with an initial investment of twenty thousand (20,000) Omani Rials ($52,000). On April 20, 2011, OMAG, JOL, RCA and CCC entered into a shareholder agreement relating to LLC (the "Shareholder Agreement").

Pursuant to the Shareholder Agreement, OMAG invested an additional 70,000 Omani Rials ($182,000) into LLC and agreed to make a further additional investment into LLC of 210,000 Omani Rials ($546,000) after the execution of the DA (the "OMAG Final Equity

Investment"). As of September 30, 2017, OMAG had invested 300,000 Omani Rials ($780,000) into LLC. Pursuant to the Shareholder Agreement, RCA invested the value of the Land Rights as a non-cash "payment-in-kind" capital contribution to LLC on July 2, 2015.

Further pursuant to the Shareholder Agreement, RCA and CCC invested an aggregate of 60,000 Omani Rials ($156,000) into LLC and agreed, subject to certain conditions precedent, to make further additional investments into LLC in the aggregate amount of 26,628,125 Omani Rials ($69,233,125). As of the date hereof, CCC has defaulted on its obligation to make its Deferred Cash Investment into LLC and OMAG has exercised the OMAG Options to purchase all of the LLC shares owned by CCC. RCA has not yet made its Deferred Cash Investment into LLC which was due by July 17, 2016. OMAG and RCA anticipate agreement to an "Amended and Restated Shareholder Agreement" pursuant to which RCA will make its OR 7,640,625 [$19,865,625] Deferred Cash Investment. (See: Note 1).

*The CCC Deferred Investment Obligation and the OMAG Options*

The conditions precedent to CCC and RCA being required to make their agreed $69,233,125 aggregate additional investments (their "Deferred Equity Investments") into LLC include (1) the execution of a construction contract on or before July 1, 2016 between LLC and CCC-Oman (the "CCC-Contract") and (2) execution of a legally binding agreement between LLC and a lender pursuant to which such lender agrees to provide Debt Financing for the first phase or any or all phases of the Omagine Project in an amount sufficient to finance the first phase of the Omagine Project's construction plus the installment payments due to OMAG for its Success Fee and Pre-Development Expense Amount (the "First Financing Agreement Date").

The First Financing Agreement Date occurred on November 29, 2015 but the CCC-Contract was not executed on or before July 1, 2016 nor will it be executed and RCA and OMAG are presently in negotiations with investors which may lead to an "Amended and Restated Shareholder Agreement".

The failure to execute the CCC-Contract by July 1, 2016 does not relieve RCA of its continuing obligation under the Shareholder Agreement (irrespective of such CCC-Contract failure) to make RCA's approximately $20 million Deferred Investment into LLC; but it may (under certain conditions) relieve CCC of its obligation under the Shareholder Agreement to make its approximately $49 million Deferred Investment into LLC.

Additionally pursuant to the Shareholder Agreement, such failure of the CCC-Contract to occur on or before July 1, 2016 automatically and without any further action required by any party, triggered and activated on July 2, 2016 an option in favor of Omagine, Inc. (the "OMAG Option") to purchase all LLC Shares presently owned by CCC at any time of OMAG's choosing prior to July 1, 2017 at a price equal to CCC's original purchase price of 22,500 Omani Rials ($58,500). Furthermore pursuant to the Shareholder Agreement, neither CCC-Oman nor CCC-Panama is permitted to sell any of such LLC Shares presently owned by them prior to July 2, 2017 to any Person other than Omagine, Inc., or to a purchaser designated by Omagine, Inc., in a sale made pursuant to the exercise of the OMAG Option. On April 3, 2017 OMAG exercised its option to purchase all of the shares of LLC owned by CCC-Oman and CCC-Panama. After the closing of the option purchase LLC will then have only two shareholders – OMAG and RCA.

Although RCA and OMAG are presently negotiating with an investor to replace CCC as an LLC investor, there is no assurance that it will happen. If agreement is not reached by RCA and OMAG on the matters presently under discussion with such investor, or if alternative financing is not obtained, or if alternative shareholder arrangements are not agreed, LLC may not be able to complete the Omagine Project and may not be able to recover the $718,614,000 value of the Land Rights included in the Registrant's Consolidated Balance Sheet at September 30, 2017 and December 31, 2016 (See Note 2).

Further pursuant to the Shareholder Agreement, LLC is required to pay OMAG a Success Fee of $10,000,000 in five equal annual installments beginning on or within 10 days after the Draw Date and a Pre-Development Expense Amount to be determined (presently estimated at $17,920,114) payable 50% on or within 10 days after the Draw Date and 50% in five equal annual installments beginning on the first anniversary of the Draw Date. The Draw Date is defined as "the date upon which LLC draws and receives the first amount of Debt Financing pursuant to a Financing Agreement". It is possible that the payment terms for the Pre-Development Expense Amount and the Success Fee may be modified.

22

NOTE 12 – RELATED PARTY TRANSACTIONS

At September 30, 2017 and December 31, 2016, respectively, OMAG's accounts payable included $72,051 and $88,800 due to its officers and directors.

For the nine months ended September 30, 2017 and 2016, OMAG expensed a total of $11,500 and $68,000, respectively, for consulting fees paid to an entity controlled by the Deputy Managing Director of LLC.

In April 2016, OMAG paid a $300,000 sponsorship fee to the same such entity controlled by the Deputy Managing Director of Omagine LLC for the Registrant to serve as the Title Sponsor Partner of the 2016 World Summit on Innovation and Entrepreneurship hosted by the United Nations at UN headquarters in New York City from May 19, 2016 to May 23, 2016.

NOTE 13 – SUBSEQUENT EVENTS

On October 4, 2017, pursuant to the SEDA, Omagine Inc. sold 940,740 Common Shares to YA for proceeds of $100,000.

Omagine, Inc. and Auctus Fund, LLC ("Auctus"), an accredited investor, entered into a convertible promissory note dated October 6, 2017 (the "Auctus Convertible Note" or the "Note") for the principal amount of $57,750. The Maturity date of the Note is July 6, 2018 and the Note may be prepaid at any time on or before April 6, 2018 with interest at 12% per annum and prepayment penalties ranging from 35% to 50% of the principal. The Note is convertible into the Company's Common Stock after 180 days from the Issuance Date at a conversion price equal to the lower of the Trading Price on the latest complete Trading Day prior to the date of this Note and fifty percent of the lowest Trading Price for the Common Stock during the twenty-five consecutive Trading Days ending on the latest complete Trading Day prior to the Conversion Date. The Company received the $45,000 net proceeds of the Note on October 16, 2017.

Omagine, Inc. and EMA Financial, LLC ("EMA"), an accredited investor, entered into a convertible promissory note dated September 28, 2017 (the "EMA Convertible Note" or the "Note") for the principal amount of $55,000. The Note is due September 28, 2018 with interest at 12% per annum and convertible into the Company's Common Stock after 180 days from the Issuance Date at a conversion price equal to the lower of the closing sale price for the Common Stock on the Principal Market on the Trading Day immediately preceding the Closing Date, and fifty percent of either the lowest sale price for the Common Stock on the Principal Market during the twenty-five consecutive Trading Days including and immediately preceding the Conversion Date, or the closing bid price. The Company received the $44,500 net proceeds of the Note on October 18, 2018.

On October 17, 2017, the Registrant and St. George Investments LLC executed a fifth amendment extending the Maturity Date to November 17, 2017 and the Registrant paid $8,000 to St. George Investments in consideration of the extension.

Omagine, Inc. and an accredited investor entered into a convertible promissory note dated November 2, 2017 for the principal amount of $146,000. The Note is due December 8, 2017 with interest at 12% per annum and convertible into the Company's Common Stock beginning on December 8, 2017 at a conversion price of $0.10 per Common Share, and beginning on December 15, 2017, the outstanding balance plus accrued interest on the Note is convertible into the Company's Common Stock at a conversion price of $0.05 per share. During the conversion period of the Note, on or after December 8, 2017 or December 15, 2017 as the case may be, the accredited investor shall be entitled to convert the Note at a conversion price of less than $0.10 or $0.05 as the case may be should any common stock purchase from the Company, or any exercise of Company stock options or warrants fall below the $0.10 or $0.05 conversion price of the Note then in effect. On November 2, 2017 in connection with the $146,000 note, OMAG modified the accredited investor's (i) April 13, 2017 promissory note (as amended September 12, 2017) by reducing the conversion price from $0.20 per share to $0.10 per share, (ii) modified the July 3, 2017 promissory note by reducing the conversion price from $0.15 to $0.10 per share, and (iii) modified the April 13, 2017 Warrant by extending the exercise date from December 31, 2017 to June 30, 2018, allowing for a cashless exercise of the Warrant, and changing the exercise price with a variable feature (the greater of 80% of the market price on the trading day preceding the relevant exercise date, or $0.50 per share) to an exercise price of $0.50 per share.

On November 3, 2017, Omagine, Inc. paid in full the $145,885 due pursuant to the ISJ Investments Inc. Convertible Promissory Note consisting of the $100,000 principal amount, $5,885 in accrued interest and the cash redemption premium of $40,000.

On November 13, 2017, the Registrant and St. George Investments LLC executed a sixth amendment extending the Maturity Date to December 17, 2017 and the Registrant paid $8,000 to St. George Investments in consideration of the extension.

23

Item 2 - Management's Discussion and Analysis of Financial Condition and Results of Operations

## Summary

The development of the Omagine Project has been delayed. We never expected that a $5 Billion company like CCC would default on their investment obligation – but they did. CCC has now been removed as an LLC shareholder and is being replaced by a new investor. The failure to execute the CCC-Contract by July 1, 2016 did not relieve RCA of its continuing obligation under the Shareholder Agreement to make its approximately $20 million Deferred Investment into LLC. This $20 million cash Deferred Investment from RCA was due to be paid to LLC on July 2, 2016 and is now past-due (the "Past-Due RCA Investment").

We have a written Investment Agreement from the local Omani investor mentioned below who has passed away and which investment we do not now expect to happen. We have a verbal commitment from a recently formed investment fund for MENA Region real-estate transactions (the "MENA-Venture Fund") organized by the Kossovar managers of a European fund with which we have been dealing. We have a non-legally binding November 2017 signed letter of intent from a Southeast Asian-based real-estate investment group which is active in Singapore and Thailand and is seeking to expand in the MENA Region (the "Singapore Developer"). LLC is presently in final discussions with the MENA-Venture Fund and is in continuing discussions with the Singapore Developer. In addition RCA and OMAG are also in continuing discussions with a Dubai based developer which was previously active in Oman and well known to RCA (the "Dubai Developer"). Omagine LLC hopes and intends to close the most advantageous deal it deems possible with one or more of these potential investors and/or co-developers or with some other prospective investor with which the Company is in contact.

During the second and third quarter of 2017 and continuing up to the date hereof multifaceted discussions and correspondence between and among management, MOT and RCA occurred with respect to, among other things, the Past-Due RCA Investment which is now an almost 18 month past due obligation of RCA to invest its $20 million equity investment into LLC (which was due and payable to LLC in July 2016), the status of the possible new investors to replace CCC, the timelines for completion of the Omagine Project and the possibility that the DA may be amended, extended, replaced or terminated by MOT. These complex discussions continue as of the date hereof and involve at least two Omani government ministries as well as other Oman and U.S. governmental entities and authorities and more recently now, probably Sultan Qaboos, the ruler of Oman as well. The outcome of these multifaceted discussions is not yet clear or concluded but in all such similar prior events – of which there were a few - MOT has granted the reasonable requests of the Company for the time extensions required to perform certain tasks such as the closing of either the $20 Million Past-Due RCA Investment and/or a new investor to replace CCC. Management understands that RCA and MOT are in contact and correspondence with respect to the Omagine Project and its development timelines, the DA, the UA, the $20 Million Past-Due RCA Investment, potential new investors and other matters and that RCA (which apparently is a continued strong supporter of the Omagine Project and of OMAG) is also in contact with His Majesty Sultan Qaboos regarding the Omagine Project's timelines, developers, the $20 Million Past-Due RCA Investment, potential new investors and possible adjustments to any of the foregoing. As would be expected, management is not privy to the exact nature of these hi-level government discussions but LLC management is scheduled to meet with the RCA representative sometime before November 24th to be briefed on such ministerial and governmental discussions as are relevant to the Omagine Project and the Omagine Project.

The OMAG Common Stock is, and always has been, a proxy for the performance of LLC and the project delays to date have put downward pressure on the OMAG Common Stock. LLC can begin the masterplanning and development of the Omagine Project when and if RCA pays its $20 million Past-Due RCA Investment obligation, or when and if an investment transaction with one of LLC's present investment prospects closes (which has not happened yet although we anticipate – but cannot guarantee - that it will occur soon). LLC management is presently in continuing intense discussions with:

i.    RCA, about RCA's $20 Million Past-Due RCA Investment obligation to LLC, and

ii    The MENA-Venture Fund to replace CCC as a $20 million financial investor, and

ii    the Singapore Developer regarding a co-development deal and a $20 million investment into LLC, and

iv    the Dubai Developer regarding a co-development deal and a $20 million investment into LLC.

Notwithstanding the foregoing, shareholders and investors are cautioned that until an equity investment transaction as generally described above actually closes LLC will not have the funding sufficient to begin design, masterplanning and initial site work on the Omagine Project and no assurance can be given at this time that any such investment transaction will be finally consummated.

Although LLC is presently negotiating the foregoing described transactions, there is no assurance that any of these investments will happen until they actually do happen. If agreement is not reached by LLC and/or RCA and/or one or more of the new investors on the matters presently under discussion, or if alternative financing is not obtained for both LLC and OMAG, LLC may not be able to complete

the Omagine Project, the Company may not be able to continue operations, and LLC may not be able to recover the $718,614,000 value of the Land Rights included in the Registrant's Consolidated Balance Sheet at September 30, 2017 and December 31, 2016.

Management cautions that future events rarely develop exactly as forecast and the best estimates routinely require adjustment. Investors and shareholders are cautioned not to place undue reliance on any forward-looking statement or forecast, which speaks only as of the date hereof.

24

Management presently estimates that the total net positive cash flow from the development of the Omagine Project will be approximately $3 billion and the net present value of that cash flow is approximately $1.6 billion. A present estimate therefore of the portion of that projected cash flow allocable to OMAG would be in excess of $1 billion USD assuming an OMAG ownership percentage of LLC of between 60% to 75%. Approximately $900 million to $1 billion USD would therefore be the expected damages to OMAG and the expected claim amount by OMAG in any potential lawsuit in the event of any untoward circumstances (which no one presently expects to occur) arising from LLC's not receiving for any reason, its required $20 Million Past-Due RCA Investment to begin development of the Omagine Project as a result of RCA's failure to fulfill its legally binding investment obligation pursuant to the Shareholder Agreement.

The financing and execution framework for real estate development projects are usually quite similar. They generally move from concept design; to feasibility studies; to land acquisition; to masterplanning; to detailed design; to debt financing for construction; to construction; and then finally to revenue generating sales and/or operations.

The financial architecture of real estate projects generally requires that the developer (in our case, LLC) finance and pay for all organizational costs (legal, accounting, administrative, etc.), concept design, land acquisition (i.e. purchasing the land for the project), initial feasibility and market studies, masterplanning, detailed design, financial advisory fees and/or other engineering & development consultancy costs (collectively, the "Soft Costs"). The Soft Costs are all financed from the developer's (in our case LLC's) own cash resources provided by its shareholders (in our case OMAG, RCA and CCC) and this is the reason that the receipt by LLC of the $20 Million Past-Due RCA Investment is so crucial to LLC's success. The cost of construction (the "Hard Costs") are generally financed via bank loans ("Project Finance").

Most Soft Costs are not capitalized as assets on the developer's balance sheet but are written off as operating expenses. Land however (like buildings, machinery or equipment) is a long-lived asset that is capitalized as an asset on the developer's balance sheet and recorded at the purchase price paid for it by the developer. Like any asset therefore, it becomes a component of the developer's shareholder equity.

As specifically memorialized by the Shareholder Agreement, LLC did not purchase the land rights with cash – but with shares of LLC stock. Therefore the consideration paid by RCA for the purchase of such shares of LLC stock was the approximately $720 million value of the land ("Land Rights") given in exchange for such stock. The acquisition of the land rights by LLC in exchange for LLC stock was negotiated by OMAG on behalf of LLC and resulted in a $720 million increase in LLC's shareholder equity with no cash outlay by LLC.

After the Soft Costs have been incurred by the developer, a project's construction is then generally financed via a combination of bank debt and the developer's cash (from equity or property sales). Bank debt is typically restricted by the bank assuring itself that there is an acceptable ratio of debt to equity on the developer's balance sheet (a typical ratio being 70% debt vs 30% equity) and requiring a portion of that equity to be cash equity.

For example using the 70/30 ratio, a developer wishing to construct a $330 million project (or a $330 million phase of a project) would need approximately $100 million of shareholder equity on its balance sheet in order to borrow the full $330 million. Such borrowings may of course be further supported or reduced by the developer utilizing the receipt of deposits, installment payments and final payments from property sales made by the developer during the construction of the project (or phase of the project) or by utilizing a portion of its own cash reserves.

One can readily see therefore the significant borrowing power advantage and financial leverage afforded to LLC by OMAG's negotiating and arranging for the aforementioned $720 million of Land Rights to be added to LLC's shareholder equity. Only after the developer (LLC) completes the land acquisition, the necessary engineering & development consultancy studies and the project masterplanning (all of which are Soft Cost tasks to be paid for by LLC), can LLC approach banks to arrange the debt facilities needed to finance the Hard Costs of construction. In the case of the Omagine Project, management estimates that such Soft Cost expenses will be approximately $25 million USD.

The 2011 LLC Shareholder Agreement among OMAG, RCA and CCC as well as OMAG's 2012 Strategic Warrant distribution to its shareholders and other capital raising activities (including the SEDA with YA and other private placement stock sales) foresaw, foreshadowed and accommodated the various future Omagine Project's development stages. Management had a clear-eyed pre-DA and Post-DA view of its multiple strategic objectives.

OMAG conceptualized the project and executed and financed all Pre-DA efforts including the following strategic objectives (i) signing a Shareholder Agreement that memorialized the land acquisition and assembled an unassailably credible and financially strong shareholder structure for LLC (RCA and CCC); (ii) arranging a world-class construction contractor with proven capability & financial capacity (CCC); (iii) demonstrating the project's desirability and viability to the Government (getting the DA signed). Delays in signing

the DA were much longer than expected but ultimately the foregoing Pre-DA strategic objectives - including the land acquisition - were achieved.

OMAG had financed its support of LLC and the Omagine Project during this Pre-DA time with private placement sales of its Common Stock, the YA SEDA and via a rights offering to its shareholders. Management viewed its Post-DA tasks as less complicated since the financial and operational roadmap had been put in place. The Shareholder Agreement was specifically structured to, among other things:

i. have LLC assume the ongoing financial burdens of carrying out the project in the Post-DA period,

ii. increase LLC's shareholder equity by $700 million to $1 billion via the land rights thereby greatly supporting LLC's Project Finance bank loan requirements, and

iii. reimburse OMAG for its $18 million of Pre-DA expenses.

25

Per the Shareholder Agreement which was purposefully structured to align the financial needs of the project's development with the financial resources required to execute it:

1) Pre-DA, OMAG financed the $18 million of pre-development expenses;

2) Pre-DA, the 3 shareholders made initial token investments totaling $390,000. ($234,000 by OMAG; $97,500 by RCA; $58,500 by CCC);

3) Post-DA, OMAG invested an additional $546,000;

4) Post-DA, RCA invested the land valued at $718 million;

5) Post-DA and after the 1st Financing Agreement Date & signing of the construction contract, CCC was obligated to invest $50 million;

6) Post-DA, RCA would also be obligated to invest an additional $20 million (the Past-Due RCA Investment).

Up until the DA was signed all LLC expenses were paid via OMAG's $18 million of pre-development expenses and the above $390,000 of LLC cash equity.

After the DA was signed, LLC's shareholder equity was increased by OMAG's additional investment of $546,000 and RCA's additional non-cash land investment of $718 million.

After the 1st Financing Agreement Date and Contract Date, CCC would be obligated to invest $50 million and RCA would invest the $20 million Past-Due RCA Investment – which investments would suffice to cover *the approximately $20 million of Budgeted Soft Costs mentioned above, the completion of which were a necessary precondition to any serious construction activities.*

Unfortunately CCC defaulted on its obligations under the Shareholder Agreement to invest its $50 million and RCA has delayed paying its $20 Million Past-Due RCA Investment as required by the Shareholder Agreement.

For the next 17 months (Dec 2015 thru April 2017) – and although the 1st Financing Agreement Date had occurred on November 29, 2015 – and although CCC and LLC had agreed on several iterations of the construction contract, – CCC essentially strung OMAG and RCA along with multiple promises and agreements to invest and sign the construction contract —— all of which false promises and agreements were ultimately dishonored by CCC.

Fortunately, the Shareholder Agreement also granted OMAG an option to purchase CCC's 15% ownership of LLC in the event of such a default by CCC. OMAG exercised this option in April 2017 and OMAG now owns 75% of LLC and RCA owns 25% of LLC. The foregoing described default by CCC (whether purposeful or otherwise) had several effects on LLC & OMAG:

1) Valuable time was lost in beginning the project development because the critical Soft Cost tasks of masterplanning and engineering studies could not be undertaken absent funding for the approximately $25 million Soft Cost budget mentioned above;

2) Someone had to continue to finance LLC's and the Omagine Project's existence Post-DA until either

   a. the CCC matter could be favorably resolved and CCC's investment received, or

   b. until CCC was replaced with an alternate investor, or

   c. until RCA paid its $20 million Deferred Cash Investment (the $20 Million Past-Due RCA Investment which was due on July 2, 2016).

However, only OMAG stepped forward to continue to finance LLC's and the Omagine Project's continued existence. OMAG has incurred approximately $13 million in such Post-DA expenses to date. Since the DA was signed, OMAG has in fact single-handedly kept LLC and the Omagine Project viable via its continued financing of LLC's operations. OMAG is no longer willing to continue this effort alone.

3) The OMAG Common Stock is, and always has been, a proxy for the performance of OMAG'S subsidiary, LLC. The aforementioned delays and financial strains put downward pressure on the OMAG stock thus inhibiting management's ability to utilize the SEDA or to arrange private placements of its Common Stock without unduly diluting its shareholders.

4) OMAG's continued financing of LLC's Post-DA expenses severely strained OMAG's resources and caused it to incur debt which management of OMAG previously had studiously avoided.

Nevertheless, now that the long drama / spectacle with CCC is over, the only matter preventing forward progress on the Omagine Project is closing an approximately $20 million equity investment in LLC. RCA could resolve this matter instantly by paying LLC the $20 Million Past-Due RCA Investment. A long past due $20 million investment obligation is already in place. Pursuant to the Shareholder Agreement, approximately 17 months ago in July 2016, RCA became obligated to invest $20 million into LLC. LLC has in a timely manner given RCA frequent written and verbal notices of this obligation but as of the date hereof RCA has not fulfilled this investment obligation.

We had expected to close a substantial LLC investment with an Omani investor in January 2017 but that investor died in November 2016.

We then expected to close a $20 million investment with a European fund in July 2017 and that fund's management has now formed the MENA-Venture Fund with whom discussions are presently ongoing. As discussed above, LLC management is attempting to close a $20 million investment with the MENA-Venture Fund to replace the CCC investment. This process has been ongoing now for many months and is well advanced. Management expects, but cannot guarantee, that its ongoing discussions with the MENA-Venture Fund will be successfully concluded.

Discussions with RCA regarding its $20 Million Past-Due RCA Investment obligation which became due under the Shareholder Agreement in July 2016 are also ongoing and are bound up with the complex negotiations mentioned above between and among LLC, OMAG, RCA and MOT.

LLC has a signed written agreement (an "Investment Agreement") with the local Omani investor who passed away in November 2016. This binding Investment Agreement was signed by LLC and the investor in November 2016 and contemplated the funding of the investment in January 2017. Subsequent to entering into this Investment Agreement, the investor unexpectedly passed away. The investor's heirs have acknowledged the validity of the Investment Agreement and we are awaiting the settlement of the investor's estate (which we understand to be quite substantial and complicated). We do not presently anticipate a positive outcome to this transaction however given the discord we have witnessed among the investor's heirs.

LLC is in final discussions with the MENA-Venture Fund mentioned above and is also in moderately advanced discussions and negotiations with both the Singapore Developer and the Dubai Developer.

Although often beset by byzantine delays, the present state of affairs with respect to the Omagine Project is quite straightforward. LLC will begin the masterplanning and development of the Omagine Project when either:

   i.   RCA fulfills its obligation pursuant to the Shareholder Agreement to invest its $20 million equity investment into LLC (the $20 Million Past-Due RCA Investment), or

   ii.  The closing of an equity investment for at least $10 million with a new LLC investor to replace CCC occurs.

Ongoing discussions and negotiations with the potential new investors and/or co-developers identified above and separately between and among the several parties involved (including RCA, MOT, OMAG and other relevant government officials) are expected to resolve the RCA investment impasse and the new investor closing. Management presently anticipates that a transaction with the MENA-Venture Fund with which it is in final negotiations may conclude by the end of November or early December 2017 but no assurance can be given that any such transaction will actually close until it actually does close.

Shareholders and investors are again cautioned that until an equity investment transaction as generally described above actually closes LLC will not have the funding sufficient to begin design, masterplanning and initial site work on the Omagine Project and no assurance can be given at this time that any such investment transaction will be finally consummated. We have experienced considerable delays to date.

27

*Overview*

Omagine, Inc. ("OMAG" or the "Registrant") was incorporated in Delaware in October 2004 and is a holding company which conducts substantially all its operations through its majority owned subsidiary Omagine LLC, an Omani limited liability corporation ("LLC") and its wholly-owned subsidiary Journey of Light, Inc., a New York corporation ("JOL"). The Registrant and JOL are sometimes collectively referred to herein as "OMAG" and the Registrant, JOL and LLC are collectively referred to herein as the "Company".

The Company is focused on entertainment, hospitality and real estate development opportunities in the Middle East and North Africa (the "MENA Region") and on the design and development of distinctive tourism destinations. The Company presently concentrates the majority of its efforts on the business of LLC and specifically on the Omagine Project. OMAG has 23,093,084 shares of its Common Stock issued and outstanding as of September 30, 2017.

In November 2009, OMAG organized LLC as its 100% wholly owned subsidiary under the laws of the Sultanate of Oman ("Oman") and pursuant to the provisions of the U.S.-Oman Free Trade Agreement to design, develop, own and operate our initial project – a mixed-use tourism and real estate project named the "Omagine Project" (See "The Omagine Project" below). OMAG originally capitalized LLC at Omani Rials ("OR") 20,000 [$52,000]. In 2011 OMAG's 100% ownership of LLC was reduced to 60% pursuant to a shareholders' agreement (the "Shareholder Agreement") signed by OMAG, JOL and three new LLC minority investors (See: Exhibit 10.6 and "The Shareholder Agreement" below).

In October 2014, LLC and the Government of Oman (the "Government") signed an agreement (the "Development Agreement" or "DA") for the development in Oman by LLC of the Omagine Project (See: Exhibits 10.7 and 99.1 and "The Development Agreement and the Usufruct Agreement," below). On July 2, 2015, after the Usufruct Agreement ("UA") was registered by the Government legally perfecting LLC's ownership of the Land Rights, the Government and LLC agreed that July 1, 2015 (the "Operative Date") was the date from which time periods for the execution by LLC of certain tasks enumerated in the DA were to be measured.

As of the date hereof, the shareholders of LLC as registered in Oman at the Ministry of Commerce & Industry (the "Registered Shareholders") are[1]:

   i.   Omagine, Inc. and

   ii.   Royal Court Affairs ("RCA"), an organization representing the personal interests of His Majesty Sultan Qaboos bin Said, the ruler of Oman, and

   iii.   Two subsidiaries of Consolidated Contractors International Company, SAL ("CCIC") which are:

      a.   Consolidated Contracting Company S.A. ("CCC-Panama"), a wholly owned subsidiary of CCIC, and

      b.   Consolidated Contractors Oman Company LLC ("CCC-Oman"), CCIC's operating subsidiary in Oman.

CCIC is a 65 year old Lebanese multi-national company headquartered in Athens, Greece having worldwide and operating subsidiaries in among other places, every country in the MENA Region. In its fiscal years immediately prior to 2016, CCIC had approximately five (5) billion U.S. dollars in annual revenue and one hundred thirty thousand (130,000) employees but management's best information at this time is that both CCIC's revenue and number of employees have since been dramatically reduced as a result of adverse economic and business conditions for CCIC in the MENA Region (See: "Market Conditions" below). CCC-Panama and CCC-Oman are sometimes referred to collectively in this report as "CCC".

---

[1]  As previously disclosed, all our prior efforts to conclude the CCC Contract and CCC's required investment under the Shareholder Agreement were unsuccessful. On April 3, 2017 OMAG exercised its option to purchase all of the shares of LLC owned by CCC-Oman and CCC-Panama, thereby leaving OMAG and RCA as LLC's two remaining shareholders. After the closing of the option purchase the Registered Shareholders at the Ministry of Commerce & Industry in Oman will be amended to reflect the fact that CCC is no longer an LLC shareholder.

28

Management has not abandoned its efforts to close the investment transaction memorialized by the Investment Agreement with the Omani investor who died in November 2016 but we have lost much valuable time and no longer believe it will occur in the time frame we and the Ministry of Tourism require. We have concluded that we can no longer rely on the assurances of the investor's heirs about an imminent conclusion of the estate as the heirs have frequently indicated to us that the estate settlement was imminent – but delays have continued to date. Management presently deems it highly unlikely that LLC will ever close this investment and no assurance can be given to investors and shareholders that such investment transaction will ever occur.

We are no longer relying on the conclusion of the estate settlement mentioned above and we are in final discussions with the MENA-Venture Fund with whom we have been holding discussions in parallel. We are also in an advanced state of discussions with the Singapore Developer and the Dubai Developer. Although we had expected to close an investment by now, that has not yet happened and we continue to be hopeful that such a financial investment with the MENA-Venture Fund can be closed by the end of November or early December 2017 and/or that a co-development transaction with either the Singapore Developer or the Dubai Developer can be arranged in early 2018 or before. Discussions continue with the MENA-Venture Fund and separately with the Singapore Developer who executed a Letter of Intent with LLC in November 2017. Separate discussions are also ongoing with RCA for the payment by RCA of the $20 Million Past-Due RCA Investment obligation.

LLC will not have the approximately $20 million of funding sufficient to begin the serious design, masterplanning and initial site activities on the Omagine Project until RCA pays LLC its $20 million equity investment as required by the Shareholder Agreement and/or until we close a transaction with a replacement investor for CCC. As mentioned above, the Soft Costs are typically paid for by the developer (LLC) out of equity as opposed to the much greater project finance costs which are typically paid for by the developer (LLC) via bank loans arranged by the developer. Management has also been conducting parallel project finance discussions with a bank and we expect a successful conclusion to that discussion to occur soon after RCA pays LLC the $20 Million Past-Due RCA Investment as required by the Shareholder Agreement or we close an equity investment with the MENA-Venture Fund, the Singapore Developer or the Dubai Developer.

Notwithstanding the foregoing, shareholders and investors are again cautioned that until an equity investment transaction as generally described above actually closes LLC will not have the funding sufficient to begin design, masterplanning and initial site work on the Omagine Project and no assurance can be given at this time that any such investment transaction will be finally consummated.

We intend to amend the Shareholder Agreement as necessary to memorialize any such new investment by a new investor when and if it occurs (an "Amended and Restated Shareholder Agreement"). Serious design, development and construction activities on the Omagine Project can begin only after such investment transaction closes.

As these matters unfold, management will report all material developments and agreements to its shareholders in a timely manner.

Although LLC is presently negotiating with RCA with respect to the payment to LLC of the $20 Million Past-Due RCA Investment obligation which is due from RCA pursuant to the provisions of the Shareholder Agreement, and with the MENA-Venture Fund, the Singapore Developer and the Dubai Developer to replace CCC as an LLC investor, there is no assurance that any of these investments will happen until they actually do happen.

If agreement is not reached by LLC and RCA with respect to the payment to LLC of the $20 Million Past-Due RCA Investment or by LLC and/or the MENA-Venture Fund, the Singapore Developer or the Dubai Developer (or some other new investor) on the matters presently under discussion as indicated herein, or if alternative financing is not obtained for both LLC and OMAG, LLC may not be able to complete the Omagine Project, the Company may not be able to continue operations, and LLC may not be able to recover the $718,614,000 value of the Land Rights included in the Registrant's Consolidated Balance Sheet at September 30, 2017 and December 31, 2016.

Management cautions that future events rarely develop exactly as forecast and the best estimates routinely require adjustment. Investors and shareholders are cautioned not to place undue reliance on any forward-looking statement or forecast, which speaks only as of the date hereof.

29

## The Shareholder Agreement

Upon organizing Omagine LLC in 2009, OMAG made an initial cash investment into LLC of OR 20,000 [$52,000] in consideration for the issuance to OMAG of 200,000 LLC Shares.

Pursuant to the Shareholder Agreement:

i.   Before the DA was signed and after the execution of the Shareholder Agreement, the LLC Shareholders purchased an aggregate of 1,300,000 LLC Shares for an aggregate cash investment of OR 130,000 [$338,000], as follows:

   a)   OMAG purchased an additional 700,000 LLC Shares for OR 70,000 [$182,000] in cash, and

   b)   RCA purchased 375,000 LLC Shares for OR 37,500 [$97,500] in cash, and

   c)   CCC-Panama purchased 150,000 LLC Shares for OR 15,000 [$39,000] in cash, and CCC-Oman purchased 75,000 LLC Shares for OR 7,500 [$19,500] in cash (collectively, the "225,000 Initial CCC Shares").

ii.  After the DA was signed on October 2, 2014, OMAG purchased an additional 2,100,000 LLC Shares for an additional investment by OMAG of OR 210,000 [$546,000] in cash, and

iii. On July 2, 2015, RCA purchased an additional 663,750 LLC Shares in consideration for the non-cash investment by RCA of the Land Rights valued at OR 276,666,667 [$718,614,000].

The construction contract with CCC-OMAN was not signed and the investments required pursuant to the Shareholder Agreement from CCC-Oman, CCC-Panama and RCA were not received by LLC. Pursuant to the terms and conditions of the Shareholder Agreement, OMAG was granted the OMAG Options to purchase the 225,000 Initial CCC Shares from CCC for 22,500 Omani Rials ($58,500) in the event of a default by CCC. (See: the Shareholder Agreement attached hereto as Exhibit 10.6). On April 3, 2017 OMAG exercised the OMAG Options to purchase all of the shares of LLC owned by CCC.

As of September 30, 2017 and the date hereof the LLC shareholders have made cash investments into LLC as indicated in the following Table A:

Table A -  LLC Shareholders' Cash Equity Investments into Omagine LLC

| | Omagine, Inc. | | Royal Court Affairs | | Consolidated Contractors | |
|---|---|---|---|---|---|---|
| | OR | USD | OR | USD | OR | USD |
| Initial cash equity investment at inception | OR 20,000 | $  52,000 | 0 | 0 | 0 | 0 |
| Additional cash equity investment at signing of Shareholder Agreement (the "SHA") | OR 70,000 | $  182,000 | OR 37,500 | $  97,500 | OR 22,500 | $  58,500 |
| Additional OMAG Deferred Cash Equity Investment due under the SHA before the first Financing Agreement Date ** | OR 210,000 | $  546,000 | 0 | 0 | 0 | 0 |
| Total Cash Equity Investments made by each of the LLC Shareholders into LLC as of December 31, 2016 and the date hereof | OR 300,000 | $  780,000 | OR 37,500 | $  97,500 | OR 22,500 | $  58,500 |

30

As of September 30, 2017 and the date hereof RCA has made a non-cash payment-in-kind investment into LLC as indicated in the following Table B:

Table B – RCA's Non-Cash Equity Investment into Omagine LLC

| | Omagine, Inc. | | Royal Court Affairs | | Consolidated Contractors | |
| --- | OR | USD | OR | USD | OR | USD |
| Additional non-cash equity investment of Land Rights on registration of the Usufruct Agreement | 0 | 0 | OR 276,666,667 | $718,614,000 | 0 | 0 |

As of July 1, 2016 and the date hereof RCA is obligated to make an additional Deferred Cash Investment (the Past-Due RCA Investment) into LLC as indicated in the following Table C:

Table C – RCA Deferred Cash Equity Investment into Omagine LLC

| | Omagine, Inc. | | Royal Court Affairs | | Consolidated Contractors | |
| --- | OR | USD | OR | USD | OR | USD |
| Additional RCA Deferred Cash Investment which is now due under the SHA | 0 | 0 | OR 7,640,625 | $19,865,625 | 0 | 0 |

As of June 30, 2016 CCC was obligated to make additional Deferred Cash Investments into LLC as indicated in the following Table D, however that did not occur.

Table D – CCC Deferred Cash Equity Investments into Omagine LLC

| | Omagine, Inc. | | Royal Court Affairs | | Consolidated Contractors | |
| --- | OR | USD | OR | USD | OR | USD |
| Additional Deferred Cash Investments which may be due under the SHA | 0 | 0 | 0 | 0 | OR 18,987,500 | $ 49,367,500 |

\* All conversions of Omani Rials to U.S. Dollars in this Report are calculated at an exchange rate of one (1) Omani Rial being equivalent to $2.60 except for the land valuation which is calculated at an exchange rate of one (1) Omani Rial being equivalent to $2.5974. See: "The Land Rights" and "Critical Accounting Policies", below.

31

In order to bring the Omagine Project to its present state, OMAG (as of September 30, 2017), has:

(i) invested 300,000 Omani Rials ($780,000) in cash into LLC, and

(ii) expended $17.9 million of Pre-Development Expenses on behalf of the Omagine Project through the October 2, 2014 DA signing date consisting of both cash and non-cash expense items as OMAG had promised to do pursuant to the SHA, and

(iii) single-handedly kept the Omagine Project and Omagine LLC financially afloat after the October 2, 2014 DA signing date by expending an additional $13.07 million (as of September 30, 2017) on behalf of the Omagine Project via cash loans from Omagine, Inc. to Omagine LLC ("Loans") and the direct payment by Omagine, Inc. of Omagine LLC liabilities and accounts payable ("Advances") consisting of $5.5 million of cash and $7.5 million of non-cash items, neither of which Loans nor Advances Omagine, Inc. had any obligation whatsoever to do pursuant to the SHA.

All $13.07 million of such Loans and Advances are liabilities of LLC to OMAG and due on demand. All $17.9 million of such Pre-Development Expenses will be liabilities of LLC, reimbursable to Omagine, Inc. in accordance with the terms of the Shareholder Agreement (as may be amended) See: the following Table E, and "Pre-Development Expenses and Loans and Advances to LLC" as of September 30, 2017, below.

### Table E - Pre-Development Expenses, Loans and Advances

| Summary | Cash Items | Non-Cash Items (Depreciation; Amortization; Stock Option Expense) | Total |
|---|---|---|---|
| Pre-Development Expense Amount (incurred prior to the October 2, 2014 DA signing date) | $13,611,951 | $4,308,163 | $17,920,114 |
| Loans & Advances as of 9/30/2017 (incurred on or after the October 2, 2014 DA signing date) | $5,530,763 | $7,544,856 | $13,075,619 |
| Total (Due to OMAG from LLC) | $19,142,714 | $11,853,019 | $30,995,733 |

The foregoing is a summary of some of the terms of the Shareholder Agreement and does not purport to be complete and it is qualified in its entirety by reference to the full text of the SHA. The full text of the SHA is attached hereto as Exhibit 10.6. RCA and OMAG are presently in negotiations with investors which may lead to an Amended and Restated Shareholder Agreement.

### The Omagine Project

The Omagine Project is a mixed-use tourism and residential real estate project. Subject to normal and customary scheduling changes during its development and construction the Omagine Project is expected to take approximately five years from the start date to complete. Due to CCC's default on its investment and construction contract obligations pursuant to the Shareholder Agreement and to RCA's delay in making its $20 million investment into LLC as required by the Shareholder Agreement, the project's start date has been significantly delayed and has not yet occurred. The Omagine Project is being developed on one million square meters (equal to 100 hectares or approximately 245 acres) of beachfront land (the "Existing Land") facing the Gulf of Oman just west of Oman's capital city of Muscat and approximately six miles from Muscat International Airport. Present development plans envision the creation of approximately a net additional 106,000 square meters of "Reclaimed Land" which together with the Existing Land will comprise approximately 1,106,000 square meters of land (the "Project Land"). The Omagine Project will require substantial Project Finance to complete (See: "The Shareholder Agreement", above and "Financial Advisor", below).

The Omagine Project is planned to be an elegant integration of cultural, scientific, heritage, entertainment and residential components, including seven pearl shaped (20 meter diameter) buildings (the "Pearls") located along an open boardwalk with associated entertainment exhibitions; an amphitheater and stage; green landscaped spaces; a canal; an enclosed harbor and marina; boat slips and docking facilities; retail shops; a variety of restaurants, cafés and entertainment venues; a five-star resort hotel; a four-star hotel; and possibly an additional three or four-star hotel; shopping and retail establishments integrated with the hotels; commercial office buildings; and more than two thousand elegant residences to be developed for sale by LLC. The ethos of the project is elegant but relaxed entertainment and the Company expects that the Pearls will become "the Landmark" for the Sultanate of Oman.

Pursuant to Omani Law, non-Omani persons are not permitted to purchase land in Oman unless such land is located within an Integrated Tourism Project ("ITC") such as the Omagine Project. The Government has designated the Omagine Project as an ITC and has issued a license to LLC (an "ITC License") thereby permitting the sale by LLC of the freehold title to the Project Land and to properties developed on the Project Land to any person, including any non-Omani person. Since the Omagine Project will contain significant hospitality (hotels), retail, commercial, and entertainment elements, LLC's business operations are expected over time to encompass real estate development, hospitality, entertainment and property management.

### The Development Agreement and the Usufruct Agreement

OMAG's majority owned subsidiary, LLC signed a Development Agreement ("DA") with the Government of Oman in October 2014 for the development in Oman by LLC of the Omagine Project. The legal effectiveness of the DA was conditional upon its ratification by Oman's Ministry of Finance which Ratification occurred in March 2015. On July 1, 2015, the Government and LLC entered into a Usufruct Agreement ("UA") with respect to the Land Rights over the Existing Land and the DA and UA extend such Land Rights to all of the Project Land.

On July 2, 2015, after the UA was registered by the Government legally perfecting LLC's ownership of the Land Rights, the Ministry of Tourism ("MOT") of the Government and LLC agreed in writing that July 1, 2015 would be the "Operative Date" from which time periods for the execution by LLC of certain tasks enumerated in the DA are to be measured. The MOT states in relevant part in writing to LLC that: *"We ask you to receive the land and begin procedures for executing the project as per the development agreement entered into with you, keeping in mind that the effective commencement date of the development agreement is 1 July 2015"*. (See Exhibits 10.8 and 99.2). The MOT has not further extended the Operative Date but MOT has previously agreed with RCA and OMAG that LLC should seek a new investor to replace CCC and then come back to MOT for the appropriate DA extensions as needed. Assuming RCA pays LLC the $20 Million Past-Due RCA Investment obligation specified in the Shareholder Agreement (or LLC replaces CCC with a new investor as contemplated above in this report but which has not yet happened), we expect the Operative Date to be extended. No assurance however can be given that such an equity transaction will be closed or that the Operative Date will actually be extended until such events actually occur.

During the second and third quarter 2017 and continuing up to the date hereof multifaceted discussions and correspondence between and among MOT, RCA, LLC and OMAG occurred with respect to the obligation of RCA to invest its $20 million equity investment into LLC (which was due and payable to LLC in July 2016), the status of the possible new investors to replace CCC, the timelines for completion of the Omagine Project and the possibility that the DA might be amended, extended, replaced or terminated by MOT. These complex discussions continue as of the date hereof and involve at least two Omani government ministries as well as other Oman and U.S. governmental entities and authorities and more recently now, probably Sultan Qaboos, the ruler of Oman as well. The outcome of these multifaceted discussions is not yet clear to the several parties involved. This is not the first time such discussions have taken place and in all such similar prior events, the Government has granted the reasonable requests of the Company for extensions of the time required to perform certain tasks such as the closing of either the $20 Million Past-Due RCA Investment and/or a new investor to replace CCC. Management cautions however that future events rarely develop exactly as forecast and the best estimates routinely require adjustment.

The DA and UA are the contracts that govern the design, development, construction, management and ownership of the Omagine Project, the use and sale by LLC of the Project Land, and the Government's and LLC's rights and obligations with respect to the Omagine Project. In the event of any conflict between the terms and conditions of the DA and the terms and conditions of the UA, the terms and conditions of the DA control (See Exhibits 10.7, 99.1, 10.8 and 99.2). The term of the DA is 20 years and the term of the UA is 50 years (renewable) commencing from the Operative Date. The UA and those DA provisions relevant to the UA survive the expiration of the term of the DA.

The Land Rights owned by LLC give it extensive rights over the Project Land including the right to sell such Project Land on a freehold basis. LLC may use, control, develop, retain, operate and/or sell the approximately 1.1 million square meters of Project Land to itself or to third parties. The DA obligates LLC to pay the Government twenty-five (25) Omani Rials ($65) for each square meter of Project Land purchased directly by LLC or sold by LLC to any third party (the "Land Price"). The average valuation for the Land Rights (net of such Land Price at OR 276,666,667 ($718,614,000) (See: "The Land Rights", below).

33

The five year period commencing on the Operative Date is a rent free period (the "Rent Free Period") and thereafter LLC will pay annual rent to the Government (the "Land Rent") based on only the built but unsold commercial area (excluding the residential area) of the Omagine Project (approximately 150,000 sq. meters) or approximately OR 45,000 ($117,000) per year based on the current annual per square meter fee of OR 0.300 ($0.78). No Land Rent is due or owing during the Rent Free Period and no Land Rent is ever due or owing with respect to plots of Project Land (i) on which there is a residential building, or (ii) on which there is not a substantially completed non-residential building (i.e. Project Land that is open space, roads, non-residential building work-in-progress, etc. are rent-free).

The continued legal effectiveness of the DA subsequent to the Operative Date is dependent upon certain milestone dates being achieved (any or all of which may be extended or waived by the Government), including: (1) LLC's delivery to the Government by June 30, 2016 of a term sheet with lenders for the financing of the first or any other phase of the Project, [this milestone date was achieved by the term sheet and financing agreement which LLC received from the Qatari Bank in November 2015], (2) LLC's submission to the Ministry of Tourism of a social impact assessment by March 31, 2016 and the Government's approval thereof by June 30, 2016, (3) the Government's approval by June 30, 2016 of the development control plan for the Omagine Project, and (4) the transformation of LLC into a joint stock company by June 30, 2016 (these milestone dates 2, 3 and 4 and others are not yet achieved and the dates required for their completion are expected to be extended as mentioned above if and when the Operative Date is extended). LLC has suffered many delays as a result of the CCC default and RCA's delay in paying the $20 Million Past-Due RCA Investment to LLC and as a result we have been assured recently and in the past by Government officials and RCA that the Operative Date will be extended by MOT provided we are able to begin the design, masterplan and development of the Omagine Project – which as noted above is entirely dependent upon either RCA paying the $20 Million Past-Due RCA Investment to LLC and/or LLC securing a replacement investor for CCC in a timely fashion. We understand from these government officials that MOT is losing patience with RCA and OMAG with regard to the continued delays and as a result there has been and continues to be some intense discussion and correspondence between MOT and RCA specifically about these matters as well as the abovementioned complex discussions and negotiations between and among MOT, RCA, LLC and OMAG with respect thereto. Management is not privy to the exact nature of the RCA-MOT discussions but understands and believes that RCA is defending the DA and UA interests of LLC (of which RCA is a shareholder) and that RCA may raise the matter to His Majesty Sultan Qaboos if they deem it necessary to do so. No assurances can be given at this time however that LLC's failure to meet certain milestone achievement dates will continue to be waived by MOT or that the Operative Date will be extended until these actions are actually done so in writing by MOT.

LLC management and RCA have met with and spoken to the Minister of Tourism and MOT staff members several times during the period from December 2016 to the date hereof in regard to CCC's default, RCA's investment obligation with respect to the $20 Million Past-Due RCA Investment, our efforts to finalize the Amended and Restated Shareholder Agreement with our proposed new investor who died and then with his heirs, our proposed investment funds and the MENA-Venture Fund who may be replacement investors for CCC, as well as in regard to the delays encountered to date by LLC in meeting certain DA milestone dates as measured from the Operative Date and the resulting DA defaults. The MOT (and all Government Ministries) are also acutely aware of the unusual fiscal strains over the past few years imposed on the present banking and economic environments in the region due to falling oil prices and stringent Government budget controls. No written extension of the Operative Date or additional written waivers of the Project development delays can be made by MOT until RCA invests its past due $20 million equity investment obligation into LLC or until we close an investment transaction with a replacement investor for CCC. As noted above MOT is losing patience with LLC with regard to the continued delays. Management is highly focused on convincing RCA to pay its $20 million investment obligation under the Shareholder Agreement to foreclose the possibility of any negative action being further pursued by MOT and then getting all prior LLC defaults and delays waived in writing by MOT, getting the prior LLC delays will in fact be waived in writing by MOT and getting the development of the Omagine Project started in earnest. Management understands from RCA that they (RCA) and MOT are presently directly discussing these very issues among themselves.

No assurance can be given however to what extent, if any, that such RCA-MOT discussions will yield a satisfactory result or that continued MOT verbal waivers of the LLC delays will occur or that RCA will promptly pay the $20 Million Past-Due RCA Investment amount to LLC or that LLC will close a transaction with the MENA-Venture Fund, the Singapore Developer, the Dubai Developer or any other investor or that as a result of any of the foregoing, the prior LLC delays will in fact be waived in writing by MOT or that the Operative Date will in fact be extended in writing by MOT. Our assumptions contained and expressed herein were reasonably based on information available to the Company at the time so furnished and as of the date of this report. All such forecasts, projections and assumptions are subject to significant uncertainties and contingencies, many of which are beyond the Company's knowledge or control, and no assurance can be given that such forecasts, projections or assumptions will be realized. No assurances can be given regarding the achievement of future results, as our actual results may differ materially from our projected future results as a result of the risks and uncertainties we face, and actual future events may differ from anticipated future events because of the assumptions underlying the forward-looking statements that have been made regarding such anticipated events.

Pursuant to the DA, LLC must substantially complete the construction of the seven Pearl buildings and one hotel (the "Minimum Build Obligation" or "MBO") by June 30, 2020 (the "MBO Completion Date"), as such date may be amended or extended per the DA as

indicated above. The DA imposes no performance timelines on LLC with respect to completing the development or construction of elements of the Omagine Project other than the MBO but the completion of the MBO will require LLC to obtain the necessary Project Finance to do so. Any material breach by LLC of its obligation to perform the MBO would constitute an event of default under the DA. The DA specifies that the principal construction contract should be executed by June 30, 2016. This (i.e. the CCC Contract) did not happen as indicated above. LLC is required to provide written notice to the Government in certain circumstances, such as LLC's change in an anticipated milestone date that would result in a substantial achievement of work to occur later than 60 days after such milestone date. Such notice has been communicated both verbally and in writing to the appropriate government officials and MOT is aware of the scope of the DA delays encountered by LLC to date. It will be necessary for MOT to extend the Operative Date (and in turn, the MBO Completion Date) as they have previously agreed to do subject to LLC securing the necessary equity investments outlined above in order for LLC to be able to meet the DA's construction deadline for the Minimum Build Obligation. It will not be possible to achieve the June 30, 2020 MBO Completion Date and we will necessarily require certain DA waivers and extensions in writing from MOT with respect to several matters in the DA after we resolve the $20 million equity infusion into LLC as described above.

34

OMAG undertook and financed many development activities on behalf of LLC subsequent to the DA signing (the "Initial Activities") in an effort to fast-track the Omagine Project's development. The fast-track advantages sought to be gained thereby however have not materialized due to CCC's default which resulted in LLC's failure to utilize the $25 million Al-Rayan Loan to finance the Initial Activities, and LLC's ongoing operations in Oman (See: our previous disclosures in prior reports filed with the SEC). The cause of such failure to utilize the $25 million Al-Rayan Loan was CCC's failure to make its Deferred Cash Investment into LLC as required after the November 2015 Financing Agreement Date after initially agreeing to do so and LLC's extended and much drawn out and ultimately futile negotiations with CCC relevant to the CCC-Oman construction contract (to which CCC often initially agreed to various versions and later reneged on their prior agreements).

Because of these delays therefore, the more serious and substantial design, master planning and construction activities for the Omagine Project did not begin in December 2015 as planned and as required for the fast-track development strategy management had planned; and they did not begin in July 2016 as would have been possible had RCA met its obligation to invest its $20 million into LLC in July 2016; and they have not yet begun. (See: "Initial Activities" and "Pre-Development Expenses and Loans and Advances to LLC", below).

Non-Omani persons (such as expatriates living and working in Oman) are not permitted by Omani law to purchase land or residences in Oman outside of an ITC. The Government's designation and licensing of the Omagine Project as an ITC therefore permits LLC to sell the freehold title to Project Land and properties which are developed on Project Land to any Omani or non-Omani individual or juristic person worldwide. Properties within an ITC enjoy a premium price relative to properties not in an ITC. Any Project Land or buildings remaining unsold at the expiration of the 50 year Usufruct Term will revert to the Government. LLC does not anticipate that there will be any such unsold properties at the expiration of the 50 year Usufruct Term.

The foregoing summary of some of the terms of the DA and of the UA does not purport to be complete and it is qualified in its entirety by reference to the full texts of such agreements. The full text of the Development Agreement is attached hereto as Exhibits 10.7 and 99.1. The full text of the Usufruct Agreement is attached hereto as Exhibits 10.8 and 99.2 and also contained in Schedule 2A of the Development Agreement.

*The Land Rights*

The value of the Project Land has been determined in 2015 by three highly experienced professional valuation firms in accordance with the requirements and procedures specified for such a valuation by (i) the Royal Institution of Chartered Surveyors ("RICS") of London, England, and (ii) International Financial Reporting Standards ("IFRS"). Each of the three firms has a worldwide brand in the real estate valuation business.

- In November 2014, LLC engaged the Oman office of Savills (http://www.savills.com/ ("Savills") operating as Arabian Real Estate LLC (http://www.savills.om). Savills provides real estate services from over 600 offices worldwide, is listed on the London Stock Exchange, and is a FTSE 250 Index company.

- In December 2014, LLC engaged DTZ International Ltd., a Dubai, UAE firm (now: Cushman & Wakefield International Limited) with extensive experience in Oman (http://www.cushmanwakefield.com) ("C&W"). C&W is one of the top global commercial real estate service companies.

- In January 2015, LLC engaged Jones Lang LaSalle, UAE Limited, Dubai Branch (http://www.jll-mena.com/mena/en-gb/locations/Our-locations-in-MENA/dubai) ("JLL"). JLL has 53,000 employees operating across more than 230 offices in 80 countries.

35

The Savills and C&W final valuation reports were received by LLC in January 2015. The ILL final valuation report was received by LLC in July 2015. The Company is of the opinion that ILL's valuation is flawed and most probably represents a statistical outlier. In an abundance of caution however, management has nevertheless determined to include the ILL valuation in its calculation of the average value of LLC's Land Rights. The Land Rights valuations by the three aforementioned firms are summarized in the table below:

### Land Rights Valuation

| Valuation Firm | Omani Rials |
|---|---|
| Savills | OR.295,000,000 |
| C&W | OR.385,000,000 |
| ILL | OR.150,000,000 |
| **Average** | **OR.276,666,667** |

In view of the changing economic conditions in the MENA Region due to the fall in oil prices, LLC may commission an updated land valuation in the coming months.

### The Accounting Treatment for the Land Rights

OMAG and JOL prepare their financial statements in accordance with accounting principles generally accepted in the United States ("US GAAP") and the Company prepares its consolidated financial statements in accordance with US GAAP. LLC's financial statements are prepared in accordance with International Financial Reporting Standards ("IFRS").

LLC has land under development valued at 276,666,667 Omani Rials. Based on a $2.5974 per 1 Omani Rial exchange rate, the Company recorded this land under development in its financial statements at $718,614,000 and the Company has allocated this amount as follows: 188,963,334 Omani Rials ($490,813,363 based on a $2.5974 per 1 Omani Rial exchange rate) to property. This land under development was purchased by LLC on July 2, 2015 pursuant to the terms of the Shareholder Agreement whereby an LLC shareholder subscribed for 663,750 LLC Shares at a purchase price equal to the value of the Land Rights. Since the Land Rights represented a non-cash payment-in-kind for the LLC Shares, it was necessary to value the Land Rights.

Three expert real estate valuation companies were engaged by LLC to independently value the Land Rights in accordance with the professional standards specified by RICS and IFRS. The average of the three Land Rights valuations was OR.276,666,667. (See: "The Land Rights", above and Exhibits 99.4, 99.5 and 99.6).

Since the 276,666,667 Omani Rial value of the Land Rights is substantial, LLC retained the services of PricewaterhouseCoopers LLP ("PwC") to provide its written analysis and report to LLC with respect to the correct IFRS accounting method LLC should use to record the 276,666,667 Omani Rial Land Rights value in its IFRS compliant financial statements. PwC did not advise on the valuation of the Land Rights (as determined by Savills, C&W and ILL), but only on the correct accounting LLC should use to record such Land Rights valuation in LLC's financial statements in accordance with IFRS. PwC's written report was received by LLC in August 2015. Promptly thereafter, LLC consulted with its independent auditor, Deloitte & Touche (M.E.) & Co. LLC ("Deloitte") with respect to the matter, and Deloitte's written technical analysis report (which agreed with PwC's analysis) was received by LLC in November 2015. Given the passage of time, the recent regional economic downturn (and attendant Government budget strains) spurred by the sudden oil price collapse, and the delays encountered to date by LLC in beginning the development of the Omagine Project, LLC intends to secure a new or updated land valuation report subsequent to the payment by RCA of the Past-Due RCA Investment or the closing of an investment into LLC as described above in this report.

The Land Rights over the Project Land are extensive, are closely akin to ownership rights and include the right to sell such land on a freehold basis. The Land Rights are virtually equivalent to ownership rights and like any asset, if its value were to become impaired for any reason (including any un-waived contractual reason pursuant to the DA requirements), a reserve for such impairment would need to be established at such time. Although it is not required to do so, in view of the unsettled economic environment in Oman and the greater MENA Region and because of the inordinate delays in resolving the CCC matters and obtaining a replacement investor for CCC, LLC plans to update its land valuation when it has the resources to do so to verify if any material changes in the value of the Project Land may have occurred since the above three valuation reports were completed. Consideration of the foregoing concerns may possibly require the establishment of such a reserve for impairment. Management's decision as to whether or not to undertake such updated reports and/or whether or not to establish such a reserve will depend to a large extent upon management's assessment at the time of the likelihood of (i) RCA fulfilling its $20 million equity investment obligation under the Shareholder Agreement, and (ii) securing a replacement investor for CCC, and the economic conditions in Oman. As of the date hereof intense and multifaceted discussions and correspondence between and among management, MOT and RCA continue with respect to the obligation of RCA to invest its $20

million equity investment into LLC, the status of a new investor to replace CCC and the possibility that the DA might be amended, extended, replaced or terminated by MOT. These complex discussions involve at least two government ministries as well as other governmental entities and authorities. If such discussions are not resolved favorably to LLC or if the Operative Date and DA timelines are not extended or if either the $20 Million Past-Due RCA Investment or an equity investment by a new investor is not soon received by LLC, then the Company may not be able to complete the Omagine Project or continue operations and may not be able to recover the $718,614,000 value of the Land Rights recorded in its financial statements. Both PwC and Deloitte independently concluded that the Land Rights should be recorded as capital and as tangible assets (work-in-process inventory and land) on LLC's financial statements.

36

With respect to the Company's consolidated financial statements, the Company's independent auditor in the U.S. has likewise concurred that pursuant to US GAAP, the Land Rights should be recorded as capital, inventory and land. Also pursuant to US GAAP long-lived assets are reviewed for impairment whenever events or changes in circumstances indicate that the carrying amount of the assets might not be recoverable. Conditions that would necessitate an impairment assessment include a significant decline in the observable market value of an asset, a significant change in the extent or manner in which an asset is used, or a significant adverse change that would indicate that the carrying amount of an asset or group of assets is not recoverable. For long-lived assets such as the Land Rights to be held and used, the Company recognizes an impairment loss only if its carrying amount is not recoverable through its undiscounted cash flows and measures the impairment loss based on the difference between the carrying amount and the estimated fair value. As stated above the Company intends to update its land valuation and may establish an impairment reserve for the Land Rights in light of (i) the continuing negative changes in the economic climate in the MENA Region and in Oman resulting from the recent collapse in oil prices (which have since somewhat recovered), (ii) the resulting economic strains evident in the Oman economy and Government budget deficits, and (iii) the uncertainties resulting from and surrounding the RCA and MOT discussions with respect to the $20 Million Past-Due RCA Investment and the Omagine Project, its prospects and future to which management is not privy.

In determining the proper amounts to be allocated to inventory and to land, LLC calculated the percentage (x) by dividing (y) the area of the land LLC presently plans definitively to sell, by (z) the total area of the Project Land, and then multiplying that percentage (x) by 276,666,667 Omani Rials to get the number (N) for inventory. The amount to be allocated to property was then calculated by subtracting N from 276,666,667 Omani Rials. Using its detailed internal financial model, management calculated (x) to be equal to 68.3%, thereby making the inventory number (N) equal to 188,963,334 Omani Rials ($490,813,363 based on a $2.5974 per 1 Omani Rial exchange rate) and the property number equal to 87,703,333 Omani Rials ($227,800,637 based on a $2.5974 per 1 Omani Rial exchange rate). In its consolidated financial statements therefore, the Company has allocated the value of the Land Rights between (i) land under development which is held for sale (inventory), and (ii) land under development which is held for investment (PP&E). As more precise land use percentages emerge during and after the masterplanning and construction of the Omagine Project, the percentage allocations for the value of the Land Rights may be reclassified to distinguish between the land underlying properties that we will own and operate and those which we will own and lease.

**Pre-Development Expenses and Loans and Advances to LLC**

Prior to the DA being signed, OMAG incurred significant costs related to marketing, planning, concept design, re-design, feasibility studies, engineering, financing, promotions, capital raising, travel, legal fees, consulting and professional fees, other general and administrative activities and similar such activities including preparing and making presentations to the Government and to potential investors and all other activities and matters associated with the negotiation and conclusion of the DA with the Government (collectively, the "Pre-Development Expenses"). The Shareholder Agreement defines the "Pre-Development Expense Amount" as the total amount of such Pre-Development Expenses incurred before the DA was signed by the Government and LLC on October 2, 2014.

OMAG expended $17,920,114 to pay for 100% of the Pre-Development Expense Amount.

Subsequent to the October 2, 2014 DA signing date OMAG has voluntarily - and without any obligation to do so - single-handedly kept LLC and the Omagine Project financially afloat by expending (as of September 30, 2017) an additional $13,075,619 million on behalf of LLC and the Omagine Project via Loans and Advances from OMAG to LLC.

37

With respect to the Company's consolidated financial statements, the Company's independent auditor in the U.S. has likewise concurred that pursuant to US GAAP, the Land Rights should be recorded as capital, inventory and land. Also pursuant to US GAAP long-lived assets are reviewed for impairment whenever events or changes in circumstances indicate that the carrying amount of the assets might not be recoverable. Conditions that would necessitate an impairment assessment include a significant decline in the observable market value of an asset, a significant change in the extent or manner in which an asset is used, or a significant adverse change that would indicate that the carrying amount of an asset or group of assets is not recoverable. For long-lived assets such as the Land Rights to be held and used, the Company recognizes an impairment loss only if its carrying amount is not recoverable through its undiscounted cash flows and measures the impairment loss based on the difference between the carrying amount and the estimated fair value. As stated above the Company intends to update its land valuation and may establish an impairment reserve for the Land Rights in light of (i) the continuing negative changes in the economic climate in the MENA Region and in Oman resulting from the recent collapse in oil prices (which have since somewhat recovered), (ii) the resulting economic strains evident in the Oman economy and Government budget deficits, and (iii) the uncertainties resulting from and surrounding the RCA and MOT discussions with respect to the $20 Million Past-Due RCA Investment and the Omagine Project, its prospects and future to which management is not privy.

In determining the proper amounts to be allocated to inventory and to land, LLC calculated the percentage (x) by dividing (y) the area of the land LLC presently plans definitively to sell, by (z) the total area of the Project Land, and then multiplying that percentage (x) by 276,666,667 Omani Rials to get the number (N) for inventory. The amount to be allocated to property was then calculated by subtracting N from 276,666,667 Omani Rials. Using its detailed internal financial model, management calculated (x) to be equal to 68.3%, thereby making the inventory number (N) equal to 188,963,334 Omani Rials ($490,813,363 based on a $2.5974 per 1 Omani Rial exchange rate) and the property number equal to 87,703,333 Omani Rials ($227,800,637 based on a $2.5974 per 1 Omani Rial exchange rate). In its consolidated financial statements therefore, the Company has allocated the value of the Land Rights between (i) land under development which is held for sale (inventory), and (ii) land under development which is held for investment (PP&E). As more precise land use percentages emerge during and after the masterplanning and construction of the Omagine Project, the percentage allocations for the value of the Land Rights may be reclassified to distinguish between the land underlying properties that we will own and operate and those which we will own and lease.

**Pre-Development Expenses and Loans and Advances to LLC**

Prior to the DA being signed, OMAG incurred significant costs related to marketing, planning, concept design, re-design, feasibility studies, engineering, financing, promotions, capital raising, travel, legal fees, consulting and professional fees, other general and administrative activities and similar such activities including preparing and making presentations to the Government and to potential investors and all other activities and matters associated with the negotiation and conclusion of the DA with the Government (collectively, the "Pre-Development Expenses"). The Shareholder Agreement defines the "Pre-Development Expense Amount" as the total amount of such Pre-Development Expenses incurred before the DA was signed by the Government and LLC on October 2, 2014.

OMAG expended $17,920,114 to pay for 100% of the Pre-Development Expense Amount.

Subsequent to the October 2, 2014 DA signing date OMAG has voluntarily - and without any obligation to do so - single-handedly kept LLC and the Omagine Project financially afloat by expending (as of September 30, 2017) an additional $13,075,619 million on behalf of LLC and the Omagine Project via Loans and Advances from OMAG to LLC.

37

A summary of the Pre-Development Expense Amount and of the Loans and Advances is detailed in the following table:

### Pre-Development Expenses, Loans and Advances

| | Cash Items | Non-Cash Items | Total |
|---|---|---|---|
| Pre-Development Expense Amount (incurred prior to the October 2, 2014 DA signing date) | $ 13,611,951 | $ 4,308,163 | $ 17,920,114 |
| Loans & Advances (incurred on or after the October 2, 2014 DA signing date) | $ 5,530,763 | $ 7,544,856 | $ 13,075,619 |
| Total Due to OMAG from LLC | $ 19,142,714 | $ 11,853,019 | $ 30,995,733 |

All $13,075,619 of such Loans and Advances are liabilities of LLC to OMAG and are payable on demand. All $17,920,114 of such Pre-Development Expenses will be liabilities of LLC to OMAG and reimbursable to OMAG in accordance with the terms of the Shareholder Agreement. The terms and conditions of an Amended and Restated Shareholder Agreement may change the presently existing terms and conditions of the existing Shareholder Agreement.

### The Pre-Development Expense Amount

Pursuant to the Shareholder Agreement as presently in effect, the date subsequent to the first Financing Agreement Date when LLC draws down the first amount of debt financing is defined as the "Draw Date".

The first Financing Agreement Date occurred on November 29, 2015 when LLC and Masraf Al Rayan signed a Financing Agreement. A Draw Date pursuant to that Financing Agreement never occurred however because CCC, after first agreeing in December 2015 to promptly (i) finalize the negotiation of the CCC-Oman construction contract ("CCC-Contract") which in December 2015 was in an advanced stage of completion, (ii) sign the CCC-Contract, and (iii) invest their Deferred Cash Investments immediately after the CCC-Contract was signed – subsequently – and on several different occasions defaulted on all of these commitments and on its obligations under the Shareholder Agreement. Consequently, these matters were the subject matter of numerous and virtually continuous discussions, negotiations and agreed changes (subsequently defaulted on by CCC) from December 2015 through March 2017 with many and varied interim "agreed agreements", all of which were "agreed" and then later forsaken by CCC. The CCC-Contract negotiations were ultimately abandoned by management (See: "The CCC-Contract", below) and the OMAG Options were exercised by OMAG in April 2017.

Further pursuant to the Shareholder Agreement as presently in effect:

1) the liability for the Pre-Development Expense Amount shall be recorded on LLC's financial records on the Draw Date and in accordance with International Financial Reporting Standards ("IFRS"), and

2) fifty percent (50%) of the Pre-Development Expense Amount will be paid to OMAG on or within ten (10) days after the Draw Date, and

3) the remaining fifty percent (50%) of the Pre-Development Expense Amount will be paid to OMAG in five equal annual installments beginning on the first anniversary of the Draw Date.

### The Loans and Advances to LLC

The $13,075,619 of Loans and Advances (as of September 30, 2017) are payable to Omagine, Inc. by LLC on demand (but as a practical matter, not until LLC has the financial capacity to do so and Omagine has no intention of demanding immediate payment of the Loans and Advances until LLC has such financial capacity).

## The Success Fee

The Shareholder Agreement defines the Success Fee as being equal to ten (10) million dollars. Pursuant to the terms of the Shareholder Agreement as presently in effect:

1) the liability for the Success Fee shall be recorded on LLC's financial records on the Draw Date and in accordance with the IFRS, and

2) the Success Fee will be paid to Omagine, Inc. in five annual two (2) million dollar installments beginning on or within ten (10) days after the Draw Date.

OMAG, may at its sole option, not enforce the aforementioned payment schedules for the Pre-Development Expense Amount and/or the Success Fee as agreed in the Shareholder Agreement and may agree to a different schedule for such payments and OMAG may likewise, at its sole option, refrain from demanding payment of the Loans and Advances until LLC is in a financial position to make such payment.

As of the date hereof, OMAG reluctantly continues to make Loans and Advances to and on behalf of LLC for the activities being undertaken by or on behalf of LLC for the Omagine Project and expects to do so for only a short time further or until RCA pays the $20 Million Past-Due RCA Investment to LLC or the closing of an equity investment replacing CCC into LLC occurs.

In light of the First Financing Agreement Date having already occurred with no associated Draw Date, an Amended and Restated Shareholder Agreement (assuming it is agreed and executed) is expected among other things, to address, restate and formalize more precisely the terms of repayment by LLC to OMAG of the Pre-Development Expense Amount and the Success Fee but the manner, terms and conditions to be agreed relative thereto is uncertain at this time. As stated above however, the Loans and Advances are current liabilities of LLC and are payable by LLC to OMAG upon OMAG's first simple demand. Management's primary goal continues to be the launch of serious design and construction activities for the Omagine Project as soon as possible and management does not object to any reasonable resolution of these and other matters preventing that goal from being accomplished. Notwithstanding the foregoing, if and when RCA pays the $20 Million Past-Due RCA Investment to LLC or LLC closes an equity investment to replace CCC similar to the potential equity investments mentioned above and herein or otherwise, it is OMAG management's present intention to demand repayment from LLC of all or a substantial portion of the Loans & Advances then due and owing from LLC to OMAG.

## LLC Capital Structure

As of the date hereof the Registered Shareholders have made:

(i) cash investments totaling OR 360,000 (of which OR 300,000 [$780,000] of which $300,000 [$936,000] was invested by OMAG), and

(ii) a non-cash investment of the Land Rights valued at OR 276,666,667 ($718,614,000), for a total investment to date of OR 277,026,667 ($720,269,334).

LLC is presently capitalized as follows:

| Shareholder | Omani Rials | US Dollars |
|---|---|---|
| OMAG | OR 300,000 | $    780,000 |
| RCA | OR 276,704,167 | $718,711,500 |
| CCC-Panama | OR 15,000 | $      39,000 |
| CCC-Oman | OR 7,500 | $      19,500 |
| Total | OR 277,026,667 | $719,550,000 |

As of the date hereof, as a result of OMAG having made its OR 210,000 ($560,000) Deferred Cash Investment into LLC, LLC is presently obligated to issue and register a further 2,100,000 LLC Shares to OMAG.

RCA has made its OR 276,666,667 ($718,614,000) non-cash PIK Investment of the Land Rights into LLC but has not yet made its OR 7,640,625 [$19,865,625] Deferred Cash Investment into LLC (the $20 Million Past-Due RCA Investment) in July 2016 as required by the Shareholder Agreement. It is management's expectation that OMAG and RCA will agree to an Amended & Restated Shareholder Agreement (including an Amended RCA Subscription Agreement) pursuant to which RCA will pay the $20 Million Past-Due RCA Investment to LLC and LLC will issue a further 663,750 LLC Shares to RCA in exchange for the Land Rights (which right to receive such 663,750 LLC Shares is presently waived by RCA pursuant to the present Shareholder Agreement because of RCA's failure to pay the $20 Million Past-Due RCA Investment to LLC as required by the Shareholder Agreement.

As of the date hereof, CCC has defaulted on its obligation to make its Deferred Cash Investment into LLC and to negotiate in good faith and sign the CCC Contract and RCA has not yet made its $20 Million Deferred Cash Investment into LLC in July 2016 as required by the Shareholder Agreement but is expected to do so pursuant to an Amended & Restated Shareholder Agreement which will include an Amended & Restated RCA Subscription Agreement.

As of the date hereof, the ownership percentages of LLC as registered at the Oman Ministry of Commerce & Industry are as follows:

| LLC Shareholder | % Ownership |
| --- | --- |
| OMAG | 60% |
| RCA | 25% |
| CCC-Panama | 10% |
| CCC-Oman | 5% |
| **Total:** | **100%** |

On April 3, 2017 OMAG exercised the OMAG Options to purchase all of the shares of LLC owned by CCC-Oman and CCC-Panama. RCA continues to be obligated to make its further cash investment into LLC in the aggregate amount of OR 7,640,625 [$19,865,625] but, depending upon the outcome of currently ongoing discussions, the timing and payment of such RCA Deferred Cash Investment may or may not change from that memorialized in the Shareholder Agreement presently in effect to that which may be agreed in an Amended and Restated Shareholder Agreement. CCC has indicated to management that it will default and not make its Deferred Cash Investment into LLC in the aggregate amount of OR 18,987,500 [$49,367,500].

*The Transformation*

At some time subsequent to the execution of the Amended and Restated Shareholder Agreement, LLC intends to transform its corporate structure from a limited liability company into a joint-stock company (the "Transformation").

The Shareholder Agreement also specifies, among other things, the corporate governance and management policies of LLC and it provides for the LLC shares presently owned by JOL to be transferred to OMAG subsequent to the signing of the DA. We presently expect this share transfer to occur at the time of the Transformation of LLC into a joint stock company or at the time of the execution of the Amended and Restated Shareholder Agreement.

The foregoing summary of the terms of the Shareholder Agreement does not purport to be complete and is qualified in its entirety by reference to the full text of the Shareholder Agreement attached hereto as Exhibit 10.6.

**Banks, Investors and Contractors**

**The Al Rayan Bank**

As previously reported, on November 29, 2015, LLC executed a Murabaha Facility Agreement (the "Al Rayan Loan Agreement") with Masraf Al Rayan Bank (Qatar) for a $25 million loan (the "Al Rayan Bank Loan") to finance the first phase of the Omagine Project consisting of design, development and initial construction activities. The Al Rayan Bank Loan, which was subject to the satisfaction of certain conditions precedent to closing, would bear interest at an annual rate equal to the 12 month LIBOR rate plus 1% and would be payable one year from the closing date. One condition precedent to closing was that the loan be secured by a $25,000,000 cash deposit in an LLC account at Masraf Al Rayan Bank (Qatar). Such security deposit was expected (and agreed by CCC) to be provided by CCC pursuant to the terms of the Shareholder Agreement but CCC reneged on its agreement to do so and this did not occur. As a result, this Al Rayan Bank Loan facility was not and will not be utilized. The Al Rayan Loan Agreement and the Al Rayan Bank Loan will not be utilized by LLC due to CCC's default and failure to make its required OR 18,987,500 [$49,367,500] Deferred Investment into LLC pursuant the Shareholder Agreement.

Management remains optimistic that its ongoing discussions with an alternative bank can be concluded when and if RCA pays the $20 Million Past-Due RCA Investment to LLC and/or a new investor to replace CCC becomes an LLC shareholder.

40

## Other Investors and Contractors

During 2015, 2016 and to date, management has conducted a multitude of investor presentations across the MENA Region, Europe and Asia with potential LLC equity investors and high net-worth individuals. Several of these investors expressed interest in becoming shareholders of LLC and LLC management is presently focused on the MENA-Venture Fund, the Singapore Developer and the Dubai Developer as potential investors. Since approximately 18 months ago, (July 2016) RCA remains obligated to invest its $20 million equity investment into LLC.

Given the present liquidity issues at local banks, the matter of construction debt financing ("Project Finance") is an issue at the top of all developer's and contractor's agendas. As mentioned above, the required Project Finance for the Omagine Project – or any project – is not really needed until after the masterplanning and design phase is complete or near complete.

## Design, Development & Construction:

The design, development and construction of the Omagine Project will be divided into various phases (each, a "Phase"). Since the CCC Contract has not and will not be signed, neither CCC nor any other contractor is presently expected to be the General Contractor for the entire Omagine Project. The various construction Phases are now expected to be put out to bid to various contractors and this competitive bidding process (especially given the present economic environment for contractors in the MENA Region) is expected to garner substantial cost savings for LLC.

## Initial Activities

The Post-DA Period is the time period between the DA signing and the date hereof. The execution of many initial activities during this period by LLC required the parallel launching by LLC management of many diverse efforts and processes on multiple fronts immediately after the DA Execution Date of October 2, 2014. This early initiative fast track strategy which was financed entirely by OMAG included:

1. the DA was Ratified by the Government;

2. the UA was signed and registered with the Government;

3. the Operative Date of July 1, 2015 replaced both the Execution Date of October 2, 2014 and the Effective Date of March 11, 2015 referenced in the DA;

4. three separate valuation studies and reports were commissioned and the valuation of the Land Rights was completed;

5. expert accounting analyses and reports were received from PwC, Deloitte and the Company's independent auditor regarding LLC's purchase of the Land Rights and the recording thereof in LLC's and the Company's financial statements;

6. LLC booked 276,666,667 Omani Rials of new equity which is also reflected in the Company's consolidated financial statements;

41

7.   a cost accounting budgetary framework to be used during the development, construction and marketing of the Omagine Project was created by an independent accounting and finance consultant;

8.   an expert IT consultant was selected to architect and install the IT framework and solutions we intend to implement across LLC and the Company and across the Omagine Project's "smart city" environment;

9.   an independent third party update to our feasibility study was commissioned and completed;

10.  an update of LLC's internal financial model by specialist real estate investment bankers and advisers was commissioned and completed;

11.  confirmation from banks in Oman (but not from banks outside of Oman) that the value of the Land Rights can be used as collateral to support the Syndicated Bank Financing was received;

12.  the "Brand Identity" and associated brand pillar components and uniform brand messaging platform we intend to implement for Omagine, LLC and the Omagine Project were created;

13.  LLC's strategic plan was completed;

14.  multiple meetings with, and multiple iterations of proposals and presentations from major mission-critical project consultants (architects, designers, master planners, engineers, program managers, quantity surveyors, real estate advisers, hospitality advisers, hotel management companies, financial advisers and others) have been received, reviewed and analyzed by management and selections of many consultants have been made by management;

15.  candidates for senior LLC executive positions have been recruited, interviewed and selected;

16.  extensive and multiple presentations and meetings with potential LLC equity investors in six MENA Region countries, Europe, Asia and the U.S. were conducted and while most purported investors turned out in the end to be brokers, not investors, negotiations with several selected strategic investors are still ongoing with a present focus on the MENA-Venture Fund, the Singapore Developer and the Dubai Developer as potential investors;

17.  extensive and multiple presentations and meetings with local, regional and international banks in Oman, the MENA Region and Europe with respect to the provision of Syndicated Bank Financing have occurred with a present focus on one such bank;

18.  Multiple drafts of the CCC Contract were created (most recently in May 2016) but the final attempt to close this transaction ended unsuccessfully after many delays, and

19.  several other initial drafts of contracts for mission-critical consultants were prepared.

*The CCC Contract / The CCC Phases*

The CCC-Contract was not and will not be signed with CCC-Oman. Management was previously optimistic and positively inclined to believe that a beneficial conclusion for all parties concerned would be forthcoming but no conclusion occurred and management finally concluded that no amount of further negotiations would result in a definitive conclusion of these matters with CCC.

The Omagine Project will however still be developed in Phases but the previously described and disclosed description of phases will be altered as we go forward. Discussions with CCC have ceased and OMAG has exercised its option to purchase all of the shares of LLC owned by CCC-Oman and CCC-Panama.

It is presently expected that several building contractors will be involved in the project as the various Phases of the work is designed and specified and then put out to bid by local contractors after the design is substantially completed. As part of the masterplaning, we will develop a phasing program for the entire project and as the design and/or specifications of any Phase is sufficiently completed such that LLC can tender it for competitive bidding it will do so. CCC-Oman will be welcome to bid on any such Phase if it so desires.

42

Any new construction contracts with potential contractors will be modeled after the early draft CCC-Contract as envisioned by LLC and will be based on internationally accepted contracting standards promulgated by the International Federation of Consulting Engineers ("FIDIC") and will contain a set of industry standard performance parameters, incentives and penalties to ensure LLC's interests are protected and that value is delivered.

LLC will manage the bidding and competitive process by which the various contractors will be chosen. There is an ample supply of qualified contractors in Oman and the MENA region.

The contractor will only commence construction activities on a Phase or section of a Phase after the design therefore is substantially completed and after the competitive bids therefore are examined and a contract award is made by LLC.

It is anticipated that several Phases will be under construction simultaneously in an overlapping manner as the various designs and specifications for the various Phases are sequentially completed. Construction on Phases will continue until the conclusion of all Permanent Works constituting the Omagine Project are completed.

LLC plans to maintain a robust control of the design of the entire project and of each Phase through to completion.

_Development Phases / Construction Phases / Project Financing / Masterplanning_

It is anticipated that the Omagine Project will be developed in several phases and each such phase will likely include one or more Sections of construction. It is expected therefore that several tranches of project financing from banks or other financial institutions will occur and several Financing Agreements will likely be executed during the course of the project's phased development and construction. The first Financing Agreement Date occurred on November 29, 2015 with the signing of the Al Rayan Loan agreement but as stated above, because of CCC's default, it was never utilized. In order for the Omagine Project to move forward, RCA must now pay LLC the $20 Million Past-Due RCA Investment and/or LLC must now close an equity investment transaction with a new investor to replace CCC.

Until other Financing Agreements are actually executed by the relevant parties however, no assurance can be given that they actually will be so executed or that Project Financing will be available to LLC. Each such further Financing Agreement, if any, is expected to coincide approximately with the beginning of a new development and construction plans, all of which phases will include design, marketing and one or more new Sections of construction activities. The closing of a tranche of Project Finance whether from banks, investors, financial institutions or from Syndicated Bank Financing will each be memorialized by a separate Financing Agreement.

The November 29, 2015 execution date of the first such Financing Agreement with Masraf Al Rayan is defined in the Shareholder Agreement as the "Financing Agreement Date". The earlier that the Financing Agreement Date occurred, the better it was expected to be for LLC, the Omagine Project, and all concerned for a variety of reasons but this was ultimately complicated by the CCC-Contract delays, CCC's ultimate default and RCA's failure thereafter to pay the $20 Million Past-Due RCA Investment to LLC as described herein and in our prior quarterly and annual reports filed with the SEC. The present liquidity squeeze in GCC banks may continue to have a negative impact on our Project Finance efforts. Notwithstanding the foregoing sentence, the bank with which we are presently negotiating a project finance package does not have such liquidity issues.

No assurance however can be given at this time as to whether the Company will be successful in arranging either Equity Sales or Debt Facilities or in closing the financing facility for the Omagine Project until such events actually happen.

Any reference in this report to a term or condition of the Development Agreement, the Usufruct Agreement and/or the Shareholders Agreement does not purport to be complete and is qualified in its entirety by reference to the full texts of such agreements. The full text of the Development Agreement is attached hereto as Exhibits 10.7 and 99.1. The full text of the Usufruct Agreement is attached hereto as Exhibits 10.8 and 99.2. The full text of the Shareholder Agreement is attached hereto as Exhibit 10.6.

43

The masterplanning of the Omagine Project will not begin until RCA fulfills its $20 million investment obligation pursuant to the Shareholder Agreement or until a new investor to replace CCC is secured. No further feasibility study is presently required or planned for the project as our financial model adequately demonstrates the project's financial feasibility. We may however commission a further feasibility study or an update to the present one depending on future circumstances and/or requirements of lenders. It is presently planned that in parallel with the masterplanning effort we will engage the hospitality, real estate, insurance and marketing consultants to execute various professional studies which will inform the masterplanning process and our business plan. These consultants and advisers all contribute to and inform the masterplanning and final design process for the Omagine Project.

The preliminary master plan along with the various studies and our fleshed-out business plan (which in turn is informed by our now completed Strategic Plan) is expected to be utilized by the financial adviser to drive the Syndicated Bank Financing effort.

During the masterplanning process, exact sizes, shapes and placement of the various project elements (residential, hotels, entertainment, landscape, etc.) are determined and as the master plan evolves and takes shape, the various follow-on Phases of development and construction will also naturally evolve. Simultaneously with these processes, the Financial Adviser will be updating the Omagine Project's financial model to reflect the precise and final constituent project elements along with their projected costs and associated projected revenue streams. Finally, all of the foregoing data and other marketing, sales and strategic planning studies created by or on behalf of LLC are assembled into an "LLC Business Plan". With the LLC Business Plan in hand and with the LLC Financial Adviser in the lead, LLC and the Financial Adviser and other select consultants set about the business of making final presentations to the various banks, with which we are now and will continue to be in touch, with the objective of arranging the Syndicated Bank Financing.

Notwithstanding anything contained in this report regarding possible, proposed or planned (i) sales of equity by OMAG and/or LLC ("Equity Sales"), or (ii) debt facilities with banks, financial institutions or other persons or sale of debt securities by LLC (collectively, "Debt Facilities"), or (iii) Syndicated Bank Financing or Project Finance, no assurance can be given at this time as to whether the Company or LLC will be able to obtain the significant amount of financing and Project Finance necessary over time to execute the development of the Omagine Project.

Over the past many months, we have conducted, and continue to conduct, numerous meetings:

i.   with respect to LLC Equity Sales, with several potential equity investors and developers (including the MENA-Venture Fund, the Singapore Developer and the Dubai Developer) interested in becoming shareholders of LLC, including investment funds, regional developers, and high net-worth individuals from Europe, Asia and several MENA Region countries, and

ii.  with respect to OMAG Equity Sales, with investment funds and high net-worth investors in the U.S., Europe, Asia and the MENA Region interested in becoming shareholders of OMAG, and

iii. with respect to Debt Facilities for LLC other than Syndicated Bank Financing, with several banks and other potential investors in the U.S., Europe, the GCC countries and Oman, and

iv.  with respect to major local, regional and international banks in Oman and the GCC there appeared to be a significant amount of banking liquidity in 2015, but presently the banking liquidity levels are modestly rebounding after being under severe pressure in 2016 primarily as a result of the worldwide drop in the price of crude oil and resulting decrease in deposits into these banks by governments. The large appetite we witnessed in 2015 at such banks for providing Syndicated Bank Financing and Debt Facilities to LLC cooled in 2016 and 2017. Notwithstanding the foregoing, the Qatari bank with which we have discussed a project finance package does not have such liquidity issues.

LLC management and financial executives have held numerous meetings and discussions over the past numerous months with many major local and international banks, the purpose of which, among other things, was to discuss the prospects for such banks providing the Syndicated Bank Financing which is expected to be composed primarily of debt financing from banks. This is a crucial matter to address and accomplish in order to make the Omagine Project a reality. Based on present assumptions, we estimate that LLC's peak Syndicated Bank Financing requirements will be approximately $350 to $400 million during the multi-year development cycle of the Omagine Project.

44

The process of obtaining project financing is not a trivial exercise. It is a time-consuming and complicated process which, when successful, culminates in an event known as a "Financial Close" – usually several Financial Close events - as projects of the size and scope of the Omagine Project are almost always developed in phases. With respect to any proposed Syndicated Bank Financing requirements, the question of whether or not LLC's Land Rights can or will be used by the various banks as collateral to support such Syndicated Bank Financing is therefore of considerable importance. At present LLC management is confident that banks within Oman will use LLC's Land Rights as collateral for bank debt facilities for LLC but we are unclear as to the position of many of the regional and international banks outside of Oman in this regard. We will fully engage in this project financing process after the masterplanning effort is well underway.

The DA addresses this matter in considerable length and clearly contemplates that LLC - as the registered owner of the Land Rights will be granting a security interest in its Land Rights to banks and lenders to the project. The DA further obliges the Government - as the registered owner of the land - to consent to any such grant of a security interest by LLC. (See: Exhibits 10.7 and 99.1, and Clause 22 of the DA - Lenders Security Interest). The DA states in relevant part:

> "... the Government shall enter into Direct Agreements with Lenders acknowledging their rights by way of Security Interests over certain assets of the Project Company including an assignment to the Lenders of the Development Agreement, the Usufruct Agreement, other related agreements, and the Project Assets ..." (See: Exhibits 10.7 and 99.1, Schedule 20 to the DA - Principles of Direct Agreement).

The major Omani banks with which LLC management has met - and with whom we continue to meet and update - have indicated that LLC's Land Rights will be considered by such Omani banks as collateral to support bank financing debt facilities for the Project Finance for the Omagine Project but other non-Omani regional and international banks (including their branches in Oman) have been less forthcoming with definitive answers until they see more details about the nature and extent of LLC's Land Rights.

LLC management is presently confident that the OR 276,666,667 ($718,614,000) value of its Land Rights (which value may be adjusted in 2018 pursuant to an updated land valuation report) will be considered by the Omani banks as collateral for the Syndicated Bank Financing for the Omagine Project but it remains unclear at this stage whether or not banks other than Omani banks will do likewise. Notwithstanding the foregoing statement however, it is not possible at this time to predict with certainty what future events may alter LLC's present assessment of its ability to use its Land Rights to collateralize any bank debt financing including any Syndicated Bank Financing.

*Updated Studies*

In addition to the valuation studies and reports with respect to the Land Rights (See: "The Land Rights", above), management also commissioned:

(i) an updated feasibility study of the Omagine Project by an independent third party which is a professional real estate, tourism and marketing consultant, and

(ii) an updated LLC internal financial model for the Omagine Project by unaffiliated third parties who are expert financial, investment banking and real estate consultants.

Both the updated feasibility study and the financial model have been completed (and may be further updated as and if required) and they will be utilized by LLC to fine tune its development plans, and ultimately by LLC's designated Financial Adviser for the balance of the project in arranging the Syndicated Bank Financing and other financing for LLC as may be required.

OMAG LLC's internal financial model is updated, modified and adjusted from time to time in order to capture what management believes are the then present market realities and projected trends. The financial model is organized to show best case, worst case and probable case scenarios. The most recently updated probable case scenario forecasts substantial net positive cash flows for OMAG LLC over the seven year period subsequent to the signing of the DA and a net present value ("NPV") of the Omagine Project of approximately $1.6 billion dollars. Management believes its financial model assumptions are reasonable but cautions that they may change as new facts and information become available, as the development program and design process unfolds and as market conditions require. It is virtually certain that the various components of the financial model - and therefore the estimates of total cash flow and NPV - will change from time to time in line with market fluctuations and as the project unfolds.

45

The sale of residential and commercial properties is a large revenue driver supporting OMAG LLC's internal financial projections. The OR 276,666,667 average valuation of the Land Rights has had a positive effect on projected revenue at LLC.

*Management cautions that investors should not place undue reliance on the aforementioned financial model projections or on estimates by market participants mentioned herein as all such projections, estimates and forecasts are subject to significant uncertainties and contingencies, many of which are beyond the Company's control, and no assurance can be given that the projections will be realized or that the estimates or forecasts will prove to be accurate. Potential investors are cautioned not to place undue reliance on any such forward-looking statement or forecast, which, unless otherwise noted to the contrary, speaks only as of the date hereof.*

### Off Plan Sales and Land Price Payments

As is present practice in Oman, LLC anticipates that sales contracts with third party purchasers of residential or commercial properties that are purchased "off plan" (i.e. purchased before the construction thereof), will stipulate the payment to LLC by such purchasers of (i) a deposit on signing of such sales contract, and (ii) progress payments during the construction period of the relevant property covered by such sales contract. Since the aggregate of such deposit and progress payments before and during the construction of the relevant property is expected to be approximately 85% of the sales price of the relevant property stipulated in such sales contract, LLC anticipates that (i) the construction costs for properties that are sold "off plan" will be substantially "owner-financed" by the relevant purchaser, and (ii) it will likely be unnecessary therefore for LLC to utilize any or very much Syndicated Bank Financing in order to pay for the construction costs of properties which are sold pursuant to "off plan" sales contracts. Management expects that this commonly accepted sales contract and payment process will significantly benefit LLC by reducing its aggregate requirements for Syndicated Bank Financing from its banks. The consumer appetite for such "off plan" sales is less today than it was in recent years. (See "Market Conditions" below).

Furthermore, Land Price Payments to the Government are not due or owing from LLC until such time as LLC legally transfers the freehold title to land to a purchaser at the time of the closing of the sale of such land. Such closings will only occur after LLC has received final payment of the relevant sales contract amount from the purchaser. LLC's financing profile is therefore further enhanced since it is not obligated to make any Land Price Payments to the Government until after it has already received 100% of the contracted sales price amount from the relevant purchaser at the closing when the freehold title to such land and property is transferred to the purchaser.

### Consolidated Results

The financial results of LLC are included in the consolidated financial results of the Company in accordance with accounting principles generally accepted in the United States. The Company experienced a substantial increase in capital on July 2, 2015 when the Land Rights were registered in LLC's name and later recorded in LLC's and the Company's financial statements. The Company will experience additional substantial increases in capital, if and when further capital increases occur from RCA's payment to LLC of the $20 Million Past-Due RCA Investment and a new investor to replace CCC is secured by LLC and the then appropriate percentage representing OMAG's ownership interest in LLC is recorded in the Company's consolidated financial statements. LLC's ongoing financial results will be included in the consolidated financial statements of the Company as appropriate for as long as OMAG remains a shareholder of LLC.

In addition to the activities mentioned above, the Company's preparations for its future business activities also include, but are not limited to: (i) negotiating various agreements with other major vendors, contractors, consultants and employees proposed to be involved in the Omagine Project, (ii) arranging the appropriate and required legal, accounting, tax and other professional services both in Oman and the U.S., (iii) reviewing and complying (to the extent we are presently able) with the listing requirements of various stock exchanges so we may be prepared to apply for such listing(s) as soon as we are eligible, (iv) examining various other matters we believe will enhance shareholder value, and (v) examining other potential Company revenue streams which are ancillary to, and derivative of, the Omagine Project.

46

The Company plans to enter businesses other than real estate development - and ancillary to, and derivative of, the Omagine Project - and the Company presently expects to generate ongoing revenue streams from such businesses, but no projections of the amount of such revenue, if any, can be made at this time.

Although the Company had previously expected to generate revenue by this time as LLC (i) began reimbursing OMAG for its Pre-Development Expenses, and (ii) begins paying the Success Fee installments to OMAG, such reimbursements for its Pre-Development Expenses are now likely to be delayed and/or possibly altered by the terms of an Amended and Restated Shareholder Agreement (which will not affect the on-demand repayment terms of the Loans and Advances) or until RCA's payment to LLC of the $20 Million Past-Due RCA Investment and a new investor to replace CCC is secured by LLC [See: "Pre-Development Expenses and Loans and Advances to LLC" and "Success Fee" above]. The Company is not expected to generate revenue from sales or operations of properties within the Omagine Project until the development and construction of the Omagine Project is substantially underway. The masterplanning, development and construction of the Omagine Project cannot begin until RCA pays LLC the $20 Million Past-Due RCA Investment and/or a new investor to replace CCC is secured by LLC.

### Financial Adviser

LLC's financial adviser ("Financial Adviser") for the Omagine Project is expected to be a bank or other professional financial consulting company. As such the Financial Adviser will arrange the syndication among several banks of the debt financing ("Syndicated Bank Financing") for the Omagine Project.

We are presently in discussions with a Qatari bank which has already given LLC a "soft commitment" with respect to the provision by it of the debt financing required for the Omagine Project.

Importantly, given the present liquidity issues at local and MENA Region banks, the matter of Project Finance is an issue that has now moved to the forefront of LLC's agenda. While the required Project Finance for the Omagine Project (estimated at approximately $400 million) -- or any project -- is not usually needed until after the masterplanning and design phase is complete or near complete, given present economic strains both developers and contractors are well advised to seek to lock up a Project Finance commitment early on rather than waiting to start a syndication at a later date.

LLC's Financial Adviser will advise on capital structure and lead the arrangement and placement of the Syndicated Bank Financing. LLC will then work together with its Financial Adviser to appoint lead arrangers for such Syndicated Bank Financing which may include the Financial Advisor itself

The amount of Syndicated Bank Financing owed at any one time by LLC to its Lenders is expected to fluctuate over the development and construction cycle of the Omagine Project and will be greatly influenced by (i) any additional Equity Sales at LLC, and (ii) the pace and tempo of LLC's receipt of proceeds from its planned sales of real estate to third parties. The capital of LLC, proceeds from Equity Sales if any, Syndicated Bank Financing and the proceeds from sales of its residential and commercial properties, are expected to be utilized by LLC to develop the Omagine Project.

The maximum amount of such Syndicated Bank Financing presently expected to be outstanding at any one time during the development and construction cycle of the Omagine Project is presently estimated by management to be between $350 million and $400 million.

47

We have had extensive discussions with a number of MENA Region financial institutions with respect to such Syndicated Bank Financing and while they remain interested in discussing the Project Finance for the Omagine Project, almost all such banks confirmed the tightening of bank liquidity due to the current economic climate resulting from the sharply reduced price for crude oil. We are presently in discussions with a Qatari bank which is not experiencing such liquidity issues and which has already given LLC a "soft commitment" with respect to the provision by it of the debt financing required for the Omagine Project. With LLC's Financial Adviser leading this effort, management remains hopeful with respect to LLC's prospects for arranging the Syndicated Bank Financing for the Omagine Project but recognizes that given present economic and market conditions, it is not a trivial task and will be challenging. These discussions are ongoing and cannot be concluded until after the masterplanning of the Omagine Project is well underway and no assurances can be given at this time regarding the outcome, if any, from such discussions. The DA recognizes and addresses this issue when it states, in relevant part:

*"The Government recognizes that the Project Company intends to raise limited recourse financing in relation to the Project and that Lenders may expect to be afforded certain rights in relation to it. Accordingly, the Project Company will by or before the completion of twelve (12) months from the Execution Date [now the Operative Date of July 1, 2015; see Exhibits 10.7, 99.1, 10.8 and 99.2] enter into a written term sheet with the Lenders for the financing of the First Phase, any other phase or all of the Project (a "Term Sheet"). If the Project Company has not delivered a copy of such Term Sheet to the Government by or before the expiry of the twelve (12) month period referred to above, this Development Agreement then shall have no further effect." (See Exhibits 10.7 and 99.1).*

The condition referred to above was fulfilled on November 9, 2015 when LLC entered into a written term sheet with Masraf Al Rayan with respect to the financing of the then planned first phase of the Omagine Project. Unfortunately due to CCC's failure to fulfil its investment obligations under the Shareholder Agreement such financing was never utilized.

MENA Region banks and financial institutions continue to maintain adequate levels of liquidity but the rapid fall in world oil prices is a challenge to those banks whose liquidity relies to a great deal on government deposits resulting from the sale of crude oil. Such new and large government borrowings from commercial banking institutions tend to crowd out commercial borrowing capacity for private companies. The largest banks of course are weathering this storm more handily then the mid-size or smaller banks.

The project financing environment in Oman and the MENA Region continues to remain cautious after the rapid decline of worldwide oil prices which led to the rapid decline of bank deposits being received from governments. LLC management regularly meets with several internationally recognized Financial Advisers, all of whom have deep and wide-ranging expertise in the MENA Region project financing markets and as part of their normal business activities are in regular contact with MENA Region banks and international financial institutions regarding the status of and conditions prevailing in the project finance marketplace. The Company is now cautiously optimistic (but less confident then it had been before the 2015 sudden drop in oil prices) that LLC and its yet to be designated Financial Adviser will be able to arrange the necessary project financing for the Omagine Project. Management believes that all the Financial Advisers and banks with whom it has recently met concur that there is currently still a reasonable degree of liquidity and appetite among MENA Region banks and financial institutions for lending to, and investing in, sound development projects in the MENA Region. Most such persons and institutions however are more cautious than they were in years past because of the recent rapid fall in oil prices and the continuation of the unsettled military activities ongoing in Syria, Iraq, Yemen and Libya.

Notwithstanding the fact that LLC has already received a "soft commitment" with respect to the provision of the debt financing required for the Omagine Project from a Qatari bank without the aforementioned liquidity issues, no assurance can be given at this time that LLC will be able to obtain any, or a sufficient amount of the project financing required to develop, build and complete the Omagine Project. If such a circumstance were to occur, it would have a material adverse effect on our business and operations.

Market Conditions

As previously disclosed and as has been and continues to be widely reported by local and international media and press, the worldwide price of crude oil fell very suddenly and dramatically in 2014 and 2015 (from over $100 per barrel to about $25/$30 per barrel) as robust production in the U.S. and elsewhere created a global glut of crude oil. Presently the price of crude oil is about $55/bbl. Almost all countries in the MENA Region are dependent on the sale of crude oil to support their economies and their government spending programs.

Although MENA Region governments had 100s of billions of dollars of savings in sovereign reserve funds, this oil price shock ushered in an extremely challenging environment for the MENA Region governments and for the companies of all types – including developers and contractors – operating in the MENA region. In reaction to the large, rapid and unexpected drop in crude oil prices, government budgets were slashed across the region; contractors' payments were delayed; and many government sponsored projects were postponed, delayed or cancelled. Payment delays and stalled government projects off the back of the decline in oil prices have severely impacted the entire construction industry in the MENA Region – including in Oman. The Omagine Project however is not a government sponsored project and LLC is a private company.

48

Crude oil prices "seem" to have recently stabilized around the mid $50s per barrel price and a rebalancing of the market "seems to be" is in progress but the knock-on effects of the lower government spending and the delayed payments by MENA Region governments to contractors has had a severe economic impact on local economies and contractors.

Almost all local banking institutions in the MENA Region are dependent on large deposits from oil and gas sales by governments in order to provide the normally excess liquidity apparent in the local banking system prior to this recent dramatic worldwide drop in oil prices. With the sudden fall in deposits from oil sales, bank liquidity at local banking institutions in the GCC and wider MENA Region were under immense pressure as deposits fell dramatically while simultaneously governments became large borrowers where they were not before. Even now some of the largest contractors are experiencing difficulties.

We expect that this sudden business cycle change will eventually right itself as all market participants adapt to the new realities but we are cautiously optimistic, provided RCA pays LLC the $20 Million Past-Due RCA Investment and/or the MENA-Venture Fund, the Singapore Developer, the Dubai Developer or another new investor is secured by LLC to replace CCC, that the Company will be able to convince the Government to waive all past delays and DA defaults, and extend the Operative Date as needed in order for LLC to proceed with the orderly development of the Omagine Project. Because of the significant delays in developing the Omagine Project to date however, tensions are high both in the local market and the Government and no assurance can presently be given that our present plans will succeed. Also, should the current negative economic conditions caused by the drop in oil prices, Government budget reductions and deficits and the GCC-wide liquidity squeeze at banks continue unabated, a knock-on effect in the real estate markets resulting in slower or fewer sales and lower selling prices could occur.

The market intelligence garnered by management indicates that both transaction volume and pricing in the Omani real estate market are stable relative to performance in 2015 and 2016. We are presently unsure what the impact on transaction volume and pricing will be from the fall in crude oil prices but we expect (and presently observe) some softness in the market as all participants adjust to the "new normal" of $40 to $50 crude oil prices. The timing by LLC of its launch of residential and commercial sales at the Omagine Project cannot presently be predicted with any accuracy as it is planned to occur within the first 12 months after RCA pays the $20 Million Past-Due RCA Investment and/or after the closing of an investment with new investor to replace CCC.

Trends in the Omani market during the past few years have indicated a reduced presence of speculative buyers and a reduced consumer appetite for pre-sales of residence units ("off-plan" sales) as buyers now frequently demand a finished product before entering into sales contracts with developers. Although, many societal disorders, military activities and terrorism continue in other parts of the MENA Region, as long as the politically stable and quite safe conditions existing at present in Oman persist then, market conditions should favorably impact LLC's future operations.

Nearby Dubai is experiencing softness in its residential sales and leasing market but in general Dubai's economy (a regional barometer) remains relatively strong and, in certain areas, quite robust. Raw material and labor prices remain somewhat volatile in Oman having recently experienced both downward and upward swings over the past year – but overall construction costs are sharply down due to the severe competition presently in the market among building contractors.

In Iraq, Syria, Yemen and Libya, among other countries, daily violent military clashes and terrorism are now commonplace. Other Arab countries in the MENA Region have experienced and are experiencing demonstrations of discontent with the rule of their heads of state and in some cases these demonstrations are being met with violent pushback by some MENA Region governments but this was not and is not the case in politically and economically stable Oman. Anxiety over the health of His Majesty, the much beloved Sultan Qaboos, and what effect, if any, that will have on Oman's political stability and leadership succession seems to have abated as His Majesty is seen to be actively managing state affairs.

49

Construction material costs and property selling prices in Oman and the surrounding region remain somewhat volatile and because of, among other things, the presently unsettled economic environment, undue reliance on present forecasts should be avoided. Management cautions that future events rarely develop exactly as forecast and the best estimates routinely require adjustment. Management fully expects that its cost estimates for the Omagine Project (and therefore, its financial model) will require adjustment – possibly significant adjustment – as future events unfold. Investors and shareholders are cautioned not to place undue reliance on any such forward-looking statement or forecast, which speaks only as of the date hereof.

Nearby Dubai leads the way for the Gulf tourism market and this is likely to be the case for the foreseeable future, given its existing visitor market, attractions, its impressive future capital development and marketing investment programs, and especially given its recent selection as the host for EXPO 2020 which is expected to attract over 25 million visitors.

Sales and Marketing

After RCA fulfills its past due $20 million investment obligation or after LLC closes an investment transaction to replace CCC as an investor and shareholder, LLC plans to undertake several wide ranging and continuous marketing, advertising, branding and public relations campaigns to establish its brand identity prior to LLC's launch of residential and commercial properties for sale and to advertise and promote its forthcoming entertainment, hospitality and retail offerings.

As we move forward we plan to construct and operate a sales showroom at the Omagine Site. The sales office/showroom will be staffed with experienced real estate sales personnel and will contain large scale models of the Omagine Project and its various components as well as associated collateral sales and marketing materials.

The anticipated launch date for residential and commercial sales was previously planned to be in the first or second quarter of 2018 but the unexpected death of our proposed new investor in LLC has now delayed this launch date further and it is now contingent on the timing (which management is unable to presently estimate) of RCA paying the $20 Million Past-Due RCA Investment to LLC or the closing of an investment transaction with a new investor to replace CCC. Management expects that the relative stability of local real estate markets as well as the Government's continuing improvements to Oman's infrastructure (Muscat International Airport, roads, regional airports, etc.) will contribute positively to LLC's future sales prospects. The impact of the recent fall in crude oil prices and the knock-on economic effects on consumers and government projects is unknown and difficult to predict at this time.

Management expects the Omagine Project to benefit from Dubai's hosting of EXPO 2020, and similarly from nearby Qatar's hosting of the World Cup Games in 2022. Both of these events are expected to attract a huge amount of visitors and tourists. The Omagine Project will be conveniently located one hour from Dubai and Qatar by air and is easily accessible by a fine roadway system in both Oman and the U.A.E. A visit to the Omagine Project will be a natural and logical addition to a Dubai or Qatar visit.

Sale prices and rental rates for housing in other integrated tourism projects in the Muscat area of Oman have remained relatively stable during 2016 and 2017 and as of the date of this report. The inventory of unsold housing in the secondary (re-sale) market (both outside of and within ITCs) has diminished due to recent, albeit quite price-sensitive, sales activity. New housing inventory, especially smaller apartments designed to hit perceived market price-points, has continued to come onto the local Muscat area market and the market absorption rates (number of market transactions) for such new residential housing is strong. The DA allows for sales and pre-sales of any of the residential or commercial buildings that will be developed and built on the Omagine Site.

The DA stipulates the obligation of the Government to issue such Licenses and Permits as may be required for the development of the Omagine Project, including but not limited to issuing an Integrated Tourism Complex License ("ITC License") designating the Omagine Project as an ITC. On June 26, 2014, the Government issued an ITC License to LLC designating the Omagine Project as an ITC.

Non-Omani persons (including expatriates living and working in Oman) are forbidden by Omani law to purchase land, residences or commercial properties in Oman *unless such land, residences or commercial properties are located within an ITC*. Because it is now licensed as an ITC, the land, residences and commercial properties within the Omagine Project may be sold to any buyer worldwide - including any non-Omani buyer - and the freehold title to such land, residences and commercial properties may be transferred to such buyers. Residences in ITCs are viewed to be highly desirable by purchasers (by both investors and owner-occupiers) and ITC residences therefore enjoy a premium selling price relative to non-ITC residences. Purchasers of residences within the Omagine Project (or any ITC) are entitled by Omani Law to be issued a resident visa (for themselves and their immediate family).

50

The excellent location of the Omagine Site is recognized by local market participants and the significance of the provision of the Omagine Site to LLC is substantial. The increase in the value over the last several years of the land constituting the Omagine Site (which value LLC plans to have re-confirmed with an updated valuation report in 2018) has had a positive effect on the valuation of the Land Rights and is expected to have a positive effect on LLC's revenue from the sale of residential and commercial properties. Irrespective of any possible downward re-valuation of the land as a result of our planned 2018 update to our land valuation report, the value of the land constituting the Omagine Site is expected to be a primary driver of future LLC and Company revenue and the benefits accruing to LLC and the Company pursuant to LLC's Land Rights over the Project Land is expected to be material and significant.

Pursuant to the DA and UA, LLC will pay the Government OR 25 ($65) per square meter for the Project Land it sells to third party purchasers. The average valuation for the Land Rights (net of such Land Price) is OR 276,666,667 ($718,614,000) (See: "The Land Rights", above).

Design, Engineering, Construction, Program Management, Content Development

The Company does not presently own or directly operate any design, engineering, content development or construction companies or facilities. With assistance from OMAG via the Loans and Advances, LLC has undertaken many critical tasks as indicated above, but for LLC to fully accomplish its objectives and undertake and finance the Omagine Project, RCA will have to pay LLC the $20 Million Past-Due RCA Investment or LLC will have to close an Equity Sale transaction with a new investor to replace CCC. The failure to date by RCA to pay the $20 Million Past-Due RCA Investment is the sole cause for the past 17 months of delays (subsequent to July 2, 2016) in the Omagine Project masterplanning and development process.

Subject to the approval of its shareholders and to negotiating and agreeing to a contract, LLC intends to hire a design firm, an engineering firm, a program management firm, a construction management firm and a quantity surveying/cost consultant firm.

The interpretive design, entertainment content, and visitor experience design candidates to be hired by LLC have been narrowed to a short list of professional companies. One or more of such companies ("Content Developers") will be engaged by LLC to design the transformation of the Omagine Project's high level strategic vision for the content of the Pearl structures and surrounding areas into physical places offering emotional, intellectual and physical experiences and interactions. Each of the prospective Content Developers has serviced a diverse client base, including theme parks, museums, zoos, aquariums and other such complex entertainment centers around the world, including in the MENA Region, and each continues to regularly produce world class attractions globally of the size and scope of the Omagine Project.

LLC presently intends to hire various local Omani contractors for the construction of the Omagine Project.

To date, OMAG has generally conceived the development concepts and defined the "scope of work" and then, as required, contracted with various designers, architects, contractors and consultants in the United States, Europe and the Middle East to perform those tasks. LLC will engage various firms as its consultants (master planner, engineers, real estate and hospitality consultants, etc.) who will together with management finalize the design for the entire Omagine Project. There are many such consultants available with competitive pricing and the Company does not believe that the loss or inability to perform of any such consultant which it has selected would have a material, adverse impact on its business or operations. The Company believes it maintains a good working business relationship with its consultants. As presently planned, all copyrights to all material documents, designs and drawings executed by such independent designers, architects, contractors and consultants are, or will be, the property of either LLC or OMAG.

51

Results of Operations:

*Overview*

The Company is expected to generate revenue as LLC begins reimbursing OMAG for its Pre-Development Expenses and Loans and Advances and begins paying the Success Fee installments (See: "Pre-Development Expenses and Loans and Advances to LLC" and the "Success Fee", above) but is not expected to generate revenue from operations in the near term until the development of the Omagine Project is substantially underway. The development of the Omagine Project cannot begin until RCA pays LLC the $20 Million Past-Due RCA Investment amount or LLC closes an Equity Sale transaction with a new investor to replace CCC. The Company will need to generate sustainable operating revenue in order to attain its objectives and sustain its operations going forward.

As the development program for the Omagine Project becomes more detailed and as the planning and design processes progress, the estimates of construction and development costs have and will become proportionately more accurate. LLC presently expects, based on the current assumptions underlying its updated development program, that the development costs (including the costs for design, construction, program management and construction management) for the Omagine Project will be between $2.1 and $2.5 billion dollars.

The costs of labor and materials as well as the selling prices and market absorption rates of new residential and commercial properties remain somewhat volatile in Oman and accurate forecasts for such future costs, selling prices or market absorption rates cannot be made at this time. (See "Market Conditions" and "Sales and Marketing", above).

LLC nevertheless presently expects, based on current assumptions and market activity that such residential selling prices during the Omagine Project's planned multiple sales releases will be at least equal to the prices that are presently budgeted by LLC and that total construction costs will be lower.

Beginning in the Company's September 30, 2015 consolidated financial statements and continuing to date, the Company's consolidated financial statements reflect a substantial increase in capital resulting from the inclusion therein as of July 2, 2015 of the value of the Land Rights purchased by LLC. The opinion of our independent auditors in our fiscal year 2016 (and 2015) audited financial statements included in this Report does not contain any expression of concern about our ability to continue as a going concern. In their opinion on our fiscal year 2014 audited financial statements, our auditors expressed substantial doubt about our ability to continue as a going concern but beginning in our September 30, 2015 unaudited quarterly financial statements and continuing through to our September 30, 2017 unaudited financial statements, that expression of concern has been removed.

In the first six months of 2017, OMAG sold (a) an aggregate of 639,948 restricted Common Shares to investors for aggregate proceeds to OMAG of $233,078 and (b) an aggregate of 430,190 restricted Common Shares to the Company's president, vice president and three independent directors for aggregate proceeds to OMAG of $226,000.

The Development Agreement was signed by LLC and the Government of Oman on October 2, 2014. Thereafter the DA was ratified by the Government, the UA was signed by and registered with the Government and LLC's Land Rights were valued by three outside independent experts at an average valuation of seven hundred eighteen million six hundred fourteen thousand dollars ($718,614,000).

The Company is presently holding discussions with RCA with respect to its past due $20 million equity investment into LLC and with the MENA-Venture Fund, the Singapore Developer, the Dubai Developer and other potential investors with respect to the purchase of LLC shares either directly from LLC or from OMAG.

Investors and shareholders should be aware that the execution of the Omagine Project over the multi-year schedule contemplated by the Company will require significant amounts of project financing which is planned to be arranged in several tranches in parallel with the development cycle of the project and no assurance can be given that any or all of such required project financing, including the proposed debt financing with a regional bank, will be able to be obtained by LLC.

Forecasts, projections and assumptions contained and expressed herein were reasonably based on information available to the Company at the time so furnished and as of the date hereof. All such forecasts, projections and assumptions are subject to significant uncertainties and contingencies, many of which are beyond the Company's control, and no assurance can be given that such forecasts, projections or assumptions will be realized. No assurances can be given regarding the achievement of future results, as our actual results may differ materially from our projected future results as a result of the risks we face, and actual future events may differ from anticipated future events because of the assumptions underlying the statements that have been made regarding such anticipated events.

52

**THREE MONTHS ENDED SEPTEMBER 30, 2017 vs.**
**THREE MONTHS ENDED SEPTEMBER 30, 2016**

The Registrant did not generate any revenue or incur any cost of sales during the three month periods ended September 30, 2017 and 2016. The Registrant is relying on Omagine LLC's operations for the Registrant's future revenue generation.

Total selling, marketing, general and administrative operating expenses ("SG&A Expenses") were $370,162 during the three months ended September 30, 2017 compared to $738,590 during the three months ended September 30, 2016. This $368,428 (50%) decrease in SG&A Expenses was attributable to the following expense categories: professional fees ($258,496), commitment fees including stock-based compensation ($150,000), travel ($104,729) and other selling, general and administrative costs ($11,606), offset by increases in officers' and directors' compensation including stock-based compensation ($72,390), consulting fees including stock-based compensation ($83,633) and occupancy costs ($80).

The Registrant sustained a net loss of $500,061 for the three months ended September 30, 2017 compared to a net loss of $677,045 for the three months ended September 30, 2016. This $176,984 (26%) decrease in the Registrant's net loss for the three months ended September 30, 2017 compared to the prior period was principally attributable to the $368,428 decrease in SG&A Expenses mentioned above and an increase in amortization of debt discounts ($54,035), increase in interest expense ($4,208), an increase in extension fees for notes payable of $24,000 and a decrease in net loss attributable to non-controlling interests in LLC ($109,201).

**NINE MONTHS ENDED SEPTEMBER 30, 2017 vs.**
**NINE MONTHS ENDED SEPTEMBER 30, 2016**

The Registrant did not generate any revenue or incur any cost of sales for the nine month periods ended September 30, 2017 and 2016.

Total SG&A Expenses were $1,211,333 during the nine month period ended September 30, 2017 compared to $2,176,004 for the nine months ended September 30, 2016. This $964,671 (44%) decrease was attributable to the following expense categories: consulting fees including stock-based compensation ($286,789), professional fees ($290,357), travel ($243,655), commitment fees including stock-based compensation ($150,000), occupancy ($1,198) and other selling, general and administrative costs ($54,729) offset by increase in officers' and directors' compensation including stock-based compensation ($62,057).

The Registrant sustained a net loss of $1,458,641 for the nine months ended September 30, 2017 compared to a net loss of $2,159,877 for the nine months ended September 30, 2016. This $701,236 (33%) decrease in the Registrant's net loss for the nine months ended September 30, 2017 compared to the prior period was principally attributable to the $964,671 decrease in SG&A Expenses mentioned above and increases in amortization of debt discounts ($89,606), increase in interest expense ($13,706), an increase in extension fees for notes payable of $34,000 and a decrease in net loss attributable to non-controlling interests in LLC ($126,123).

*Liquidity and Capital Resources*

The Registrant incurred net losses of $1,458,641 and $2,159,877 during the nine months ended September 30, 2017 and 2016, respectively. During the nine months ended September 30, 2017, the Registrant had a decrease in cash of $228,712 resulting from the positive cash flow of $178,078 from financing activities offset by a negative cash flow of $406,790 from operating activities. Financing activities for the nine months ended September 30, 2017 consisted of proceeds from the sale of Common Stock of $283,078, proceeds of $185,000 from convertible notes payable offset by payment of four monthly installments totaling $290,000 for the "December 2016 YA Loan".

The Registrant had $0 in capital expenditures for the nine months ended September 30, 2017.

At September 30, 2017, the Registrant had $490,879,879 in current assets, consisting of $490,813,363 of land under development held for sale (See Note 2 to the Registrant's consolidated financial statements), $7,500 prepaid expenses and other current assets, $58,500 of 15% equity interest in Omagine LLC and $516 of cash. The Registrant's current liabilities at September 30, 2017 totaled $2,963,445 consisting of $932,058 of convertible notes payable and accrued interest, $471,290 of notes payable and accrued interest, $1,024,771 of accounts payable and accrued expenses and $535,326 of accrued officers' payroll. At September 30, 2017, the Registrant had working capital of $487,916,434 compared to working capital of $488,376,460 at December 31, 2016. Thirty-two percent (32%) of the $2,963,445 of current liabilities at September 30, 2017 ($962,503) is due and owing to officers and/or directors of the Registrant

53

The $465,029 decrease in the Registrant's working capital at September 30, 2017 compared to December 31, 2016 is attributable to the increase in current liabilities ($300,458) and a decrease in cash ($228,712), offset by the increase in prepaid expenses and other current assets ($5,641) and 15% interest in Omagine LLC ($58,500). The Registrant's liabilities at September 30, 2017 increased compared to December 31, 2016 due to increases in accounts payable, accrued expenses and other current liabilities ($151,666), increases in accrued officers' payroll ($115,700) and convertible notes payable and accrued interest ($248,189, offset by decreases in notes payable and accrued interest ($215,097).

*Warrants*

As of September 30, 2017, OMAG has 6,672,124 Common Stock purchase warrants ("Warrants") issued and outstanding, (a) 3,211,062 of which are exercisable for the purchase of one Common Share at a per Common Share exercise price of $5.00 [the "$5 Warrants"]; (b) 3,211,062 of which are exercisable for the purchase of one Common Share at a per Common Share exercise price of $10.00 [the "$10 Warrants"] [collectively (a) and (b) being the "Strategic Warrants"] and (c) 250,000 of which are exercisable for the purchase of one Common Share at a per Common Share exercise price equal to the greater of: (i) $0.50, or (ii) eighty percent (80%) of the Market Price on the Trading Day immediately preceding the relevant Exercise Date ("Adjustable Warrants").

Management is hopeful that the 6,672,124 outstanding Warrants will eventually become "in the money" and will be exercised which will provide a future source of additional financing for OMAG.

*Strategic Warrants*

Of the 6,422,124 Strategic Warrants distributed, 3,211,062 are exercisable at $5 per Common Share and 3,211,062 are exercisable at $10 per Common Share. On January 14, 2016, OMAG filed a Post-Effective Amendment on Form S-1 (Commission File No. 333-183852) to update the previous registration of all 6,422,124 then issued and outstanding Strategic Warrants and the 6,422,124 Common Shares underlying such Strategic Warrants (the "Updated Warrant Registration"). The SEC declared the Updated Warrant Registration effective January 25, 2016. The effective status of the Updated Warrant Registration expired on October 21, 2016 and the Company intends to file an updated post-effective amendment to maintain the warrants effective status of such registration statement. Pursuant to a Board of Directors resolution dated August 12, 2015, the expiration date of all Strategic Warrants was extended from December 31, 2015 to December 31, 2016 and pursuant to a Board of Directors resolution dated December 9, 2016, the Strategic Warrants were again extended from December 31, 2016 to December 31, 2017. All other terms and conditions of the Strategic Warrants remained unchanged.

*Tempest Warrants*

On June 24, 2014, OMAG issued the 1,000,000 Tempest Warrants to an investor each of which were exercisable for the purchase of one restricted Common Share at a per Common Share exercise price equal to the greater of: (a) $1.00 per Common Share, or (b) 80% of the closing sale price for a Common Share on the Trading Day immediately preceding the relevant exercise date: (See: Exhibit 4.4). Prior to their expiration date, a total of 650,603 Tempest Warrants were exercised for aggregate proceeds to OMAG of $916,540. The remaining 349,397 Tempest Warrants expired unexercised on June 23, 2016. As of the date of this Report there were no Tempest Warrants issued or outstanding.

*Adjustable Warrants*

On October 14, 2016, in connection with a non-interest bearing $75,000 convertible promissory note in favor of Rural Concepts LLC, a British corporation ("Rural Concepts"), OMAG issued 150,000 Adjustable Warrants to Rural Concepts. On April 13, 2017, in connection with a non-interest bearing $100,000 convertible promissory note in favor of an accredited investor, OMAG issued 100,000 Adjustable Warrants to such accredited investor.

54

*Standby Equity Distribution Agreements*

Between 2009 and 2011, OMAG had a Stand-By Equity Distribution Agreement with an affiliate of YA (the "2009 SEDA"). OMAG and YA were parties to a second Stand-By Equity Distribution Agreement (the "2011 SEDA") which was terminated on July 21, 2014. The 2009 SEDA and the 2011 SEDA are collectively referred to herein as the "Prior SEDAs".

On April 22, 2014, OMAG and YA entered into a new Standby Equity Distribution Agreement which was amended on October 10, 2014 (the "2014 SEDA"). The 2014 SEDA is generally on the same terms as the 2011 SEDA.

Any use by OMAG of the 2014 SEDA will be guided by several factors, including but not limited to: (i) the availability and cost of alternative financing, (ii) our ability to rapidly access required financing, (iii) the liquidity and market price of our Common Stock, (iv) the exercise, if any, of Warrants, (v) the likelihood (or actuality) of the success of our present efforts to arrange (a) new equity investments into OMAG and (b) new debt and/or equity investments into LLC, (vi) the likelihood (or actuality) of LLC having the financial capacity to pay OMAG the $10 million Success Fee and the Pre-Development Expense Amount and Loans and Advances in excess of $30 million. (See: "Financial Advisor", and "The Shareholder Agreement", "LLC Capital Structure", "Pre-Development Expenses / Post-DA Pre-Development Expenses", above), and (vii) our then current cash requirements.

Because the market for our Common Stock has historically exhibited low liquidity levels, we may not be able to take full advantage of the 2014 SEDA if such liquidity levels do not improve. If the market for our Common Shares is exhibiting low liquidity levels at the time we give YA an Advance Notice (a "Put") and if YA sells Common Shares into the public market during the five Trading Day Pricing Period subsequent to our Put (as is YA's customary practice), it is likely that the price of our Common Shares will decline. Any such price decline will immediately increase the number of Common Shares we would otherwise be required absent such price decline to deliver to YA subsequent to the Pricing Period in satisfaction of such Put. This is precisely what happened in early October 2017 when a severe liquidity crisis at the Company compelled OMAG to give YA a put for $100,000 which was ultimately satisfied by the issuance to YA of 940,740 Common Shares. If this pattern continued to happen with subsequent Puts by us, it is likely that we would issue and sell to YA the maximum 3,000,000 shares available under the 2014 SEDA before reaching the aggregate sales price of $5 million available under the 2014 SEDA.

LLC is obligated to design, develop and construct the $2.5 billion Omagine Project. Given the size and scope of the Omagine Project, it is expected that LLC will require a minimum of $300 million (possibly up to $500 million) of debt financing / project financing (including the Construction Financing) over various times during the next 4 to 5 years. This Construction Financing requirement will not be addressed by utilizing the 2014 SEDA. Notwithstanding that fact, the Company expects to have substantial and rapidly forthcoming working capital requirements other than the Construction Financing for a portion of which it plans to utilize the 2014 SEDA but no assurance can be given that the Company will be able to obtain the necessary working capital.

Given the considerable resources we will be required to bring to bear to execute the Omagine Project, we presently expect that we will fully utilize the entire $5 million amount available to us under the 2014 SEDA. Such use of the 2014 SEDA will of course be guided by the price, liquidity and volatility of our Common Stock as we move forward. We cannot presently predict what other future sources of financing might become available to us to cause us to utilize less than the full $5 million available under the 2014 SEDA and our present assessment is that, we will surely need the full $5 million available under the 2014 SEDA. The Prior SEDAs indisputably provided the Company the lifeline needed to achieve the DA signing and the 2014 SEDA will likely provide some of the supplementary working capital the Company will need going forward.

Prior SEDAs

The 2009 SEDA expired in 2011. The 2011 SEDA was due to expire on September 1, 2014 but was terminated on July 21, 2014 by the mutual consent of the parties. (See: Exhibit 10.19).

In connection with the 2011 SEDA, OMAG filed with the SEC a registration statement (the "2011 SEDA Registration Statement") on Form S-1 (Commission File No. 333-175168) pursuant to which 3,244,216 Common Shares were registered (including 244,216 Common Shares issued to YA in May and June 2011 in satisfaction of the $300,000 commitment fees due under the 2011 SEDA). Between August 24, 2011 and May 6, 2014, YA purchased 561,690 Common Shares from OMAG under the 2011 SEDA for an aggregate Purchase Price of $835,000 and YA did not thereafter purchase any Common Shares from OMAG under the 2011 SEDA. On July 21, 2014 OMAG filed a post-effective amendment to the 2011 SEDA Registration Statement de-registering the previously registered 2,438,310 Common Shares which were not issued or sold to YA pursuant to the 2011 SEDA. Such post-effective amendment to the 2011 SEDA Registration Statement was declared effective by the SEC on July 25, 2014.

The 2014 SEDA

On April 22, 2014, OMAG, OMAG and YA entered into a new Standby Equity Distribution Agreement which was amended on October 10, 2014 and thereafter amended again on September 20, 2016 to extend the term of the SEDA (the "2014 SEDA"). The 2014 SEDA is generally on the same terms as the 2011 SEDA. Unless earlier terminated in accordance with its terms, the 2014 SEDA shall automatically expire on the earlier of (i) February 1, 2019, or (ii) the date on which YA shall have made payment of Advances pursuant to the 2014 SEDA in the aggregate amount of $5,000,000. In satisfaction of a $150,000 commitment fee due pursuant to the 2014 SEDA, OMAG issued 85,822 restricted Common Shares (the "Commitment Fee Shares") to YA Global II SPV, LLC which is an affiliate of YA (the "Affiliate"). In satisfaction of a $150,000 commitment fee pursuant to the "Second SEDA Amendment" in September 2016, the Company issued 161,290 restricted shares to the Affiliate.

Pursuant to the terms of the 2014 SEDA, OMAG may in its sole discretion, and upon giving written notice to YA (an "Advance Notice"), periodically sell Common Shares to YA ("Shares") at a per Share price ("Purchase Price") equal to 95% of the lowest daily volume weighted average price (the "VWAP") for a Common Share as quoted by Bloomberg, L.P. during the five (5) consecutive Trading Days (as such term is defined in the 2014 SEDA) immediately subsequent to the date of the relevant Advance Notice (the "Pricing Period").

OMAG is not obligated to sell any Shares to YA, but may, over the term of the 2014 SEDA and in its sole discretion, sell to YA that number of Shares valued at the Purchase Price from time to time in effect that equals up to five million dollars ($5,000,000) in the aggregate. YA is obligated under the 2014 SEDA to purchase such Shares from OMAG subject to certain conditions including (i) OMAG filing a registration statement with the SEC to register the resale by YA of the Shares sold to YA under the 2014 SEDA ("Registration Statement"), (ii) the SEC declaring such Registration Statement effective (the date of such declaration by the SEC being the "Registration Effective Date"), (iii) OMAG certifying to YA at the time of each Advance Notice that OMAG has performed all covenants and agreements to be performed and has complied with all obligations and conditions contained in the 2014 SEDA, (iv) periodic sales of Shares to YA must be separated by a time period of at least five Trading Days, and (v) the dollar value of any individual periodic sale of Shares designated by OMAG in any Advance Notice may not exceed the greater of (a) two hundred thousand dollars ($200,000), or (b) the average of the "Daily Value Traded" for each of the five (5) Trading Days immediately preceding the date of the relevant Advance Notice where Daily Value Traded is the product obtained by multiplying the number representing the daily trading volume of Common Shares for such Trading Day by the VWAP for Common Share on such Trading Day.

Pursuant to the 2014 SEDA in no event shall the number of Common Shares issuable to YA pursuant to an Advance cause the aggregate number of Common Shares beneficially owned (as calculated pursuant to Section 13(d) of the Securities Exchange Act of 1934, as amended), by YA and its affiliates to exceed 9.99% of the then outstanding common stock of the Company. In addition this 9.99% ownership cap may not be waived by YA or OMAG and since such ownership cap includes all Common Shares owned by any YA affiliate, such cap cannot be avoided by transferring Common Shares to an affiliate of YA.

In connection with the 2014 SEDA, on October 15, 2014 OMAG filed the Registration Statement on Form S-1 to register the 3,085,822 Common Shares covered by the 2014 SEDA. On January 8, 2015, OMAG filed an amendment to that Registration Statement and such amendment to the 2014 SEDA Registration Statement was declared effective by the SEC on January 22, 2015. Post-Effective Amendments No. 1 and No. 2 to the SEDA Registration Statement were filed with the SEC on December 21, 2015 and January 6, 2016, respectively, to maintain the effectiveness of the SEDA Registration. On January 13, 2016, the SEC declared the SEDA Registration effective which effectiveness expired on October 9, 2016. Post-Effective Amendment No. 3, No. 4 and No. 5 to the SEDA Registration Statement were filed with the SEC on January 10, 2017, February 6, 2017 and February 13, 2017, respectively, to maintain the effectiveness of the SEDA Registration and as of February 13, 2017, the SEC declared the SEDA Registration effective and such effectiveness expired on April 30, 2017. Post-Effective Amendments No. 6 and No. 7 were filed with the SEC on July 17, 2017 and August 22, 2017, respectively, to maintain the effectiveness of the SEDA Registration and as of August 28, 2017, the SEC declared the SEDA Registration Statement effective.

The foregoing summaries of the terms of the Prior SEDAs and of the 2014 SEDA do not purport to be complete and are qualified in their entirety by reference to the full texts of the Prior SEDAs and the 2014 SEDA, copies of which are attached hereto as Exhibits 10.14, 10.15 and 10.18.

Sales of Common Shares to YA pursuant to the Prior SEDAs totaled 561,690 Common Shares for an aggregate Purchase Price of $835,000. Management believes that it has been judicious and conservative in its use to date of the Prior SEDAs, but nonetheless our periodic sales of Common Shares to YA or its affiliate pursuant to the Prior SEDAs have been dilutive to all shareholders and the subsequent resales by YA of such Common Shares into the public market have from time to time inflicted downward pressure on our stock price. OMAG intends to utilize the 2014 SEDA to fund its ongoing operations as and if necessary. As of the date of this Report and pursuant to the 2014 SEDA, Omagine Inc. has sold to YA (a) 181,260 shares of its Common Shares for proceeds of $100,000 and (b) on October 4, 2017 an additional 940,740 Common Shares for proceeds of $100,000.

*The YA Loan Agreements*

OMAG and YA, the investment fund which is a party with OMAG to the 2014 SEDA, entered into an unsecured loan agreement dated July 26, 2013 (the "2013 YA Loan Agreement"). Pursuant to the 2013 YA Loan Agreement, OMAG borrowed two hundred thousand dollars ($200,000) from YA (the "2013 YA Loan") for a term of one year at an annual interest rate of 10%. The 2013 YA Loan Agreement called for a 10% monitoring and management fee equal to $20,000 to be escrowed and paid to Yorkville Advisors thereby making the net proceeds from the 2013 YA Loan to OMAG equal to $180,000. Such $180,000 of proceeds was received by OMAG on September 3, 2013. The 2013 YA Loan Agreement also extended the expiration date of the 2011 SEDA. The foregoing summary of the terms of the 2013 YA Loan Agreement does not purport to be complete and is qualified in its entirety by reference to the full text of the 2013 YA Loan Agreement attached hereto as Exhibit 10.21.

On April 22, 2014, OMAG and YA entered into another unsecured loan agreement (the "2014 YA Loan Agreement") whereby OMAG borrowed five hundred thousand dollars ($500,000) from YA (the "2014 YA Loan") for a term of one year at an annual interest rate of 10%. Pursuant to the 2014 YA Loan Agreement, on April 22, 2014, through deduction from the $500,000 principal balance of the 2014 YA Loan, OMAG (i) paid the $110,680 balance then due under the 2013 YA Loan Agreement, (ii) paid a $39,000 commitment fee with respect to the 2014 YA Loan, and (iii) prepaid the $1,096 of interest due on the 2014 YA Loan for the period April 23, 2014 through April 30, 2014. The $349,224 net proceeds of the 2014 YA Loan was received by OMAG on April 23, 2014. The foregoing summary of the terms of the 2014 YA Loan does not purport to be complete and is qualified in its entirety by reference to the full text of the YA Note Purchase Agreement, the YA Note and the YA Closing Statement attached hereto as Exhibits 10.22; 10.23; and 10.24 respectively. OMAG repaid the 2014 YA Loan pursuant to its terms.

On May 20, 2015, the Company and YA entered into a third loan agreement (the "2015 YA Loan Agreement"). Pursuant to the 2015 YA Loan Agreement, the Company borrowed five hundred thousand dollars ($500,000) from YA (the "2015 YA Loan") for a term of one year at an annual interest rate of 10%. Pursuant to the 2015 YA Loan Agreement the Company agreed to pay a $50,000 commitment fee with respect to the 2015 YA Loan to YA Global II SPV LLC, an affiliate of YA (the "Affiliate"). The $500,000 proceeds of the 2015 YA Loan was received by the Company on May 21, 2015 and the $50,000 commitment fee was paid to the Affiliate. The foregoing summary of the terms of the 2015 YA Loan does not purport to be complete and is qualified in its entirety by reference to the full text of the YA Note Purchase Agreement, the YA Note and the YA Closing Statement attached hereto as Exhibits 10.25; 10.26; and 10.27 respectively.

In 2016, the Company and YA entered into two additional loans. On March 15, 2016, the Company and YA entered into a loan agreement (the "March 2016 YA Loan Agreement"). Pursuant to the March 2016 YA Loan Agreement, the Company borrowed six hundred thousand dollars ($600,000) from YA (now named YA II PN, Ltd.) (the "March 2016 YA Loan") for a term of one year at an annual interest rate of 10%. Pursuant to the March 2016 YA Loan Agreement the Company agreed to pay off the $150,575 balance due as of March 15, 2016 under the 2015 YA Loan Agreement and to pay a $60,000 commitment fee with respect to the March 2016 YA Loan to YA Global II SPV LLC, the Affiliate. At the closing on March 15, 2016 of the March 2016 YA Loan, the appropriate amounts representing the balance due under the 2015 YA Loan Agreement and the commitment fee for the March 2016 YA Loan were deducted from the $600,000 principal balance of the March 2016 YA Loan and paid to YA and the Affiliate. The $349,425 proceeds of the March 2016 YA Loan were received by the Company on March 15, 2016. The foregoing summary of the terms of the March 2016 YA Loan does not purport to be complete and is qualified in its entirety by reference to the full text of the YA Note Purchase Agreement, the YA Note and the YA Closing Statement attached hereto as Exhibits 10.28; 10.29; and 10.30 respectively.

On June 22, 2016, the Company and YA entered into another loan agreement (the "June 2016 YA Loan Agreement"). Pursuant to the June 2016 YA Loan Agreement, the Company borrowed four hundred thousand dollars ($400,000) from YA (the "June 2016 YA Loan") for a term of one year at an annual interest rate of 10%. Pursuant to the June 2016 YA Loan Agreement the Company agreed to pay a $40,000 commitment fee with respect to the June 2016 YA Loan to the Affiliate. At the closing on June 22, 2016 of the June 2016 YA Loan, the commitment fee for the June 2016 YA Loan was deducted from the $400,000 principal balance of the June 2016 YA Loan and paid to the Affiliate. The $360,000 proceeds of the June 2016 YA Loan was received by the Company on June 22, 2016. The foregoing summary of the terms of the June 2016 YA Loan does not purport to be complete and is qualified in its entirety by reference to the full text of the YA Note Purchase Agreement, the YA Note and the YA Closing Statement attached hereto as Exhibits 10.38; 10.39; and 10.40 respectively.

On December 7, 2016, the Company and YA entered into another loan agreement (the "December 2016 YA Loan Agreement"). Pursuant to the December 2016 YA Loan Agreement, the Company borrowed seven hundred fifty thousand dollars ($750,000) from YA (the "December 2016 YA Loan") for a term of one year at an annual interest rate of 10%. Pursuant to the December 2016 YA Loan Agreement the Company agreed to pay off the aggregate of the $432,710 balance due as of December 7, 2016 under the March 2016 YA Loan Agreement and the June 2016 Loan Agreement and to pay a $75,000 commitment fee with respect to the December 2016 YA Loan to YA Global II SPV LLC, an affiliate of YA (the "Affiliate"). At the closing on December 7, 2016 of the December 2016 YA Loan, the appropriate amounts representing the balances due under the March 2016 YA Loan and the June 2016 YA Loan and the commitment fee for the December 2016 YA Loan were deducted from the $750,000 principal balance of the December 2016 YA Loan and paid to YA and the Affiliate. The $242,290 proceeds of the December 2016 YA Loan were received by the Company on December 7, 2016.

The foregoing summary of the terms of the December 2016 YA Loan does not purport to be complete and is qualified in its entirety by reference to the full text of the YA Note Purchase Agreement, the YA Note and the YA Closing Statement attached hereto as Exhibits 10.45; 10.46; and 10.47 respectively. The December 2016 YA Loan represents less than one half of one percent (0.5%) of the total assets of the Registrant and its consolidated subsidiaries. On October 11, 2017, the Registrant received a default notice from Yorkville Advisors Global, LP on behalf of YA regarding the Registrant's failure to make the December 2016 YA Loan installment payments due on June 7, 2017 and thereafter. The past due principal and interest as of September 30, 2017 was $471,290. Registrant and YA are presently negotiating an amicable arrangement to resolve this matter. The Registrant presently anticipates that the December 2016 YA Loan will be repaid from funds received by the Registrant from (i) the MENA Venture Fund, or (ii) the payment by RCA to LLC of the $20 Million Past-Due RCA Investment (and the subsequent partial payment to OMAG of a portion of the Loans & Advances); or proceeds of sales of Common Shares made pursuant to (a) private placement transactions, (b) the exercise of Warrants, or (c) the 2014 SEDA, or a combination thereof.

There can be no assurance given that OMAG will be able to successfully utilize the Warrants or the 2014 SEDA to secure the interim financing necessary for it to execute its business plan as presently conceived or that we will be able to repay the December 2016 YA Loan.

On November 14, 2016, the Company entered into an interest free Convertible Promissory Note with St. George Investments LLC for the principal amount of $185,000 due on May 16, 2017, six months from the funding date of November 16, 2016, convertible into the Company's Common Stock only in the case of non-payment or in the Event of Default at a Conversion Price equal to 60% of the three lowest daily Volume Weighted Average Prices for the Company's Common Stock during the twenty trading days immediately preceding the Conversion. The Company may prepay the Note in whole or in part at any time without penalty. After deduction of a $30,000 original issue discount (OID) and legal fees of $5,000, the Company received net proceeds of $150,000 on November 16, 2016. (See: Exhibits 10.42 and 10.43, the Note Purchase Agreement and the Securities Purchase Agreement). On May 10, 2017, the Company and St. George Investments LLC executed an amendment to the $185,000 Convertible Promissory Note dated November 14, 2016 extending the May 16, 2017 Maturity Date to July 17, 2017. In consideration of the extension, the Company paid $10,000 to St. George Investments LLC. (See: Exhibit 10.50, Amendment to Convertible Promissory Note). In July 2017, August 2017, September 2017, October 2017 and November 2017 the Company and St. George Investments LLC again extended the Maturity Date of the Note to August 17, 2017, September 17, 2017, October 17, 2017, November 17, 2017 and December 17, 2017 respectively, in consideration of extension fees paid to St. George of $8,000 for each of the July, August, September, October 2017 and November 2017 extensions. (See: Exhibits 10.52, 10.53, 10.54 and 10.55 ). OMAG presently anticipates that the Convertible Promissory Note with St. George Investments LLC will be repaid from funds received by the Company from (i) the MENA-Venture Fund, or (ii) the payment by RCA to LLC of the $20 Million Past-Due RCA Investment (and the subsequent partial payment to OMAG of a portion of the Loans & Advances).

On May 8, 2017, the Company entered into a Convertible Promissory Note with JSJ Investments, Inc., an accredited investor, for the principal amount of $100,000 with interest at 12% per annum, due February 7, 2018 and convertible into the Company's Common Stock after 180 days from the Issuance Date at a conversion price equal to 60% of the lowest trading price of the Common Stock during the twenty day period prior to the conversion. The Company may prepay the Note in full together with any accrued interest before the Prepayment Date which occurs 180 days after the Issuance Date with a premium sliding cash redemption scale: the Company may prepay the Note in full until the 90ᵗʰ day after the Issuance Date at a cash redemption premium of 125% in addition to outstanding interest; from the 91ˢᵗ day to the 120ᵗʰ day after the Issuance Date, the prepayment premium is 135%, and from the 121ˢᵗ day to the Prepayment Date of November 7, 2017, the prepayment premium is 140%. (See: Exhibit 10.49, the Convertible Promissory Note ). On November 3, 2017, the Company paid in full the $145,885 due pursuant to the JSJ Investments Inc. Convertible Promissory Note consisting of the $100,000 principal amount, $5,885 in accrued interest and the cash redemption premium of $40,000.

Omagine, Inc. and Auctus Fund, LLC ("Auctus"), an accredited investor, entered into a convertible promissory note dated October 6, 2017 (the "Auctus Convertible Note" or the "Note") for the principal amount of $57,750. The Maturity date of the Note is July 6, 2018 and the Note may be prepaid at any time on or before April 6, 2018 with interest at 12% per annum and prepayment penalties ranging from 35% to 50% of the principal. The Note is convertible into the Company's Common Stock after 180 days from the Issuance Date at a conversion price equal to the lower of the Trading Price on the latest complete Trading Day prior to the date of this Note and fifty percent of the lowest Trading Price for the Common Stock during the twenty-five consecutive Trading Days ending on the latest complete Trading Day prior to the Conversion Date. The Company received the $45,000 net proceeds of the Note on October 16, 2017. OMAG presently anticipates that the Auctus Convertible Note will be repaid from funds received by the Company from (i) the MENA-Venture Fund, or (ii) the payment by RCA to LLC of the $20 Million Past-Due RCA Investment (and the subsequent partial payment to OMAG of a portion of the Loans & Advances).

Omagine, Inc. and EMA Financial, LLC ("EMA"), an accredited investor, entered into a convertible promissory note dated September 28, 2017 (the "EMA Convertible Note" or the "Note") for the principal amount of $55,000. The Note is due September 28, 2018 with interest at 12% per annum and convertible into the Company's Common Stock after 180 days from the Issuance Date at a conversion price equal to the lower of the closing sale price for the Common Stock on the Principal Market on the Trading Day immediately preceding the Closing Date, and fifty percent of either the lowest sale price for the Common Stock on the Principal Market during the twenty-five consecutive Trading Days including and immediately preceding the Conversion Date, or the closing bid price. The Company received the $44,500 net proceeds of the Note on October 18, 2018. OMAG presently anticipates that the EMA Convertible Note will be repaid from funds received by the Company from (i) the MENA-Venture Fund, or (ii) the payment by RCA to LLC of the $20 Million Past-Due RCA Investment (and the subsequent partial payment to OMAG of a portion of the Loans & Advances).

Omagine, Inc. and an individual accredited investor entered into a convertible promissory note dated November 2, 2017 for the principal amount of $146,000 (the "November 2 Note"). The November 2 Note is due December 8, 2017 with interest at 12% per annum and convertible into the Company's Common Stock beginning on December 8, 2017 at a conversion price of $0.10 per Common Share, and beginning on December 15, 2017, the outstanding balance plus accrued interest on the Note is convertible into the Company's Common Stock at a conversion price of $0.05 per share. During the conversion period of the Note, on or after December 8, 2017 or December 15, 2017 as the case may be, the accredited investor shall be entitled to convert the Note at a conversion price of less than $0.10 or $0.05 as the case may be should any common stock purchase from the Company, or any exercise of Company stock options or warrants fall below the $0.10 or $0.05 conversion price of the Note then in effect. On November 2, 2017 in connection with the $146,000 note, OMAG modified the accredited investor's (i) April 13, 2017 promissory note (as amended September 12, 2017) by reducing the conversion price from $0.20 per share to $0.10 per share, (ii) modified the July 3, 2017 promissory note by reducing the conversion

price from $0.15 to $0.10 per share, and (iii) modified the April 13, 2017 Warrant by extending the exercise date from December 31, 2017 to June 30, 2018, allowing for a cashless exercise of the Warrant, and changing the exercise price with a variable feature (the greater of 80% of the market price on the trading day preceding the relevant exercise date, or $0.50 per share) to an exercise price of $0.50 per share. OMAG presently anticipates that the November 2 Note will be repaid from funds received by the Company from (i) the MENA-Venture Fund, or (ii) the payment by RCA to LLC of the $20 Million Past-Due RCA Investment (and the subsequent partial payment to OMAG of a portion of the Loans & Advances).

59

*Omagine LLC*

LLC presently has limited and strained resources.

OMAG invested the OMR 20,000 cash [\$52,000] OMAG Initial Equity Investment into LLC upon its organization and pursuant to the Shareholder Agreement the following additional investments have been made to date into LLC:

  i.   a further OMR 130,000 [\$338,000] cash investment was made by the LLC Shareholders, and

  ii.  a further OMR 210,000 [\$546,000] cash investment was made by OMAG, and

  iii. a further OMR 276,666.667 [\$718,614,000] non-cash investment was made by RCA.

LLC is presently capitalized at OMR 277,026,667 [\$719,550,000]. Notwithstanding the foregoing, LLC presently has limited cash resources because expenses incurred to date have depleted LLC's limited cash capital.

As of the date hereof OMAG has satisfied in full its obligation pursuant to the Shareholder Agreement.

RCA is presently obligated to make its Deferred Cash Investment into LLC in the aggregate amount of OR 7,640,625 [\$19,865,625]. This amount is the \$20 Million Past-Due RCA Investment.

The OMR 276,666.667 [\$718,614,000] investment of the Land Rights into LLC by RCA was perfected on July 2, 2015 concurrent with the registration of the Usufruct Agreement with the Oman Ministry of Housing (See: "The Land Rights", above).

The continuation of LLC's business to date is being and has been financed by OMAG.

LLC will have to arrange for payment of the \$20 Million Past-Due RCA Investment and an Equity Sale to a new LLC investor as mentioned above and for a significant amount of project financing, including most probably Syndicated Bank Financing, in order to execute its plan to develop the Omagine Project. *Until Financing Agreements with respect to such additional financing are actually executed by the parties, no assurance can be given that they actually will be so executed or that such project financing will be available to LLC.* (See "Financial Advisor", above). The Company is relying for revenue growth upon the future business of LLC.

*Omagine Inc.*

In order to generate the cash needed to sustain the Company's ongoing operations, OMAG has over the past many years relied on the proceeds from the YA Loans, other loans and from sales of Common Shares made pursuant to the 2014 SEDA and Prior SEDAs and the 2012 rights offering as well as from sales of restricted Common Shares and notes made pursuant to private placements. Management is hopeful that the Warrants will provide a future source of additional financing but it is not possible to predict if any of our Warrants will ever be exercised. Company management has continually pressed RCA during 2017 to pay the \$20 Million Past-Due RCA Investment to LLC which is long overdue. As of the date hereof RCA has not yet done so. In spite of their present obligation to make such payment, RCA has indicated that they would do so when the new investor to replace CCC is secured. In order to maintain both OMAG and LLC in existence, OMAG took on substantially more bridge financing debt during 2017 in order to plug the financing gap caused by RCA's lack of payment of its obligations. Much of this bridge financing debt carries onerous repayment terms and highly dilutive conversion features. The Company presently anticipates it will be able to repay this bridge financing debt in cash (and avoid any dilutive conversions) only if we are able to close all or a portion of the anticipated \$20 million investment with the MENA-Venture Fund by no later than mid-December 2017 or if RCA pays the \$20 Million Past-Due RCA Investment by such date (which seems unlikely). If RCA would pay such \$20 Million Past-Due RCA Investment as they are obligated to then this bridge financing debt issue – and all other issues preventing the start of the project development – would be instantly resolved.

Investors and shareholders should be aware that we have had no revenue for the past several years and we do not expect to generate any revenue until after the development of the Omagine Project is well underway.

**The failure to receive funds from RCA or the MENA-Venture Fund as indicated above or the failure to arrange further bridge financing as necessary to sustain operations until such funds are received will have a materially significant adverse effect on the Company's ability to continue operations.**

*Capital Expenditures and Construction Financing*

The Company did not incur any capital expenditures in the first nine months of 2017. We expect, assuming we are able to close one or more of the debt or equity financing necessary to begin the project development that we are presently working on, that (i) the Company will incur significant expenses related to capital expenditures, and (ii) LLC will incur substantial debt associated with project financing for the Omagine Project.

We presently expect that such capital expenditures will be largely concentrated at LLC and will largely comprise the purchase by LLC and OMAG of the quantities of office equipment, furniture, vehicles, computer hardware and software and telecommunications equipment which will be necessary to service the expanded staff and offices required at both LLC and OMAG to manage the ramping up of our business operations in Oman and the U.S.

We presently expect that such capital expenditures will be financed:

i.   at OMAG via the proceeds from sales of Common Shares via the 2014 SEDA, the exercise of Warrants, private placement sales of restricted Common Shares, and the payments received from LLC with respect to the Success Fee, the Pre-Development Expense Amount and the Advances and Loans, and

ii.  at LLC through a combination of invested capital, Equity Sales, bank loans and project finance Debt Facilities (See: "Business – The Shareholder Agreement / LLC Capital Structure," and "Masterplanning/Equity Sales/Debt Facilities/Project Financing").

No assurance can be given that such financing will be available to the Company at either OMAG or LLC.

We presently expect that any future project financing requirements (including any Syndicated Bank Financing) for LLC will be placed with regional and international banks as arranged by LLC with the assistance of its Financial Adviser. LLC's requirement for project financing is expected to be reduced by its ability to pre-sell residence and commercial units by entering into sales contracts with third party purchasers and receiving deposits and progress payments during the construction of such units. Recent trends in the Omani market however have indicated a reduced consumer appetite for pre-sales of residence units as many more buyers are now demanding a finished product before entering into sales contracts with developers. (See: "Financial Advisor" and "Market Conditions" and "Sales & Marketing").

61

*Off-Balance Sheet Arrangements*

We have not entered into and have no present intention of entering into any off-balance sheet financing arrangements. We have not formed and have no present intention of forming any special purpose entities.

**Item 3 - Quantitative and Qualitative Disclosures about Market Risk**

Information required under this caption is not required for the Registrant since it is a smaller reporting company.

**Item 4 - Controls and Procedures**

**Management's Evaluation of Disclosure Controls and Procedures**

The Company's disclosure controls and procedures are designed to ensure that information required to be disclosed by the Company in this report is recorded, processed, summarized and reported, within the time periods specified in the SEC's rules and forms. Such controls also include, without limitation, controls and procedures designed to ensure that information required to be disclosed by the Company is accumulated and communicated to the Registrant's management, including its principal executive and principal financial officers or persons performing similar functions, as appropriate, to allow timely decisions regarding required disclosure.

Under the supervision and with the participation of management, including the Registrant's chief executive and financial officer, the Company carried out an evaluation of the effectiveness of the design and operation of such disclosure controls and procedures as of the end of the period covered by this report (the "DCP Evaluation").

Based on this DCP Evaluation, the Registrant's principal executive and principal financial officer has concluded that our disclosure controls and procedures were effective as of September 30, 2017.

**Changes in Internal Control Over Financial Reporting**

There were no changes during the Company's last fiscal quarter that materially affected or are reasonably likely to materially affect the Company's internal control over financial reporting.

62

## PART II – OTHER INFORMATION

### Item 1 - Legal Proceedings

The Company is not presently a party to any legal proceedings which would have a material adverse effect on it or its operations.

### Item 1A - Risk Factors

There have been no material changes to the Risk Factors as previously disclosed under Item 1A to Part 1 of our annual report on Form 10-K for the fiscal year ended December 31, 2016 filed with the SEC on April 14, 2017.

### Item 2 - Unregistered Sales of Equity Securities and Use of Proceeds

In connection with the Prior SEDAs and with the issuance by us of the Adjustable Warrants and the Common Shares listed below, we relied upon the exemption from securities registration afforded by Section 4(2) of the Securities Act. No advertising or general solicitation was employed in offering the securities. The offerings and sales were made to a limited number of persons, all of whom were accredited investors, business associates of our Company or executive officers or directors of our Company and transfer was restricted by our Company in accordance with the requirements of the Securities Act. In addition to representations by the below-referenced persons, we made independent determinations that all of the below-referenced persons were accredited or sophisticated investors, that they were capable of analyzing the merits and risks of their investment and that they understood the speculative nature of their investment. Furthermore, all of the below-referenced persons were provided with access to our SEC filings.

On January 4, 2017, OMAG contributed 123,782 restricted Common Shares at the non-discounted valuation of $76,250 to all eligible employees of the Omagine, Inc. 401(k) Plan.

On January 4, 2017, OMAG issued 81,169 restricted Common Shares valued at $50,000 to each of the Corporation's three independent directors based on the $0.616 closing price of the Corporation's Common Stock on December 30, 2016.

On January 13, 2017, OMAG sold 18,051 restricted Common Shares to an accredited investor for proceeds of $10,000

On January 20, 2017, OMAG sold 25,000 restricted Common Shares to an accredited investor for proceeds of $12,500.

On January 25, 2017, OMAG sold 20,000 restricted Common Shares to an accredited investor for proceeds of $10,000

On February 1, 2017, the president of the Company purchased 100,000 restricted Common Shares based on the $0.62 closing price of OMAG's Common Stock on January 31, 2017 minus the Finnerty discount of 18% for proceeds of $51,000.

On February 2, 2017, three independent Company directors each purchased 94,340 restricted Common Shares and the Company's vice president purchased 47,170 restricted Common Shares based on the $0.6414 closing price of OMAG's Common Shares on February 1, 2017 minus the Finnerty discount of 18% for aggregate proceeds of $175,000.

On February 21, 2017, OMAG sold 200,000 restricted Common Shares to an accredited investor for proceeds of $100,000.

On March 31, 2017, the Company issued 93,750 restricted shares of Common Stock to its investor relations vendor as payment in full for $37,500 of services rendered for the period January 1, 2016 through March 31, 2017, and issued an additional 56,250 restricted shares of Common Stock to the same vendor as payment in full for $22,500 of services to be rendered for the period April 1, 2017 through December 31, 2017.

On April 4, 2017, the Company sold 266,667 restricted Common Shares to an accredited investor for proceeds of $80,000.

On April 11, 2017, pursuant to the SEDA, OMAG sold 132,275 Common Shares to YA for proceeds of $50,000.

On May 30, 2017, the Company sold 25,253 restricted Common Shares to an accredited investor for proceeds of $7,500.

On June 6, 2017, the Company sold 64,977 restricted Common Shares to an accredited investor for proceeds of $10,000.

On June 7, 2017, the Company sold 20,000 restricted Common Shares to an accredited investor for proceeds of $3,078.

On October 4, 2017, pursuant to the SEDA, OMAG sold 940,740 Common Shares for proceeds of $100,000.

63

*Use of Proceeds*

The proceeds of the abovementioned sales of securities were used by the Company for general corporate working capital purposes.

*Issuer Purchases of Equity Securities*

The Company did not purchase any of OMAG's issued and outstanding Common Shares during the nine month period ended September 30, 2017.

**Item 3 - Defaults upon Senior Securities**

None.

**Item 4 - Mine Safety Disclosures**

Not Applicable.

**Item 5 - Other Information**

None.

**Item 6 - Exhibits**

The following exhibits are included as part of this Form 10-Q. References to "OMAG" in this Exhibit List means Omagine, Inc., a Delaware U.S. corporation.

Exhibits numbered in accordance with Item 601(a) of Regulation S-K.

| Exhibit Numbers | Description |
|---|---|
| 3(i) | Restated Certificate of Incorporation of OMAG dated June 2, 2010 (7) |
| 3(ii) | By-laws of OMAG (1) |
| 4.1 | The Subscription and Warrant Agent Agreement dated January 31, 2012 between OMAG and Continental Stock Transfer & Trust Company (11) |
| 4.2 | Specimen of SS Warrant Certificate (11) |
| 4.3 | Specimen of $10 Warrant Certificate (11) |
| 4.4 | The Tempest Warrants (12) |
| 10.1 | The December 9, 2007 CCIC and CCC Agreement (3) |
| 10.2 | The March 19, 2007 Hamdan Agreement (2) |
| 10.3 | The December 2013 amendment extending the March 19, 2007 Hamdan Agreement (19) |
| 10.4 | The December 2014 amendment extending the March 19, 2007 Hamdan Agreement (22) |
| 10.5 | The December 2015 amendment extending the March 19, 2007 Hamdan Agreement (34) |
| 10.6 | The April 20, 2011 Shareholder Agreement (9) |
| 10.7 | The Development Agreement dated October 2, 2014 (20) |
| 10.8 | The Usufruct Agreement Dated July 1, 2015 (23) |
| 10.9 | An English Translation of the Letter Dated July 2, 2015 (23) |
| 10.10 | Convertible Promissory Note payable to Frank J. Drohan (14) |
| 10.11 | Convertible Promissory Note payable to Charles P. Kuczynski (14) |
| 10.12 | Convertible Promissory Note No. 1 payable to Louis Lombardo (14) |
| 10.13 | Convertible Promissory Note No. 2 payable to Louis Lombardo (14) |
| 10.14 | The December 8, 2008 SEDA Agreement between OMAG and YA (4) |
| 10.15 | The May 4, 2011 SEDA Agreement between OMAG and YA (8) |
| 10.16 | The June 21, 2011 Amendment Agreement to the May 4, 2011 SEDA Agreement (10) |
| 10.17 | The May 22, 2012 Waiver Letter dated re: the May 4, 2011 SEDA Agreement (13) |
| 10.18 | The April 22, 2014 SEDA Agreement between OMAG and YA (18) |
| 10.19 | The July 16, 2014 Termination Agreement terminating the May 4, 2011 SEDA Agreement (17) |
| 10.20 | The October 10, 2014 SEDA Amendment (21) |
| 10.21 | The 2013 YA Note Purchase Agreement and Amended Schedule III thereto (16) |
| 10.22 | The 2014 YA Note Purchase Agreement dated April 22, 2014 (18) |

10.23    The April 22, 2014 OMAG $500,000 Promissory Note in favor of YA (18)

10.24    The April 22, 2014 Closing Statement signed by OMAG and YA (18)

10.25    The 2015 YA Note Purchase Agreement dated May 20, 2015 (24)

10.26    The May 20, 2015 OMAG $500,000 Promissory Note in favor of YA (24)

64

| Exhibit Numbers | Description |
| --- | --- |
| 10.27 | The May 20, 2015 Closing Statement signed by OMAG and YA (24) |
| 10.28 | The March 2016 YA Note Purchase Agreement dated March 15, 2016 (26) |
| 10.29 | The March 15, 2016 OMAG $600,000 Promissory Note in favor of YA (26) |
| 10.30 | The March 15, 2016 Closing Statement signed by OMAG and YA (26) |
| 10.31 | The Omagine Inc. 401(k) Adoption Agreement (5) |
| 10.32 | The Amended Omagine Inc. 2003 Stock Option Plan (6) |
| 10.33 | The Omagine Inc. 2014 Stock Option Plan (19) |
| 10.34 | The Amended Omagine Inc. 2014 Stock Option Plan (25) |
| 10.35 | Lease expiring December 31, 2015 between OMAG and the Empire State Building LLC (15) |
| 10.36 | The Masraf Al Rayan Term Sheet (27) |
| 10.37 | The Murabaha Facility Agreement between LLC and Masraf Al Rayan Bank (27) |
| 10.38 | The June 2016 YA Note Purchase Agreement dated June 22, 2016 (28) |
| 10.39 | The June 22, 2016 OMAG $400,000 Promissory Note in favor of YA (28) |
| 10.40 | The June 22, 2016 Closing Statement signed by OMAG and YA (28) |
| 10.41 | The September 20, 2016 SEDA Amendment Agreement between OMAG and YA (29) |
| 10.42 | The November 14, 2016 Convertible Promissory Note between OMAG and St. George Investments LLC (30) |
| 10.43 | The November 14, 2016 Note Purchase Agreement between OMAG and St. George Investments LLC (30) |
| 10.44 | Convertible Promissory Note payable to SMAT Inc. (32) |
| 10.45 | Note Purchase Agreement dated December 7, 2016 by and between OMAG and YA II PN, Ltd. (31) |
| 10.46 | Promissory Note in the principal amount of $750,000 dated December 7, 2016 and issued by OMAG in favor of YA II PN, Ltd. (31) |
| 10.47 | Closing Statement dated December 7, 2016 signed by Omagine, Inc. and YA II PN, Ltd. (31) |
| 10.48 | The December 2016 amendment extending the March 19, 2007 Hamdan Agreement (33) |
| 10.49 | The May 8, 2017 Convertible Promissory Note between OMAG and JSJ Investments Inc. (34) |
| 10.50 | The May 10, 2017 Amendment to Convertible Promissory Note between OMAG and St. George Investments LLC (34) |
| 10.51 | The July 3, 2017 Convertible Promissory Note payable to an Accredited Investor (35) |
| 10.52 | The July 12, 2017 Amendment to Convertible Promissory Note between OMAG and St. George Investments LLC (36) |
| 10.53 | The August 14, 2017 Amendment to Convertible Promissory Note between OMAG and St. George Investments LLC (36) |
| 10.54 | The September 14, 2017 Amendment to Convertible Promissory Note between OMAG and St. George Investments LLC * |
| 10.55 | The October 16, 2017 Amendment to Convertible Promissory Note between OMAG and St. George Investments LLC * |
| 10.56 | The November 13, 2017 Amendment to Convertible Promissory Note between OMAG and St. George Investments LLC * |
| 10.57 | The September 28, 2017 Convertible Promissory Note between OMAG and EMA Financial LLC (37) |
| 10.58 | The September 28, 2017 Securities Purchase Agreement between OMAG and EMA Financial LLC (37) |
| 10.59 | The October 6, 2017 Convertible Promissory Note between OMAG and Auctus Fund, LLC (38) |
| 10.60 | The October 6, 2017 Securities Purchase Agreement between OMAG and Auctus Fund, LLC (38) |
| 10.61 | The September 15, 2017 Convertible Promissory Note payable to an Accredited Investor * |
| 10.62 | The November 2, 2017 Convertible Promissory Note payable to Accredited Investor * |
| 10.63 | The November 2, 2017 Amendment to Accredited Investor Warrant * |
| 10.64 | The November 2, 2017 Amendment to Convertible Promissory Note payable to Accredited Investor * |
| 10.65 | The November 2, 2017 Second Amendment to Convertible Promissory Note payable to Accredited Investor * |
| 14 | The Code of Ethics (3) |
| 22.1 | Subsidiaries of the Registrant (14) |
| 31.1 | Sarbanes-Oxley 302 certification * |
| 32.1 | Sarbanes-Oxley 1350 certification * |
| 99.1 | A PDF Reference Copy of Exhibit 10.7, Development Agreement (20) |
| 99.2 | A PDF Reference Copy of Exhibit 10.8, Usufruct Agreement (23) |
| 99.3 | A PDF Reference Copy of the Original Arabic Version of Exhibit 10.9 (23) |
| 99.4 | The Saville Final Valuation Report (23) |
| 99.5 | The C&W Final Valuation Report (23) |
| 99.6 | The TLI Final Valuation Report (23) |

EX-101.INS  XBRL INSTANCE DOCUMENT *
EX-101.SCH  XBRL TAXONOMY EXTENSION SCHEMA DOCUMENT *
EX-101.CAL  XBRL TAXONOMY EXTENSION CALCULATION DOCUMENT *

EX-101.DEF  XBRL TAXONOMY EXTENSION DEFINITION DOCUMENT*
EX-101.LAB  XBRL TAXONOMY EXTENSION LABELS DOCUMENT*
EX-101.PRE  XBRL TAXONOMY EXTENSION PRESENTATION DOCUMENT*

*      Filed herewith

65

(1)  Previously filed with the SEC on November 18, 2005 as an exhibit to Omagine's quarterly Report on Form 10-QSB for the period ended September 30, 2005 and incorporated herein by reference thereto.

(2)  Previously filed with the SEC on April 17, 2007 as an exhibit to the Company's Report on Form 10-KSB for the fiscal year ended December 31, 2006 and incorporated herein by reference thereto.

(3)  Previously filed with the SEC on April 14, 2008 as an exhibit to Omagine's Report on Form 10-KSB for the fiscal year ended December 31, 2007 and incorporated herein by reference thereto.

(4)  Previously filed with the SEC on December 31, 2008 as an exhibit to Omagine's current Report on Form 8-K and incorporated herein by reference thereto.

(5)  Previously filed with the SEC on February 25, 2009 as an exhibit to Omagine's Report on Form 10-K for the fiscal year ended December 31, 2008 and incorporated herein by reference thereto.

(6)  Previously filed with the SEC on April 14, 2010 as an exhibit to Omagine's Report on Form 10-K for the fiscal year ended December 31, 2009 and incorporated herein by reference thereto.

(7)  Previously filed with the SEC on July 20, 2010 as an exhibit to Omagine's Report on Form 10-Q for the period ended June 30, 2010 and incorporated herein by reference thereto.

(8)  Previously filed with the SEC on May 5, 2011 as an exhibit to Omagine's current Report on Form 8-K and incorporated herein by reference thereto.

(9)  Previously filed with the SEC on November 8, 2011 as an exhibit to Omagine's quarterly Report on Form 10-Q for the period ended September 30, 2011 and incorporated herein by reference thereto and a reference copy was filed as an exhibit to Omagine's current Report on Form 8-K filed with the SEC on May 31, 2011.

(10) Previously filed with the SEC on June 21, 2011 as an exhibit to Omagine's current Report on Form 8-K and incorporated herein by reference thereto.

(11) Previously filed with the SEC on February 7, 2012 as an exhibit to Omagine's registration statement on Form S-1/A (File No. 333-179040) and incorporated herein by reference thereto.

(12) Previously filed with the SEC on January 17, 2012 as an exhibit to Omagine's registration statement on Form S-1 (Commission File No. 333-179040) and incorporated herein by reference thereto.

(13) Previously filed with the SEC on September 12, 2012 as an exhibit to Omagine's Post-Effective Amendment No. 2 to its registration statement on Form S-1 (File No. 333-175168) and incorporated herein by reference thereto.

(14) Previously filed with the SEC on January 22, 2013 as an exhibit to Omagine's Amendment Number 2 on Form 10-K/A amending (a) Omagine's Report on Form 10-K. filed with the SEC on April 16, 2012 for the fiscal year ended December 31, 2011 (the "Original Filing"), and (b) Amendment No. 1 to the Original Filing filed on Form 10-K/A with the SEC on May 17, 2012, and incorporated herein by reference thereto.

(15) Previously filed with the SEC on April 1, 2013 as an exhibit to Omagine's Report on Form 10-K for the fiscal year ended December 31, 2012 and incorporated herein by reference thereto.

(16) Previously filed the 2013 YA Note Purchase Agreement with the SEC on August 5, 2013 as an exhibit to the Company's quarterly Report on Form 10-Q for the period ended June 30, 2013 and it is incorporated herein by reference thereto; and previously filed the Amended Schedule III to the 2013 YA Note Purchase Agreement with the SEC on November 19, 2013 as an exhibit to the Company's quarterly Report on Form 10-Q for the period ended September 30, 2013 and it is incorporated herein by reference thereto.

(17) Previously filed with the SEC on July 31, 2014 as an exhibit to Omagine's quarterly Report on Form 10-Q for the period ended June 30, 2014 and incorporated herein by reference thereto.

(18) Previously filed with the SEC on April 28, 2014 as an exhibit to the Company's current Report on Form 8-K and incorporated herein by reference thereto.

(19) Previously filed with the SEC on April 15, 2014 as an exhibit to the Company's Report on Form 10-K for the fiscal year ended December 31, 2013 and incorporated herein by reference thereto.

66

(20) Previously filed with the SEC on October 2, 2014 as an exhibit to Omagine's current Report on Form 8-K and incorporated herein by reference thereto.

(21) Previously filed with the SEC on October 10, 2014 as an exhibit to Omagine's current Report on Form 8-K and incorporated herein by reference thereto.

(22) Previously filed with the SEC on January 8, 2015 as an exhibit to Omagine's registration statement on Form S-1/A (File No. 333-199383) and incorporated herein by reference thereto.

(23) Previously filed with the SEC on July 9, 2015 as an exhibit to Omagine's current Report on Form 8-K and incorporated herein by reference thereto.

(24) Previously filed with the SEC on May 21, 2015 as an exhibit to Omagine's current Report on Form 8-K and incorporated herein by reference thereto.

(25) Previously filed with the SEC on November 23, 2015 as an exhibit to the Company's Report on Form 10-Q for the period ended September 30, 2015 and incorporated by reference thereto.

(26) Previously filed with the SEC on March 16, 2016 as an exhibit to the Company's current Report on Form 8-K and incorporated herein by reference thereto.

(27) Previously filed with the SEC on April 14, 2016 as an exhibit to the Company's Report on Form 10-K for the fiscal year ended December 31, 2015 and incorporated herein by reference thereto.

(28) Previously filed with the SEC on June 23, 2016 as an exhibit to the Company's current report on Form 8-K and incorporated herein by reference thereto.

(29) Previously filed with the SEC on September 21, 2016 as an exhibit to the Company's current report on Form 8-K and incorporated herein by reference thereto.

(30) Previously filed with the SEC on November 21, 2016 as an exhibit to the Company's Report on Form 10-Q for the period ended September 30, 2016 and incorporated by reference thereto.

(31) Previously filed with the SEC on December 8, 2016 as an exhibit to the Company's current report on Form 8-K and incorporated herein by reference thereto.

(32) Previously filed with the SEC on January 10, 2017 as an exhibit to Omagine's registration statement on Form S-1/A (File No. 333-199383) and incorporated herein by reference thereto.

(33) Previously filed with the SEC on February 6, 2017 as an exhibit to Omagine's registration statement on Form S-1/A (File No. 333-199383) and incorporated herein by reference thereto.

(34) Previously filed with the SEC on May 22, 2017 as an exhibit to the Company's report on Form 10-Q for the period ended March 31, 2017 and incorporated herein by reference thereto.

(35) Previously filed with the SEC on July 17, 2017 as an exhibit to the Company's registration statement on Form S-1/A (File No. 333-199383) and incorporated herein by reference thereto.

(36) Previously filed with the SEC on August 21, 2017 as an exhibit to the Company's report on Form 10-Q for the period ended June 30, 2017 and incorporated herein by reference thereto.

(37) Previously filed with the SEC on October 18, 2017 as an exhibit to the Company's current report on Form 8-K and incorporated herein by reference thereto.

(38) Previously filed with the SEC on October 19, 2017 as an exhibit to the Company's current report on Form 8-K and incorporated herein by reference thereto.

67

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

OMAGINE, INC.
(Registrant)

Dated: November 20, 2017

By: /s/ Frank J. Drohan
FRANK J. DROHAN,
Chairman of the Board of Directors, President and
Chief Executive and Financial Officer
(Principal Executive Officer and
Principal Financial Officer)

Dated: November 20, 2017

By: /s/ William Hanley
WILLIAM HANLEY
Controller and Principal Accounting Officer

68